















AXR   7/22/02   15:19

3:01-CV-00410   PEREZ V. CITY OF ESCONDIDO

*127*

*P/A.*

ORIGINAL
FILED

1  JEFFREY R. EPP, City Attorney (SBN 123565)
   MARK A. WAGGONER, Asst. City Attorney (SBN 111205)
2  OFFICE OF THE CITY ATTORNEY
   201 N. Broadway
3  Escondido, California 92025
   (760) 839-4608 Tel.

4
   Attorneys for Defendants City of Escondido,
5  Duane White, Officer J. Murphy, Sergeant Lanigan;
   Keith Sudak; Damian Torres; Steve La Marca;
6  Steve Sanders; Mike Nelson; Marco Sevilla

02 JUL 22  PH 2: 43

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:_____ DEPUTY

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11 | JAVIER PEREZ, a minor [sic]; YESENIA      | CASE NO.:   '01-CV-0410-K (AJB)
   | PEREZ, a minor; and ESTELA PEREZ, an
12 | individual,                                | DEFENDANTS OFFICER J. MURPHY,
   |                                            | STEVE LA MARCA, MARCO SEVILLA,
13 |                     Plaintiffs,            | MIKE NELSON, STEVE SANDERS,
   |                                            | SERGEANT LANIGAN, DAMIAN TORRES,
14 | v.                                         | KEITH SUDAK, DUANE WHITE, AND CITY
   |                                            | OF ESCONDIDO'S' MEMORANDUM OF
15 | CITY OF ESCONDIDO, a governmental entity;  | POINTS AND AUTHORITIES IN SUPPORT
   | ESCONDIDO POLICE DEPARTMENT, a             | OF MOTION FOR SUMMARY
16 | governmental entity [sic]; DUANE WHITE, an | ADJUDICATION AND SUMMARY
   | individual; OFFICER J. MURPHY, an          | JUDGMENT
17 | individual; SERGEANT LANIGAN, an
   | individual; KEITH SUDAK; DAMIAN            | DATE:       August 26, 2002
18 | TORRES; STEVE LAMARCA; STEVE               | TIME:       11:00 a.m.
   | SANDERS; MIKE NELSON; MARCO                | JUDGE:      Judith N. Keep
19 | SEVILLA and DOES 7 through 10,

20                     Defendants.

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///            127

28 ///

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................ 1
II.  THE PLEADINGS.................................................................................... 1
III.  STATEMENT OF FACTS ...................................................................... 2
    A.  Plaintiff Javier, Drunk and Under the Influence of Methamphetamine, Calls 911........................................................... 2
    B.  The Officers Arrive at the Scene and Develop a Plan of Action ................ 3
    C.  The Shooting .......................................................................................... 5
    D.  Officers Render First Aid to Plaintiff Javier........................................... 10
    E.  Defendants' Involvement (Or Lack Thereof) at the Scene ...................... 12
IV.  ARGUMENT ............................................................................................ 14
    A.  Summary Adjudication of the First Cause of Action............................... 14
        1.  Excessive Force......................................................................... 14
        2.  Unlawful Search........................................................................ 27
        3.  Summary:  Regarding the First Cause of Action ......................... 29
        4.  Qualified Immunity................................................................... 30
        5.  Alternative Relief:  Summary Adjudication of An Issue ............. 34
    B.  Summary Adjudication of the Second and Third Causes of Action ......... 34
    C.  Summary Adjudication of the Fourth, Fifth, and Sixth Causes of Action 36
    D.  Summary Adjudication of the Seventh Cause of Action .......................... 38
    E.  Summary Adjudication of the Eighth and Ninth Causes of Action .......... 39
    F.  Summary Adjudication of the Tenth Cause of Action.............................. 40
    G.  Summary Adjudication of the Eleventh Cause of Action......................... 41
    H.  Summary Judgment of the Complaint ..................................................... 41
V.  CONCLUSION.......................................................................................... 41

# TABLE OF AUTHORITIES

## Federal Cases

Act Up!/Portland v. Bagley, 988 F.2d 868 (9th Cir. 1998)................................................. 30

Alexander v. City and County of San Francisco, 29 F.3d 1355 (9th Cir. 1994)............ 26, 27

Anderson v. Creighton, 483 U.S. 635 (1987) ............................................................... 30, 31

Archuleta v. McShan, 897 F.2d 495 (10th Cir. 1990) ......................................................... 35

Billington v. Smith (9th Cir. 2002) 2002 WL 1349566, p. 9 ............................................... 23

City of Canton v. Harris, 489 U.S. 378 (1989) ................................................................... 27

City of Los Angeles v. Heller, 475 U.S. 796 (1986)............................................................ 27

Coon v. Ledbetter, 780 F.2d 1158 (5th Cir. 1986).............................................................. 35

Cuningham v. Gates, 229 F.3d 1271 (9th Cir. 2000)............................................ 14, 18, 23, 33

Daniels v. Williams, 474 U.S. 327 (1986) ........................................................................... 22

Duran v. City of Maywood, 221 F.3d 1127 (9th ir. 2000)............................................... 22, 23

Edwards v. City of Philadelphia, 860 F.2d 568 (3d Cir. 1988)............................................ 15

Florida v. Bostick, 501 U.S. 429 (1991) ............................................................................. 21

Gooden v. Howard County, Maryland, 954 F.2d 960 (4th Cir. 1992)............................. 30, 31

Graham v. Connor, 490 U.S. 386 (1989) ....................................................... 14, 18, 23

Harris v. Pirch, 677 F.2d 681 (8th Cir. 1982) ....................................................... 15, 20, 25

Herpel v. Joyce, (Dist.Ct.Conn. 1992) [Civil No. B:89-669 (JAC)] 1992 WL 336765 (D.Conn.).. 31

Hunter, 502 U.S. at 228, 112 S.Ct. at 537........................................................................... 30

Jeffers v. Gomez 267 F.3d 895 (9th Cir. 2001) ....................................................... 20, 21, 25, 32

Jones v. Williams, 286 F.3d 1159 (9th Cir. 2002) ................................................... 14, 16, 28

Malley v. Briggs, 475 U.S. 335 (1986) ............................................................................... 30

McKinney v. DeKalb County, Georgia, 997 F.2d 1440 (11th Cir. 1993) .............................. 15

Michigan v. Long, 463 U.S. 1032 (1983) ...................................................................... 28, 29

Miller v. Taylor, 877 F.2d 469 (6th Cir. 1989)................................................................... 15

Monell v. Department of Social Services, 436 U.S. 658 (1978)........................... 20, 25, 26

Murdock v. Stout, 54 F.3d 1437 (9th Cir. 1995)................................................................. 31

Quezada v. County of Bernalillo, 944 F.2d 710 (10th Cir. 1991) ........................................ 22

Quintinilla v. City of Downey, 84 F.3d 353 (9th Cir. 1996)................................................. 27

Rascon v. Hardiman, 803 F.2d 269 (7th Cir. 1986)....................................... 2, 15, 20, 25

Reynolds v. County of San Diego, 84 F.3d 1162 (9th Cir. 1996)................................. 30, 37, 38

Reynolds v. County of San Diego, 858 F.Supp. 1064, 1074-1075 (U.S. Dist. Ct., S.D. Ca., 1994) 37

Rizzo v. Goode, 423 U.S. 362 (1976)......................................................................... 20, 25

Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691 (1st Cir. 1994) ..................... 15, 30, 31

Saucier v. Katz, 533 U.S. 194 (2001) ..................................................................... 19, 32, 34

Scott v. Henrich, 39 F.3d 912 (9th Cir. 1994)..................................................................... 22

Terry v. Ohio, 392 U.S. 1 (1968) .................................................................. 21, 28, 29

U.S. v. Summers, 268 F.3d 683 (9th Cir. 2001) ................................................................. 21

Unterreiner v. Volkswagen, 8 F.3d 1206 (7th Cir. 1993) .................................................... 25

Watson v. Interstate Fire & Casualty Co., 611 F.2d 120 (5th Cir. 1980) ............................ 15

Wing v. Britton, 748 F.2d 494 (8th Cir. 1984). .................................................................. 15

## State Cases

Cervantez v. J.C. Penney Co., 24 Cal.3d 579 (1979)........................................................... 38

Christensen v. Superior Court, 54 Cal.3d 868 (1991)........................................................... 39

Edson v. City of Anaheim, 63 Cal.App.4th 1269 (1998)............................................ 15, 36, 37

Ess v. Eskaton Properties, Inc., 97 Cal.App.4th 120 (2002)................................................ 39

Fife v. Astenius, 232 Cal.App.3d 1090 (1991) .................................................................... 38

Susag v. City of Lake Forest, 94 Cal.App.4th 1401 (2002)........................ 14, 17, 18, 25, 36, 40

///

**Federal Statutes**

42 USC § 1983 ........................................................................................................ 15, 20, 25

**State Statutes**

California Government Code § 815.2 ........................................................................... 37
California Government Code § 820.2 ........................................................................... 37
California Government Code § 820.8 ........................................................................... 36
California Penal Code § 835a ...................................................................................... 36

# I.

## INTRODUCTION

Plaintiff Javier Perez alleges that he was subjected to excessive force by numerous officers of the City of Escondido's Police Department. His mother, Estela Perez, and his sister, Yesenia Perez, allege various causes of action along with Plaintiff Javier. The case arises out of a shooting which occurred after Javier admittedly got high on methamphetamine and drunk and then accidentally dialed 911 on his phone. When he hung up after the initial 911 call, the police dispatcher dialed his number to see if someone there needed assistance. After Javier answered, he told the dispatcher he was high and drunk and that he had a loaded gun. He stated that his mother and sister were home but refused to let the dispatcher talk to them.

Officers were sent to the scene. After refusing to follow the dispatcher's instructions to leave the gun inside, Plaintiff Javier walked outside with the gun in his hand. Plaintiff Javier does not remember raising the gun, but every officer on the scene says he raised it and pointed it directly at several officers. The threat from Plaintiff Javier appeared real and every officer there feared for the safety of himself and/or the officers present. The threat developed so fast it left the officers with no time to do anything but fire in response, and no time to issue warnings that deadly force was about to be used. Two officers—Defendant Damian Torres and Defendant Keith Sudak—fired their weapons once each, and Plaintiff Javier was struck by two bullets. None of the other officers fired. The only other physical contact between any of the other officers and Plaintiff Javier was the placement and removal of handcuffs on Plaintiff Javier, a brief pat down search for weapons, and the administration of first aid by the officers in an attempt to save Plaintiff Javier's life. Plaintiffs allege 11 causes of action against each of the officers that were on the scene during the shooting incident. Because they did nothing while there that violated anybody's constitutional rights or was tortious in any way, they are entitled to summary judgment.

## II.

## THE PLEADINGS

Plaintiffs have sued every officer who was at the scene at the time of the shooting naming every officer in every cause of action. Thus, Plaintiffs have made no distinction between the

officers who never fired a weapon and never touched Plaintiff; and those who only touched him to render first aid; and Officer Murphy who only conducted a pat down search; and Officer Sevilla who only handcuffed him; and Officers Torres and Sudak who shot him.  Plaintiffs have sued Defendants not only for excessive force but also for illegal searches that they had nothing to do with and a host of other equally groundless causes of action.  Further, it is difficult to determine from the Second Amended Complaint whether Plaintiffs are suing Chief White in his official capacity only, or in both his individual and official capacity.  This motion, therefore, will treat both.

"To the extent that [Chief White] is sued in his official capacity, this action operates as a claim against the governmental entity itself." Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir. 1986).  Therefore, throughout this motion when addressing the defenses of Chief White in his official capacity and the City , the brief will simply address the City of Escondido in the singular even though the arguments apply to, and are on behalf of, both the City and Chief White in his official capacity.  Whenever this brief discusses "Chief White's" defenses, it will be addressing Chief White as he is being sued in his individual capacity.

### III.

### STATEMENT OF FACTS

**A.    Plaintiff Javier, Drunk and Under the Influence of Methamphetamine, Calls 911**

On the night of March 10/11, 2000, the night of the subject incident, Plaintiff Javier admittedly got high on methamphetamine and drunk and then accidentally dialed 911 on his phone. (Separate Statement of Undisputed Facts "SSF" No. 1; See Plaintiff's Second Amended Complaint at p. 7, line 21; Declaration of Wilma Daubman, **Exh. J.**)  When he hung up after the initial 911 call, the dispatcher dialed his number to see if someone needed assistance.  (SSF No. 2; Dec. of Wilma Daubman, **Exh. J.**)  After Javier answered, he told the dispatcher he was high and drunk and that he had a loaded gun.  (SSF No. 3; Dec. of Wilma Daubman, **Exh. J.**)  Javier stated that his mother and sister were home but he refused to let the dispatcher talk to them.  (SSF No. 4; Dec. of Wilma Daubmun, **Exh. J.**)  During the ensuing conversation with the dispatcher, Plaintiff Javier said "send the fucking pigs, I'm ready . . . fucking ready, blast those motherfuckers."  The dispatcher then asked Mr. Perez if he had a gun and he said he did.  She asked him if he had it in his

1  hands and he responded "Hell yeah, no pigs going . . . can't take me to fucking jail or whatever."

2  She asked what kind of gun it was and he responded "a fucking handgun, what do you think?"

3  (SSF No. 5, Dec. of Wilma Daubman, **Exh. J.**)

4  **B.      The Officers Arrive at the Scene and Develop a Plan of Action**

5          Officers Murphy, LaMarca, Sevilla, Nelson, Sanders, Torres and Sudak all responded to the

6  scene. (SSF No. 6, Decs. of Justin Murphy, Steve La Marca, Marco Sevilla, Mike Nelson, Steve

7  Sanders, Damian Torres and Keith Sudak, **Exhs. A-E, G and H.**) Defendant Sgt. James Lanigan

8  also responded to the call as a Field Supervisor and, upon arrival, exercised that authority.  (SSF

9  No.7; Dec. of James Lanigan, **Exh. F.**)  When they arrived, the information the officers had from

10  dispatch was that there was a 16-year old male in the house who had been "tweaking"

11  (consumption of methaphetamine) and drinking.  (SSF No.8, Decs. of Justin Murphy, Steve La

12  Marca, Marco Sevilla, Mike Nelson, Steve Sanders, James Lanigan, Damian Torres and Keith

13  Sudak, **Exhs. A-H.**)  The male suspect had said something to the effect that he "just didn't care

14  anymore" and he had a loaded handgun.  The officers were also aware that there were other family

15  members in the house and that the suspect refused to allow the dispatch operator to speak to them.

16  The officers were concerned for the family.  (SSF No.9, Decs. of Justin Murphy, Steve La Marca,

17  Marco Sevilla, Mike Nelson, Steve Sanders, James Lanigan, Damian Torres and Keith Sudak,

18  **Exhs. A-H.**)  Sgt. Lanigan did not know if the family members were injured or being threatened.

19  He felt that the officers needed to act relatively quickly to get the teenager out of the house,

20  separated from the family, so the officers could check on *their* welfare.  (SSF No. 10; Dec. of James

21  Lanigan, **Exh. F.**)

22          After the officers arrived at the scene in front of Javier's house, they reported to Defendant

23  Sgt. James Lanigan.  (SSF No.11, Decs. of Justin Murphy, Steve La Marca, Marco Sevilla, Mike

24  Nelson, Steve Sanders, James Lanigan, Damian Torres and Keith Sudak, **Exhs. A-H.**)  Defendant

25  Lanigan discussed a plan of action with the officers and assigned them various roles. (SSF 12; Dec.

26  of James Lanigan, **Exh. F.**)

27          Defendant Lanigan assigned Officer Murphy and Officer La Marca to the "arrest team."  In

28  this role, they were to position themselves at the top of the driveway near the garage door on the

1  side of the driveway furthest from where the front walk to the house met the top of the driveway.

2  Officer Torres had a rifle and was positioned across the street where he could see the front door and

3  front walk and provide cover for the other officers.  Officer Sudak and Sanders were also providing

4  cover from positions in the street, behind vehicles parked parallel to the curb in front of the Perez

5  home.  Defendant Lanigan as well as Officer Nelson and Sevilla positioned themselves near the

6  bottom of the Perez driveway.  Officer Nelson was to provide cover while Defendant Lanigan was

7  to provide lighting by shining his flashlight on Javier if and when he came out.  And, if and when

8  the suspect came out of the house, Officer Sevilla was to give him appropriate commands including

9  direction for Javier to walk down the driveway toward Officer Sevilla.  Defendants Murphy and La

10  Marca would then be in position to approach Javier from behind and place him in custody as

11  necessary.[1]  (SSF No.13, Decs. of all officers, **Exhs. A-I.**)

12        Defendant Lanigan is a sergeant with the Escondido Police Department.  He is 43 years old

13  and began his police career in 1985.  He became a Field Training Officer in August of 1992 and

14  was assigned to the Special Investigations Unit in October of 1993.  In January 1996, he was

15  assigned to the Juvenile/Sex Crimes Unit as a full-time detective.  Thereafter, he was promoted to

16  Sergeant in July of 1998.  (SSF No. 14 ; Dec. of James Lanigan, **Exh. F.**)  During his 17 years of

17  experience as a police officer, Defendant Lanigan has been involved in scores of instances where

18  officers were called out to a scene where someone was upset and/or intoxicated by drugs and/or

19  liquor or was otherwise mentally unstable and was inside a structure threatening himself/herself or

20  others with a weapon.  (SSF  15; Dec. of James Lanigan, **Exh. F.**)  In a relatively looser vernacular,

21  Defendant Lanigan describes those instances as "surround and call" situations.  The common police

22  response used in each such situation, although adapted to the particular situation at hand, was to

23  surround the structure and then contact the suspect—usually by phone—and ask him/her to come

24  outside. (SSF 16; Dec. of James Lanigan, **Exh. F.**)  The tactics used by Defendant Lanigan in

25  deploying the officers around the Perez residence and assigning them various roles and asking

26  dispatch to ask Plaintiff Javier to come out without his weapon were consistent with the surround

27

28  
[1]    Attached to the Declaration of Justin Murphy as **Exh. A-1** is a diagram which accurately depicts the general physical layout of the scene and the positions of the officers as Justin Murphy recalls them. (Dec. of Justin Murphy, **Exh. A.**)

1  and call tactics employed in those score of prior situations.  Each of those prior situations resolved

2  without significant incident.  None of them resulted in a shooting incident.  (SSF 17; Dec. of James

3  Lanigan, **Exh. F.**)

4        Prior to taking up their positions, Defendants Sgt. Lanigan, Murphy and La Marca went to

5  the top of the driveway where an exterior light was affixed to the house and was illuminating the

6  driveway.  Defendant Murphy gave Defendant La Marca a boost and Defendant La Marca

7  unplugged the light.  They did this as a precaution so that if the suspect attempted to shoot at, or

8  assault the officers, he would have difficulty seeing them.  (SSF No. 18; Decs. of Justin Murphy and

9  Steve La Marca, **Exhs. A and B**.)  And, prior to taking up his position Defendant Murphy heard a

10  dispatch communication that the suspect had a prior arrest on record for violation of California

11  Penal Code section 12020 (possession of an unlawful weapon).  (SSF No. 19; Dec. of Justin

12  Murphy, **Exh. A.**)

13  **C.**   **The Shooting**

14        Defendant La Marca was in position next to Defendant Murphy who was next to the garage

15  door.  Defendant Murphy, a 31-year-old officer who began his police career in 1986 was in position

16  with his service weapon when he heard someone say "the door is opening".  Several seconds later

17  Defendant Murphy saw Javier step out from around the corner of the garage.  Defendant Murphy

18  could see that Javier had a phone in his right hand and handgun in his left hand.  (SSF No. 20; Dec.

19  of Justin Murphy, **Exh. A.**)  Defendant Murphy yelled to the other officers that the suspect had a

20  gun.  (SSF No. 21; Dec. of Justin Murphy, **Exh. A.**)

21        Defendant La Marca, 39 years-old and an officer since 1992, also saw Javier begin to

22  emerge from around the corner of the garage.  (SSF No. 22; Dec. of Steve LaMarca, **Exh. B.**)

23  Defendant LaMarca heard someone yell "he's got a gun" and Murphy and La Marca saw Javier

24  extend his arm directly out from his chest and point it in the direction of the officers at the foot of

25  the driveway.  (SSF No. 23; Decs. of Justin Murphy and Steve La Marca, **Exhs. A** and **B.**)

26  Defendants Murphy and La Marca thought Javier was intentionally pointing the weapon and was

27  going to shoot.  (SSF No. 24; Decs. of Justin Murphy and Steve La Marca, **Exhs. A** and **B.**)

28  Defendants Murphy and La Marca were concerned for the safety of the officers at the scene but

1 could not shoot because they did not have a clear view of Javier's body. (SSF No. 25; Decs. of

2 Justin Murphy and Steve La Marca, **Exhs. A** and **B.**) Defendants Murphy and La Marca were the

3 two officers closest to Javier. Defendants Murphy and La Marca had a clear view of Javier's gun

4 from no more than 18 feet away. It appeared to Defendants Murphy and LaMarca to be a real,

5 semiautomatic handgun. (SSF No. 26; Decs. of Justin Murphy and Steve La Marca, **Exhs. A** and

6 **B.**) Defendants Murphy and La Marca then heard gunfire and Plaintiff Javier went down.

7     Defendants Lanigan, Sevilla, and Nelson were near the bottom of the Perez driveway when

8 Plaintiff Javier came out of the house. Defendant Sevilla, a 34-year-old bi-lingual officer who has

9 been with the City since 1994, saw that a light came on from the porch area of the house. He called

10 out "Javier" to Plaintiff. (SSF No. 27; Dec. of Marco Sevilla, **Exh. C.**) He then saw Javier emerge

11 from around the corner of the garage. Defendants Sevilla and Lanigan could not see the left side of

12 Javier or Javier's left arm or hand. They could see that Javier had a phone in his right hand and that

13 he was holding it up to his ear in a position to be talking on the phone. (SSF No. 28; Decs. of

14 Marco Sevilla and James Lanigan, **Exhs. C and F.**) Defendant Lanigan shined his flashlight on

15 Javier and Defendant Sevilla called to Javier, "let me see your hands." Knowing that Javier had

16 been on the phone with a dispatch operator for approximately 20 minutes, Defendant s Lanigan and

17 Sevilla believed that Javier knew that the commands were coming from a police officer. They had

18 not heard any dispatch of contrary information. (SSF No. 29; Decs. of James Lanigan and Marco

19 Sevilla, **Exhs. C and F.**) Plaintiff Javier stepped another pace forward and Defendant Sevilla could

20 see that Javier was holding a gun in his left hand. Virtually simultaneously, as soon as the

21 flashlight came on, Defendant Sevilla yelled out to the officers "he's got a gun," and Javier lifted

22 the gun and pointed it at Defendants Sevilla's, Nelson's, and Lanigan's position. (SSF No. 30

23 Decs. of James Lanigan, and Marco Sevilla, **Exhs. C and F.**) Defendants Sevilla and Lanigan

24 feared for their safety and that of the other officers. Defendant Sevilla immediately began to back

25 up, trying to move as rapidly as possible behind a nearby camper. As he did so, he heard two shots

26 fired. (SSF No. 31; Dec. of Marco Sevilla, **Exh. C.**)

27     Simultaneous with Javier raising and pointing the gun, Defendant Lanigan heard Officer

28 Sevilla yell "gun" and "drop the gun." He heard another officer yell the same thing but does not

know who it was. To Defendant Lanigan, the gun looked real. He thought that Plaintiff Javier was going to fire at them. At that moment, Defendant Lanigan heard a shot. He did not direct anyone to fire at any time or give any command that could be so interpreted. (SSF No. 32; Dec. of James Lanigan, **Exh. F.**)

Defendant Nelson, a 24 year old officer who began his duty as a Police Trainee in January of 2000, was also at the foot of the driveway. He could see the end of the front walk where it turned 90 degrees and met the driveway. (SSF No. 33; Dec. of Mike Nelson, **Exh. D.**) As Plaintiff came out of the house, Defendant Nelson could clearly see him at the end of the front walk. As soon as Plaintiff Javier came into view, Defendant Nelson also remembers Defendant Sevilla shouting "gun" to announce to the other officers that the suspect had a gun. Defendant Nelson could see Plaintiff Javier at the end of the front walk with a cordless phone in one hand and what looked like a large caliber semiautomatic handgun in the other. (SSF No. 34; Dec. of Mike Nelson, **Exh. D.**) Defendant Nelson remembers Defendant Sevilla telling Plaintiff Javier to "let me see your hands." Defendant Nelson then saw Plaintiff Javier raise the gun and extend his arm out and point the gun. (SSF No. 35; Dec. of Mike Nelson, **Exh. D**.) Defendant Nelson concluded that Plaintiff Javier was intentionally pointing the weapon and was going to shoot. He feared for his own safety and that of the other officers on the scene. (SSF No. 36; Dec. of Mike Nelson, **Exh. D.**) When Plaintiff Javier pointed his weapon, Defendant Nelson had his own police service pistol in the "low ready position." In response to the threat from Plaintiff Javier, Defendant Nelson began to back up rapidly and brought his own pistol up to the "sighting" position. At that time, he heard two shots as he moved behind a nearby camper for better cover. (SSF No. 37; Dec. of Mike Nelson, **Exh. D.**)

Defendant Sanders began his duty as a police officer with the San Diego Police Department in 1980 and then transferred to the Escondido Police Department in 1985. Defendant Sanders, a twenty-year police veteran, behind a trailer in the street could see the front door of the house and also saw that Plaintiff Javier had a phone under his chin with his right hand and it appeared he was staggering. (SSF No. 38; Dec. of Steve Sanders, **Exh. E.**) When Plaintiff Javier got to the corner of the garage, a flashlight was shined on him from the area where the officers were at the foot of the

driveway. (SSF No. 39; Dec. of Steve Sanders, **Exh. E.**)  Defendant Sanders had his handgun out,

supported on the trailer. (SSF No. 40; Dec. of Steve Sanders, **Exh. E.**)  Defendant Sanders could

clearly see that Plaintiff Javier had a handgun in his left hand.  As he watched Plaintiff Javier,

Defendant Sanders saw Plaintiff Javier raise the gun and point it at Officers La Marca and Murphy.

(SSF No. 41; Dec. of Steve Sanders, **Exh. E.**)  Defendant Sanders heard commands being yelled to

Plaintiff Javier to raise his hands and drop the gun.  Also, knowing that Plaintiff Javier had been on

the phone with dispatch for approximately 20 minutes, he believed that Plaintiff Javier knew that

the flashlight and commands were coming from police officers and Defendant Sanders concluded

that Plaintiff Javier was intentionally pointing the weapon and was going to shoot. (SSF No. 42;

Dec. of Steve Sanders, **Exh. E.**)  Defendant Sanders feared for the other officers' safety, as well as

his own.  Defendant Sanders began to squeeze the trigger on his gun.  As he did so, he heard two

shots fired, one from across the street and the second from Officer Sudak's location near Defendant

Sanders.  Defendant Sanders let off the trigger and did not fire. (SSF No. 43; Dec. of Steve

Sanders, **Exh. E.**)

Sometime after being established in his position in the street in front of the Perez residence,

Defendant Sudak, 42 years-old and an officer since 1988,  saw the front door open and Plaintiff

Javier exit the residence.  There was light illuminating Plaintiff Javier from behind and defendant

Sudak could see he had a phone in his right hand, which he was holding in a position as if he were

talking on it. (SSF No. 44; Dec. of Keith Sudak, **Exh. H**.)  Defendant Sudak watched as Plaintiff

Javier staggered down the front walk to a point near the top of the driveway.  Officers at the bottom

of the driveway shined a light on Plaintiff Javier.  Defendant Sudak heard commands being shouted

to Plaintiff Javier to put his hands up. (SSF No. 45; Dec. of Keith Sudak, **Exh. H.**)  At that same

time he saw Plaintiff Javier raise the gun and point it.  From his perspective it appeared Plaintiff

Javier was pointing the gun directly at the officers at the bottom of the driveway. (SSF No. 46;

Dec. of Keith Sudak, **Exh. H.**)  Defendant Sudak was certain that Plaintiff Javier was not simply

raising his hands to put them up or show them to the officers in compliance with the commands, but

was instead, very deliberately pointing the weapon to aim and fire.  In fact, Plaintiff Javier only

"raised" *one* hand—the hand with the gun in it. (SSF No. 47; Dec. of Keith Sudak, **Exh. H.**)

1 | Plaintiff was well illuminated at this point and Defendant Sudak could clearly see the gun in
2 | Plaintiff Javier's hand. It appeared to be a real, semiautomatic handgun. (SSF No. 48; Dec. of
3 | Sudak, **Exh. H.**) Defendant Sudak feared for the lives of the other officers who were threatened
4 | with being shot by Plaintiff Javier. Defendant Sudak took action to stop the threat by firing one
5 | shot at Plaintiff Javier. After he fired the shot, Plaintiff Javier fell to the ground. (SSF No. 49; Dec.
6 | of Keith Sudak, **Exh. H.**) Defendant Sudak then ran up to Plaintiff Javier and assisted in rendering
7 | first aid to Javier until the paramedics arrived.

8 |       Defendant Torres, a 33-year-old police officer since 1993, took up a position across the
9 | street from the Perez residence where he could see the front door and front walk and provide cover
10 | for the other officers. (SSF No. 50; Dec. of Damian Torres, **Exh. G.**) Sometime after being
11 | established in that position he saw the front door open and Plaintiff Javier exit the residence. There
12 | was light illuminating Plaintiff Javier from behind and Defendant Torres could see he had a phone
13 | in his right hand, which he was holding in a position as if he was talking on it, and a gun in his left
14 | hand. (SSF No. 51; Dec. of Damian Torres, **Exh. G.**) Defendant Torres watched as Plaintiff Javier
15 | staggered down the front walk to a point near the top of the driveway. He heard someone say "he's
16 | got the gun." He heard commands shouted to Plaintiff Javier including Officer Murphy
17 | shouting, "put down the gun, put down the gun." (SSF No. 52; Dec. of Damian Torres, **Exh. G.**)
18 | At that same time, he saw Plaintiff Javier raise the gun and point it. From his perspective, it
19 | appeared Plaintiff Javier was pointing the gun directly at Officer Murphy. (SSF No. 53; Dec. of
20 | Damian Torres, **Exh. G.**) Defendant Torres was certain that Plaintiff Javier was not simply raising
21 | his hands to put them up or show them to the officers in compliance with the commands, but was
22 | instead, very deliberately pointing the weapon to aim and fire. In fact, Plaintiff Javier only "raised"
23 | *one* hand—the hand with the gun in it. (SSF No. 54; Dec. of Damian Torres, **Exh. G.**) Plaintiff
24 | Javier was well illuminated at this point and Defendant Torres could clearly see the gun in Plaintiff
25 | Javier's hand. It appeared to be a real, semiautomatic handgun. (SSF No. 55; Dec. of Damian
26 | Torres, **Exh. G.**) Defendant Torres feared for the lives of the other officers who were threatened
27 | with being shot by Plaintiff Javier. Defendant Torres took action to stop the threat by firing one
28 | shot at Plaintiff Javier. As soon as he fired the shot, Plaintiff Javier fell to the ground. (SSF No.

56; Dec. of Damian Torres, **Exh. G.**)  Defendant Torres crossed the street and saw the other officers giving first aid to Plaintiff Javier.  Defendant Torres stayed back and never had any physical contact with Plaintiff Javier. (SSF No. 57; Dec. of Damian Torres, **Exh. G.**)

None of the Defendants had an opportunity to intervene to prevent the other officers from firing even if they wanted to; the threat of Plaintiff Javier had simply developed too fast and was too immediate.  And, for the same reasons, none of the Defendant officers present had time to warn Plaintiff Javier that deadly force would be used if he did not drop the weapon.  (SSF No. 58; Decs.of all officers, **Exhs. A-I.**)  Nothing any of the Defendants did that night was influenced in any way by the race of anyone involved in the incident. (SSF No. 59; Decs. of all officers, **Exhs. A-I.**)

**D.      Officers Render First Aid to Plaintiff Javier**

As soon as Plaintiff Javier fell, Defendants Murphy, La Marca, Sevilla, and Lanigan ran up to him.  At this point in time, the location and severity of Javier's injuries were unknown. Defendants Murphy, La Marca, Sevilla, and Lanigan all believed that a reasonable suspicion existed that Javier might still have another weapon and pose a threat to the officers' safety. (SSF No. 60; Decs. of Murphy, La Marca ,Sevilla and Lanigan,  **Exhs. A, B, C and F**.)  Each of them knew that either he or one of the other officers would have to kneel down very close to Plaintiff Javier to search him for other weapons and then render first aid, and that when doing so (due to the extremely close quarters on the front walk caused by a hedge on one side and the garage wall on the other) that officer would be impeding any other officer's view of, and approach to, Plaintiff Javier to render assistance.  Thus, leaving Plaintiff Javier's hands free to potentially strike the officer, or grab another weapon or even the officer's weapon, seemed fraught with danger.  So, Defendant Sevilla decided the safest thing to do was handcuff Plaintiff Javier so he could be safely searched for weapons and assessed for injuries. (SSF No. 61; Decs. of all officers, **Exhs. A-I**.)  Defendant Sevilla handcuffed Javier and then moved to the front door to attempt to calm Plaintiffs Yesenia and Estela who had come out of the house.  He had no more contact with Plaintiff Javier. (SSF No. 62; Dec. of Marco Sevilla, **Exh. C.**)  Defendant Lanigan did not direct Defendant Sevilla to handcuff Plaintiff Javier, but neither did he prevent Officer Sevilla from doing so because he

1 | thought that action was absolutely permissible under the circumstances. (SSF No. 63; Dec. of

2 | James Lanigan, **Exh. F**.)  Defendant Nelson watched Defendant Sevilla handcuff Plaintiff Javier

3 | but Defendant Nelson did not touch Plaintiff Javier or assist in the handcuffing. (SSF No. 64; Dec.

4 | of Mike Nelson, **Exh. D**.)

5 | Defendant Murphy noticed that Javier was beginning to cough up blood and concluded that

6 | Javier had serious injuries, but he did not know whether or not Javier remained capable of wielding

7 | a weapon and hurting officers.  Defendant Murphy wanted to uncuff Plaintiff Javier and render first

8 | aid but knew that Javier first needed to be searched so any threat could be ruled out.  Defendant

9 | Murphy quickly donned a pair of protective gloves, quickly performed a "pat down" protective

10 | search of Javier and then uncuffed him. (SSF No. 65; Dec. of Justin Murphy, **Exh. A**.)  Defendant

11 | Lanigan did not direct Defendant Murphy to pat down search Plaintiff Javier, neither did he prevent

12 | him from doing so because he thought that it was absolutely necessary that a pat down search be

13 | conducted on Javier before he could be uncuffed and first aid could be administered. (SSF No. 66;

14 | Dec. of James Lanigan, **Exh. F**.)

15 | Defendants La Marca, Murphy, Sudak, and Nelson then administered first aid. (SSF No.

16 | 67; Decs. of Murphy, La Marca, Nelson, and Sudak **Exhs. A, B, D and H**.)  Defendant Torres saw

17 | the other officers giving first aid to Plaintiff Javier but he stayed back and never had any physical

18 | contact with Plaintiff Javier. (SSF No. 68; Dec. of Damian Torres, **Exh. G**.)  Nor did Defendant

19 | Torres have any contact with Plaintiffs Yesenia and Estela. (SSF No. 69; Dec. of Damian Torres,

20 | **Exh. G**.)  The only physical contact between Defendants and Javier from the conclusion of the pat

21 | down search and the uncuffing of Javier until Javier was transported by medical personnel, was the

22 | rendering of first aid. (SSF No. 70; Decs. of all officers, **Exhs. A-I**.)

23 | Defendant Sevilla did not grab or restrain Plaintiff Yesenia or Estela in any way other than

24 | to use his body to block their path of travel and shield them from the scene of Plaintiff Javier's

25 | trauma as he moved them back into the house and asked them to remain there.  Although Plaintiff

26 | Estela admits to hitting Defendant Sevilla in the chest during this time, [Depo. of Estela Perez at p.

27 | 96, line 17, and p. 97, line 2.] he did not strike her back or use any force other than his blocking

28 | presence to keep her back from where the officers were tending to Plaintiff Javier. (SSF No. 71;

1  Dec. of Marco Sevilla, **Exh. C.**)  Given the extremely distraught state of Plaintiff Estela's emotions,

2  it was obvious to Defendant Sevilla that Estela would not be able to effectively assist Plaintiff

3  Javier but would impede the rendering of proper first aid.  (SSF No. 72; Dec. of Marco Sevilla,

4  **Exh. C.**)  Shortly after Javier was transported to the hospital, Defendant Murphy drove Estela to the

5  hospital.  (SSF No. 73; Dec. of Justin Murphy, **Exh. A.**)

6         On March 10/11, 2000, when the Perez incident began, Chief White was at home, asleep in

7  bed.  (SSF No. 74; Dec. of Duane White, **Exh. I.**)  Chief White was awakened by a phone call from

8  a police captain who was at home and who himself had been contacted by the watch commander at

9  the police station.  Chief White was informed by that phone contact of the Perez incident sometime

10  during the event as it was unfolding.  (SSF No. 75; Dec. of Duane White, **Exh. I.**)  At this point, the

11  Chief does not recall what he was told in that conversation.  Nor does he recall what stage the event

12  was at, at that moment.  Because he was not at the scene and thus could not possibly fully

13  appreciate or properly assess the situation, he gave no orders or recommendations or guidance over

14  the phone.  (SSF No. 76; Dec. of Duane White, **Exh. I.**)  Sometime after that phone call terminated,

15  Chief White was again called at home after the shooting and was informed that a shooting had

16  occurred.  That call came in after "the incident was shutting down."  (SSF No. 77; Dec. of Duane

17  White, **Exh. I.**)  Chief White never went to the scene and did not direct or participate in any of the

18  investigatory or searching activities at the scene or in the procurement of the warrant.  Other than

19  receiving those two phone calls, Chief White had no involvement in the happening of the subject

20  incident.  (SSF No. 78; Dec. of Duane White, **Exh. I.**)

21  **E.**   **Defendants' Involvement (Or Lack Thereof) at the Scene**

22         Throughout the entire event, from the time Defendants Murphy, La Marca, Nelson, Sevilla,

23  and Sanders arrived at the Perez residence until the time they left, they never fired their weapons;

24  they never employed any force on anyone other than Sevilla's handcuffing of Plaintiff Javier; they

25  never seized anyone; they never searched anyone other than Defendant Murphy's pat down

26  protective search of Javier; and they never engaged in any of the house search activity complained

27  of by Plaintiffs.  Nor did Defendants Murphy, La Marca, Nelson, Sevilla, or Sanders direct,

28  instruct, encourage or conspire with anyone to shoot Plaintiff Javier, to use any force against

1  anyone, or to unlawfully search or seize anyone or anything.  Nor did they see any officers

2  engaging in any of the house search activities complained of by Plaintiffs.  (SSF No. 79; Decs. of

3  Justin Murphy, Steve La Marca, Mike Nelson, Marco Sevilla, and Steve Sanders **Exhs. A, B, C, D,**

4  and **E.**)

5  Throughout the entire event from the time Defendant Lanigan arrived at the Perez residence

6  until the time he left, he never fired his weapon; he never employed any force on anyone or seized

7  anyone; he never searched anyone; and he never engaged in any of the house search activity

8  complained of by Plaintiffs.  Nor did he direct, instruct, encourage, or conspire with anyone to

9  shoot Plaintiff Javier, to use any force against anyone, or to unlawfully search or seize anyone or

10  anything.  Nor did he see any officers engaging in any of the house search activities complained of

11  by Plaintiffs, nor was he in charge of any of the detectives or other personnel who searched the

12  house, or the investigation that led to it.  (SSF No. 80; Dec. of James Lanigan, **Exh. F.**)

13  Although Defendants had information about a sister and mother in the house, they had no

14  information that led them to believe that the sister or mother were ever in any danger from the

15  police at any time in the event.  They were concerned, however, that they were in danger from

16  Plaintiff Javier.  (SSF No. 81; Decs. of all officer, **Exhs. A-I.**)

17  Throughout the entire event, from the time they arrived at the Perez residence until the time

18  they left, Defendants Torres and Sudak never employed any force on anyone or seized anyone other

19  than firing their weapons at Plaintiff Javier under circumstances clearly justifying such action; they

20  never searched anyone; and they never engaged in any of the house search activity complained of

21  by Plaintiffs.  Nor did Defendants Torres or Sudak direct, instruct, encourage or conspire with

22  anyone to use any force against anyone, or to unlawfully search or seize anyone or anything.  Nor

23  did they see any officers engaging in any of the house search activities complained of by Plaintiffs.

24  (SSF No. 82; Decs. of Damian Torres and Keith Sudak, **Exhs. G** and **H.**)

25  In short, all of the Defendants find themselves being sued for compensatory and punitive

26  damages, by Plaintiffs who have alleged 11 causes of action against each of them and who have

27  accused them of engaging in "racial profiling," and behavior which Plaintiffs say was malicious and

28  oppressive, all because they put on their uniforms and went to work on the night of March 10, 2000,

1  and during that shift, showed up at the Perez residence and did their duty. (See, ¶¶ 32, 35, 41, 52,

2  56, 57, 59, 77, 80, 83, 111, 115, 119, 123, and 127 of Plaintiffs' 2nd Am. Complaint wherein each

3  of the three Plaintiffs alleges that each Defendant engaged in "racial profiling" and malicious and

4  oppressive conduct against each Plaintiff and each Plaintiff seeks punitive damages against each

5  Defendant.)  Because they did nothing while there that violated anybody's constitutional rights or

6  was tortious in any way, they are entitled to summary judgment.

7  **IV.**

8  **ARGUMENT**

9  **A.      Summary Adjudication of the First Cause of Action**

10      **1.      Excessive Force**

11      Plaintiff Javier has alleged "use of excessive and unlawful force, deprivation of life [2] and

12  liberty without due process of law, deprivation of the right of association, and denial of equal

13  protection" in violation of "his constitutional rights under the First, Fourth, and Fourteenth

14  Amendments." (See Plaintiffs' 2nd Am. Complaint at ¶¶ 33 and 45.)  The U.S. Supreme Court,

15  however, as long ago as 1989 stated that "all claims that law enforcement officers have used

16  excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a

17  free citizen should be analyzed under the Fourth Amendment and its reasonableness standard . . . ."

18  Graham v. Connor, 490 U.S. 386, 395 (1989).  Since the only factual bases for Plaintiff's § 1983

19  claim are allegations of excessive force and unlawful search--both Fourth Amendment claims--

20  Plaintiff's assertions of denial of due process, right of association and equal protection under the

21  First and Fourteenth Amendments are of no moment.  The officers' actions must be "analyzed

22  under the Fourth Amendment."  Id.

23      First, when analyzing police conduct in a case involving several officers, the conduct of

24  each officer must be separately considered and each defendant is entitled to have his separate

25  defense carefully reviewed.  Cunningham v. Gates, 229 F.3d 1271, 1281-1283, 1287-1289 (9th Cir.

26  2000); Jones v. Williams, 286 F.3d, 1159, 1163-1167 (9th Cir. 2002); Susag v. City of Lake Forest,

27  94 Cal.App.4th 1401, 1407, 1414-1416 (2002); McKinney v. DeKalb County, Georgia, 997 F.2d

28  
---
[2]      The allegation for deprivation of life is somewhat perplexing given that no one died—Plaintiff Javier survived his wounds.

1440, 1443 (11th Cir. 1993).  Second, the burden of proving excessive force is upon the plaintiff.  It is up to plaintiff to prove that the force used was excessive.  <u>Edson v. City of Anaheim</u>, 63 Cal.App.4th 1269, 1274 (1998); <u>Miller v. Taylor</u>, 877 F.2d 469, 471-472 (6th Cir. 1989); <u>Edwards v. City of Philadelphia</u>, 860 F.2d 568, 572-573 (3d Cir. 1988); <u>Wing v. Britton</u>, 748 F.2d 494, 497 (8th Cir. 1984).  Therefore, to prevail on this cause of action against Defendants, Plaintiff Javier must prove that each of the Defendants used force against him, and that it was excessive.  As demonstrated below, Plaintiff Javier cannot carry this burden of proof.

An officer cannot be held vicariously liable for the actions of others.  "Section 1983 creates a cause of action based upon *personal* liability and predicated upon fault.  An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation." (Emphasis added.)  <u>Rascon v. Hardiman</u>, 803 F.2d 269, 273-274 (7th Cir. 1986).  Without a showing of direct responsibility for the improper action, liability will not lie.  "A casual connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.  [Citation omitted.]  In short, individual liability for damages under § 1983 is predicated upon *personal* responsibility." (Emphasis added.)  <u>Id</u>.

> "What is required is a casual connection between the misconduct complained of and the official sued.  [Citation.]  'Liability may be found only if there is personal involvement of the officer being sued.'  <u>Watson v. Interstate Fire & Casualty Co.</u>, 611 F.2d 120, 123 (5th Cir. 1980)."

<u>Harris v. Pirch</u>, 677 F.2d 681, 685 (8th Cir. 1982).

In <u>Roy v. Inhabitants of the City of Lewiston</u>, 62 F.3d 691 (1st Cir. 1994), three officers (Whalen, Mercer, and Hausman) were present when Roy lunged at them with a knife in each hand.  <u>Id</u>. at 693.  One of the officers (Whalen) shot Roy twice.  The others did not fire although they had their "sidearms" drawn.  <u>Id</u>. at 693 and 696.  When discussing the propriety of the summary judgment granted to the non-shooting officers on plaintiff's § 1983 claims the Court found it dispositive that "[t]he other officers did not use deadly force or encourage Whalen to do so."  <u>Id</u>. at 696.  Thus, an officer's mere presence at the scene of a shooting with his weapon drawn is not sufficient participation in the shooting nor sufficient provision of encouragement of the shooting to equate to individual liability for alleged § 1983 violations.

1    In <u>Jones v. Williams</u>, 286 F.3d 1159 (9th Cir. 2002), the Ninth Circuit directly confronted

2 the issue of what level of involvement by an individual officer in the actions of a group of officers

3 amounts to sufficient participation to cause individual liability to attach in a § 1983 context.  In its

4 holding, the Court specifically rejected a "team effort" approach to liability.  The Court stated that

5 "[i]n order for a person acting under color of state law to be liable under § 1983 there must be a

6 showing of personal participation *in the alleged rights deprivation.*"  (Emphasis added.)  <u>Id.</u> at

7 1163.  "[A] plaintiff could not hold an officer liable because of his membership in a group without a

8 showing of individual participation in the *unlawful* conduct.  [Citation.]  <u>Chuman</u> . . . does seem to

9 require . . . the plaintiff to first establish the 'integral participation' of the officers *in* the alleged

10 *constitutional violation.* . . . [A] team liability instruction that does not require any individual

11 liability 'is an *improper* alternative ground for liability.  It removes individual liability as the issue

12 and allows a jury to find a defendant liable on the ground that even if the defendant *had no role in*

13 the *unlawful conduct,* he would nonetheless be guilty if the conduct was the result of a 'team

14 effort.'"  (Emphasis added.)  <u>Id.</u> at 1163.  During the course of the decision, the Court on three

15 separate occasions reiterates its holding that the individual officer—to be liable—must be found to

16 have engaged in the *unlawful* portion of the police conduct at the scene.  <u>Id.</u> at 1163, 1166, 1167.

17 The Court further repeated this requirement when it stated that plaintiff's proposed jury instructions

18 were erroneous because they "would have permitted the jury to find the individual officers liable

19 without also finding that they *individually conducted unreasonable searches.*"  <u>Id.</u> at 1164.  Thus,

20 mere presence at the scene and assistance in the overall search was insufficient.  To create liability,

21 plaintiff had to produce evidence of unconstitutional conduct by the individual officer accused.  <u>Id.</u>

22    In <u>Jones</u>, the Court flatly rejected a proposed instruction that stated that an individual officer

23 could be held liable for merely providing "backup" to other officers.  <u>Jones v. Williams</u>, <u>supra</u>, 286

24 F.3d at 1166-1167.  The Court held that providing backup was insufficient.  Plaintiff needed to

25 show that those officers were "integral participants in the 'unlawful conduct,' that is, the

26 destruction of personal property. . . ."  <u>Id.</u>

27    Another case that is instructive on this issue is the extremely cogent opinion written by

28 Justice McConnell, of the California Fourth District Court of Appeal in <u>Susag v. City of Lake</u>

1  Forest, 94 Cal.App.4th 1401 (2002).  In <u>Susag</u>, a group of officers were present at the scene of

2  plaintiff Richard Susag's arrest.  Plaintiff mildly struggled with three of the officers who

3  handcuffed him and "removed him from the area." <u>Id</u>. at 1406.  When he sued all nine of the

4  officers present, the trial Court granted summary judgment on behalf of six of the officers "on the

5  ground they had no physical contact with Richard." <u>Id</u>. at 1407.  The Court affirmed the summary

6  judgment, holding that "The Fourth Amendment protects individuals against 'unreasonable

7  searches and seizures.'  To state a claim of excessive force under the Fourth Amendment, a plaintiff

8  must show both that a 'seizure' occurred and that the seizure was 'unreasonable.'" <u>Id</u>. at 1414.

9  Further, the Court held that although these officers were present at the scene they "were entitled to

10  summary judgment on Richard's § 1983 cause of action because he did not meet his burden of

11  producing evidence showing *they* used physical force against or exerted authority over him that

12  resulted in a 'seizure' under the Fourth Amendment." <u>Id</u>. at 1415.

13      Lastly, in <u>Susag</u>, the Court rejected plaintiff's contention that the officers could "be liable

14  for using excessive force even if they had no physical contact with him . . . because he submitted no

15  evidence that the deputies dismissed on summary judgment directed or encouraged the use of

16  excessive force." <u>Susag v. City of Lake Forest</u>, <u>supra</u>., 94 Cal.App.4th at 1416.  Based on these

17  principles and as discussed more fully below, Defendants motion for summary adjudication of the

18  First Cause of Action should be granted.

19          a.      **Defendants Justin Murphy, Steve La Marca, Mike Nelson and Steve**
                    **Sanders**
20

21      To prevail on this cause of action against Defendants Murphy, La Marca, Nelson, and

22  Sanders, Plaintiff Javier must prove that Defendants Murphy, La Marca, Nelson and Sanders used

23  force against him, and that it was excessive.  Plaintiff Javier cannot carry this burden of proof

24  because Defendants Murphy, La Marca, Nelson and Sanders did not use any force against him

25  whatsoever, and certainly did not use excessive force.  As a result, Defendants Murphy, La Marca,

26  Nelson and Sanders are entitled to summary adjudication of Plaintiff Javier's excessive force claim.

27      Defendants Murphy, La Marca, Nelson and Sanders' presence outside Plaintiff Javier's

28  house was not unlawful, nor did such presence violate Javier's constitutional rights.  An officer, in

1  response to a situation such as that created by Plaintiff Javier, certainly violates no law by his mere

2  presence outside the home – even with his weapon drawn.  Nor does Plaintiff Javier possess any

3  constitutional right to be free of the presence of officers outside his home.

4      In the instant case, although Plaintiff Javier has *alleged* that Defendants Murphy, La Marca,

5  Nelson and Sanders aided, abetted, implemented, directed and encouraged the use of excessive

6  force, just like the plaintiff in <u>Susag</u>, he has no *evidence* of any such conduct by Defendants

7  Murphy, La Marca, Nelson and Sanders. Therefore, the same result should obtain—Defendants

8  Murphy's, La Marca's, Nelson's and Sanders' motion for summary adjudication of the First Cause

9  of Action (to the extent it is based on alleged excessive force or unlawful seizure) should be

10  granted.

### b.    Defendant Marco Sevilla

12      To prevail on this cause of action against Defendant Sevilla, Plaintiff Javier must prove that

13  Defendant Sevilla used force against him, and that it was excessive.  Plaintiff Javier cannot carry

14  this burden of proof because Defendant Sevilla did not use any force against him, other than to

15  lawfully handcuff him, and certainly did not use any excessive force.  As a result, Defendant Sevilla

16  is entitled to summary adjudication of Plaintiff Javier's excessive force claim.

17      In the instant case, although Plaintiff Javier has *alleged* that Defendant Sevilla aided,

18  abetted, implemented, directed and encouraged the shooting, just like the plaintiff in <u>Susag</u>, he has

19  no *evidence* of any such conduct by Defendant Sevilla,  Therefore, the same result should obtain –

20  Defendant Sevilla's motion for summary adjudication of the First Cause of Action (to the extent it

21  is based on alleged excessive force due to the shooting) should be granted.

22      Nor can Plaintiff succeed on the basis that it was Defendant Sevilla who handcuffed him.

23  The Fourth Amendment does not prohibit any force, just excessive force.  And, "[t]he

24  'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

25  officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham v. Connor,</u> 490 U.S.

26  386, 296 (1989). "[T]he *'reasonableness of force is analyzed in light of such factors as the*

27  *requirements for the officer's safety . . . .*" (Emphasis added.) <u>Cunningham v. Gates,</u> 229 F.3d

28  1271, 1291 (9th Cir. 2000).

1   As Defendant Sevilla came up to Plaintiff Javier, the location and severity of his wounds

2   were a complete unknown.  For all Defendant Sevilla knew Plaintiff Javier may have been only

3   grazed or may have thrown himself down out of sheer fright without being wounded at all.  (Dec. of

4   Marco Sevilla, **Exh. C.**)  Nevertheless, Defendant Sevilla or another officer was obviously going to

5   have to kneel down very close to Plaintiff Javier in order to search him and assess his physical

6   status to determine the location and severity of any injuries.  Unfortunately, there was very little

7   room to work in, due to the front walk being bordered by a hedge on one side and the garage wall

8   on the other.  Thus, the space was limited and critically restricted the ability of other officers to

9   come to the aid of the kneeling officer if Plaintiff Javier attacked him.  (SSF Nos. 60-66; Dec. of

10  Marco Sevilla, **Exh. C.**)  In the words of Defendant Sevilla, "leaving Javier's hands free to

11  potentially strike, [the kneeling officer] or grab another weapon or [the kneeling officer's] weapon,

12  seemed fraught with danger."  (Dec. of Marco Sevilla, **Exh. C.**)  "If an officer reasonably, but

13  mistakenly, believed that a suspect was likely to fight back, for instance, *the officer would be*

14  *justified in using more force than in fact was needed."*  (Emphasis added.)  Saucier v. Katz, 533

15  U.S. 194, 121 S.Ct. 2151, 2158 (2001).  Under such circumstances, it is obvious that the

16  handcuffing of Plaintiff Javier was neither an unreasonable use of force or an unlawful seizure.

17  There is, therefore, no triable issue of material fact with respect to this claim.  Thus, Defendant

18  Sevilla's motion for summary adjudication of the First Cause of Action (to the extent it is based

19  upon allegations of excessive force or unlawful seizure) should be granted.

20      **c.**    **Defendant Sergeant James Lanigan**

21  To prevail on this cause of action against Defendant Lanigan, Plaintiff Javier must prove

22  that Defendant Lanigan used force against him, and that it was excessive.  Plaintiff Javier cannot

23  carry this burden of proof because Defendant Lanigan did not use any force against him, and

24  certainly did not use any excessive force.  As a result, Defendant Lanigan is entitled to summary

25  adjudication of Plaintiff Javier's excessive force claim.

26  Defendant Lanigan's presence outside Plaintiff Javier's house was not unlawful, nor did

27  such presence violate Plaintiff Javier's constitutional rights.  Nor does Plaintiff possess any

28  constitutional right to be free of someone shining a flashlight at him.

1       In the instant case, although Plaintiff Javier has *alleged* that Defendant Lanigan aided,

2  abetted, implemented, directed and encouraged the use of excessive force, just like the plaintiff in

3  Susag, he has no *evidence* of any such conduct by Defendant Lanigan.  Therefore, the same result

4  should obtain – Defendant Lanigan's motion for summary adjudication of the First Cause of Action

5  (to the extent it is based on alleged excessive force or unlawful seizure) should be granted.

6       Plaintiff cannot succeed in imposing liability for the shooting upon Defendant Lanigan due

7  to his capacity as a supervisor.  "A § 1983 action against police supervisory officers cannot be

8  based upon the theory of respondent superior.  Monell v. Department of Social Services, 436 U.S.

9  658, 694 . . . .  Moreover, it appears that the Supreme Court has held that a § 1983 action will not

10  lie against police supervisory officers for failure to prevent police misconduct, absent a showing of

11  direct responsibility for the *improper* action.  See Rizzo v. Goode, 423 U.S. 362, . . . .  What is

12  required is a causal connection between the *misconduct* complained of and the official sued."

13  (Emphasis added.)  Harris v. Pirch, 677 F.2d 681, 685 (8th Cir. 1982).

14       "Without a showing of direct responsibility for the *improper* action, liability will not lie

15  against a supervisory official." (Emphasis added.)  Rascon v. Hardiman, 803 F.2d 269 (7th Cir.

16  1986).  "Generally, supervisory officials are not liable for the actions of subordinates on any theory

17  of vicarious liability under 42 USC § 1983.  . . . A supervisor may be liable under § 1983 only if

18  there exists either (1) his or her personal involvement *in the constitutional deprivation, or* (2) a

19  sufficient causal connection between the supervisors *wrongful* conduct and the constitutional

20  deprivation." (Emphasis added.)  Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir. 2001).  Therefore,

21  Plaintiffs cannot rely on the allegation that Defendant Lanigan is liable for the shooting (the alleged

22  *improper* action) unless they can show that he directed the officers to shoot or otherwise engaged in

23  wrongful conduct or participated in the firing of the weapons.  Defendant Lanigan's declaration is

24  clear and unambiguous, he made no such direction, and Plaintiffs possess no contravening

25  evidence.  (Dec. of James Lanigan, **Exh. F.**)  Nor can Plaintiff rely on the theory that Defendant

26  Lanigan is liable because he deployed the officers as he did and requested the dispatch operator to

27  ask Plaintiff Javier to come out of the house.  In order to succeed on that theory, Plaintiff would

28  have to prove that that conduct was *wrongful* or *improper*.  Id.  In other words, Plaintiff would have

1   to demonstrate that the actions of deploying the officers outside his house and requesting the

2   dispatch operator to ask Plaintiff Javier to come outside in some way violated the constitution, and

3   thus constituted actionable *misconduct* in a § 1983 claim.  Id.  Obviously, Plaintiff cannot succeed

4   in that endeavor because deploying the officers outside the home does not even implicate, much

5   less violate, a constitutional right.  One has no constitutional right to be free of the presence of an

6   officer outside his home.  That mere presence does not constitute a seizure.  U.S. v. Summers, 268

7   F.3d 683, 686 (9th Cir. 2001).

8          "For purposes of the Fourth Amendment, a seizure occurs when an officer, through some

9   form of physical force or show of authority, restrains the liberty of a citizen.  See Terry v. Ohio,

10   392 U.S. 1, 19, n. 16, . . . ; Florida v. Bostick, 501 U.S. 429, 434 . . . .  Such restraint occurs if 'in

11   view of all the circumstances surrounding the incident, a reasonable person would have believed

12   that he was not free to leave.  [Citations.]  When an encounter is voluntary, *no constitutionally*

13   *protected right is implicated.*"  (Emphasis added.)  U.S. v. Summers, 268 F.3d 683, 686 (9th Cir.

14   2001).  At the time Defendant Lanigan deployed the officers, no officer had yet spoken to Plaintiff

15   Javier or restrained his liberty in any fashion.  It was not until he came out of the house and

16   commands were given to Javier that there was even arguably a seizure.  Thus, the pre-seizure

17   tactical decisions involved in deploying the officers cannot be the basis of § 1983 liability for

18   Defendant Lanigan, because *that conduct implicated no constitutionally protected right.*  Id.

19   Moreover, because the entire conversation with the dispatcher was voluntary (certainly a civilian

20   dispatcher on the other end of the phone line had no authority over Plaintiff Javier and he was free

21   to ignore her every request or simply hang up) *no constitutionally protected right was implicated* by

22   anything said in that conversation.  Id.

23          To establish supervisory liability, Plaintiff Javier must demonstrate "a sufficient causal

24   connection between the supervisor's *wrongful* conduct and the constitutional violation."  (Emphasis

25   added.)  Jeffers v. Gomez 267 F.3d 895, 915 (9th Cir. 2001).  But Plaintiff Javier cannot establish

26   that Defendant Lanigan engaged in any *wrongful* conduct, much less that any such conduct caused

27   an unlawful seizure by way of the use of excessive force.  Plaintiff Javier may argue that the pre-

28   seizure tactical decisions were negligent or not consistent with Plaintiff Javier's version of the best

1  police procedures, but such allegations do not amount to § 1983 liability. [See <u>Daniels v. Williams</u>,

2  474 U.S. 327, 333 (1986)—"where a government official's act causing injury to life, liberty or

3  property is merely negligent, no procedure for compensation is constitutionally required. . . .

4  [I]njuries inflicted by governmental negligence are not addressed by the United States

5  Constitution."; <u>Quezada v. County of Bernalillo</u>, 944 F.2d 710, 714 (10th Cir. 1991)—"[§ 1983]

6  creates no rights and is not a carte blanch statute authorizing recovery for negligence or other

7  common law torts standing by themselves . . . . The civil rights law is  not a general tool to

8  discipline local law enforcement officers. . . . Thus we review this case not to determine whether

9  the police officer may have committed an actionable tort against plaintiff, but rather to determine

10  whether the conduct violated any of plaintiff's constitutional rights."; <u>Scott v. Henrich</u>, 39 F.3d 912,

11  915 (9th Cir. 1994)—when deciding which police tactic to employ, the officer need not use what

12  later may appear to be a better or less intrusive approach. "The appropriate inquiry is whether the

13  officers acted reasonably, not whether they had less intrusive alternatives available to them. . . .

14  Requiring officers to find and choose the least intrusive alternative would require them to exercise

15  superhuman judgment. . . . [Such a standard] would also entangle the Courts in endless second

16  guessing of police decisions made under stress and subjected to the exigencies of the moment.

17  Officers thus need not avail themselves of the least intrusive means of responding to an exigent

18  situation; they need only act within that range of conduct we identify as reasonable."]

19       <u>Duran v. City of Maywood</u>, 221 F.3d 1127 (9th Cir. 2000), is analogous. There, plaintiff

20  was shot after pointing a weapon at two officers who had silently walked up  his driveway with

21  their guns drawn and "did not announce their presence." <u>Id</u>. at 1131.  Plaintiff asked for an

22  instruction stating that the officers could be liable under § 1983 if the jury found they "created a

23  situation where the accidental or purposeful use of deadly force upon [plaintiff] would become

24  likely." <u>Id</u>.  The Court rejected the requested instruction, holding that an instruction allowing

25  liability to be based on creating or escalating a situation could only be given "when there is

26  evidence that a police officer's use of *excessive and unreasonable force* caused an escalation of

27  events that led to the plaintiff's injury." (Emphasis added.) <u>Id</u>. at 1130. The 9th Circuit Court very

28  recently affirmed the principle enunciated by the Court in <u>Duran</u> and held that even if an officer

1   "intentionally or recklessly provokes a violent confrontation" that "provocation" can only be the

2   basis of § 1983 liability "if the provocation is an independent Fourth Amendment violation." See

3   Billington v. Smith (9th Cir. 2002) 2002 WL 1349566, p. 9.  Thus, the uniform requirement of the

4   authorities cited is that the action of an officer must be wrongful or improper (it must itself be

5   conduct violative of the constitution) before he is subjected to liability, where he is alleged to have

6   taken action to create or escalate the situation or otherwise participated in the alleged constitutional

7   deprivation.

8        None of the actions taken by Defendant Lanigan, nor any of the pre-seizure tactics or plan

9   of action ordered by him, constituted "excessive and unreasonable force."  Duran v. City of

10  Maywood, supra; Billington v. Smith, supra.  Thus, none of Defendant Lanigan's actions,

11  decisions, plans or directions constitute wrongful or improper action in a constitutional sense as

12  required by those authorities.  There is, therefore, no triable issue of material fact with respect to

13  this issue and Defendant Lanigan's motion for summary adjudication of the First Cause of Action

14  (to the extent it is based on alleged excessive force or unlawful seizure) should be granted.

15        **d.**   **Defendants Damian Torres and Keith Sudak**

16        To prevail on this cause of action against Defendants Torres and Sudak, Plaintiff Javier

17  must prove that Defendants Torres and Sudak used excessive force against him.  Plaintiff Javier

18  cannot carry this burden of proof because Defendants Torres and Sudak were clearly justified in

19  firing their weapons at Plaintiff Javier under the circumstances.  Thus, the force used was not

20  excessive and they are entitled to summary adjudication of Plaintiff Javier's excessive force claim.

21        The Fourth Amendment does not prohibit any force, just excessive force.  And, "[t]he

22  'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

23  officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S.

24  386, 296 (1989).  "[T]he *reasonableness of force is analyzed in light of such factors as the*

25  *requirements for the officer's safety . . . .*"  (Emphasis added.)  Cunningham v. Gates, 229 F.3d

26  1271, 1291 (9th Cir. 2000).

27        Plaintiff Javier presented a very real and apparently deadly threat to the officers before *any*

28  force was employed.  There can be no doubt that once he pointed the weapon at the officers,

1  Defendants Torres' and Sudak's response in firing at him was reasonable.  Both saw him point what

2  appeared to be a real gun—one that Plaintiff Javier himself had told dispatch was a loaded

3  handgun—at their fellow officers.  Both declare that there was no time to do anything but fire and

4  certainly no time to issue a warning to Plaintiff Javier to drop the weapon on pain of deadly force

5  being used.  (Decs. of Damian Torres and Keith Sudak, **Exhs. G and H.**)  And, both were certain

6  that Plaintiff Javier's motion in lifting and pointing the gun was not a motion consistent with

7  someone raising his hands or showing his hands to officers in response to commands to "put up

8  your hands" or "show me your hands."  That observation is corroborated by the fact that Plaintiff

9  Javier did not raise or show his other non-gun- hand.  (Decs. of Damian Torres and Keith Sudak,

10  **Exhs. G and H.**)

11         Plaintiff Javier may attempt to raise a triable issue of fact by alleging that he never raised

12  the gun.  Other than the officers at the scene (all of whom have declared that Plaintiff Javier did

13  point the weapon), Javier was the only witness to the events in front of the house; and he has

14  admitted that he was "intoxicated to a state of incoherence."  (See Plaintiffs' 2nd Am. Complaint at

15  p. 7, line 21.)  He admitted to the dispatch operator that he was "drinking and "tweaking" on the

16  night of the incident.  (SSF Nos. 1-3; Dec. of Wilma Daubman, **Exh. J.**)  In deposition, he has

17  testified that he used methamphetamine that day and was "drunk."  (Depo. of Javier Perez at p. 50,

18  line 17 – p. 54, line 15 and p. 62, line 6. **Exh. K.**)  He cannot remember how much he drank or how

19  much methamphetamine he ingested.  (Depo. of Javier Perez at p. 26, lines 19-24 and p. 30 lines 9-

20  12, **Exh. K.**)  He does not remember talking to the dispatcher operator on the phone on the night of

21  the incident.  And, he cannot remember anything he said to her.  (Depo. of Javier Perez at p. 44,

22  lines 4-25 and p. 57, lines 14-17, **Exh. K.**)  Then, despite his state of intoxicated incoherence, he

23  claims that the BB pistol was "too heavy" for him to lift and that he just carried it at his side.

24  (Depo. of Javier Perez, at p. 60 lines 9-25, **Exh. K.**)  The testimony of one who was intoxicated to a

25  state of incoherence and who can remember almost nothing of an event and who claims that a BB

26  pistol he was carrying was too heavy for him to lift, is simply not to be credited.  It certainly is not

27  of sufficient weight to raise a triable issue of fact in the face of the overwhelming weight of the

28  contrary testimony.  A witness who was admittedly "intoxicated to a state of incoherence" has no

1    true personal knowledge of the events that transpired during that incapacity.  The testimony of a

2    witness without personal knowledge of a matter cannot create a "genuine issue of material fact" to

3    defeat a motion for summary judgment.  <u>Unterreiner v. Volkswagen</u>, 8 F.3d 1206, 1211-1212 (7th

4    Cir. 1993).  Further, "[n]ot every alleged factual conflict creates a 'genuine' issue of material fact.

5    As the Supreme Court points out, if the evidence creating the alleged factual conflict 'is merely

6    colorable, or is not sufficiently probative, summary judgment may be granted." <u>Id.</u>

7            There is, therefore, no genuine triable issue of material fact with respect to the First Cause

8    of Action to the extent it alleges excessive force by Defendants Torres and Sudak and, hence, their

9    motion for summary adjudication should be granted.

10                    **e.      Defendant Police Chief Duane White**

11           In this case, Plaintiff has no evidence of any unconstitutional conduct by Chief White, and

12   in fact cannot contradict the testimony that he was not even present—much less a participant in

13   illegal conduct.

14           In <u>Susag v. City of Lake Forest</u>, 94 Cal.App.4th 1401 (2002), the Court rejected plaintiff's

15   contention that the officers could "be liable for using excessive force even if they had no physical

16   contact with him . . . because he submitted no evidence that the deputies dismissed on summary

17   judgment directed or encouraged the use of excessive force." <u>Id.</u> at 1416.  In the instant case,

18   although Plaintiff Javier has *alleged* that Chief White aided, abetted, implemented, directed and

19   encouraged the use of excessive force; just like the plaintiff in <u>Susag</u>, he has no *evidence* of any

20   such conduct by Chief White.  Therefore, the same result should obtain—Chief White's motion for

21   summary adjudication of the First Cause of Action (to the extent it is based on alleged excessive

22   force or unlawful seizure) should be granted.

23           Likewise, Plaintiff cannot succeed in imposing liability for the shooting upon Chief White

24   due to his capacity as a supervisor.  As discussed more fully above, . . . "A supervisor may be liable

25   under § 1983 only if there exists either (1) his or her personal involvement *in the constitutional*

26   *deprivation, or* (2) a sufficient causal connection between the supervisors *wrongful* conduct and the

27   constitutional deprivation." (Emphasis added.) <u>Jeffers v. Gomez</u>, 267 F.3d 895, 915 (9th Cir.

28   2001).  Therefore, Plaintiffs cannot rely on the allegation that Chief White is liable for the shooting

1 | (the alleged *improper* action) unless they can show that he directed the officers to shoot or

2 | otherwise engaged in wrongful conduct or participated in the firing of the weapons.  Chief White's

3 | declaration is clear and unambiguous, he made no such direction, and Plaintiffs possess no

4 | contravening evidence.  (Dec. of Duane White, **Exh. I**.)  There is, therefore, no triable issue of

5 | material fact and Chief White's motion for summary adjudication of the First Cause of Action

6 | should be granted.

7 | **f.     Defendant City of Escondido**

8 | To impose City liability pursuant to § 1983, Plaintiff must prove that an unconstitutional

9 | policy caused the violation of his rights.  "Under Monell [citation] a municipality may be liable

10 | under § 1983 'only if its policy or custom caused the constitutional deprivation complained of.'"

11 | Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994).  There is no

12 | respondent superior liability for a municipality under § 1983.  In order to maintain a § 1983 action

13 | against a municipality, Plaintiff must *allege* and *present evidence* that the allegedly unconstitutional

14 | activities of the police officers were pursuant to a "policy statement, ordinance, regulation, or

15 | decision officially adopted and promulgated by [the entity's] officers."  Monell v. Dept. of Social

16 | Services, 436 U.S. 658, 690-694 (1978).

17 | Plaintiffs' Second Amended Complaint contains a host of "unconstitutional policy"

18 | allegations which essentially boil down to two categories:  (1) the City's policy governing the use

19 | of force was "inconsistent" with the requirements of the U.S. Constitution; and (2) the City took

20 | inadequate measures to train its officers regarding the use of force.  (See Plaintiffs' 2nd Am.

21 | Complaint, pp. 10-11.)  However, Plaintiff cannot produce evidence to support those

22 | "unconstitutional policy" allegations.

23 | Meanwhile, the City presents evidence in support of this motion that squarely refutes

24 | Plaintiff's allegations in this regard.  Chief White's declaration discusses the City's policy

25 | regarding the use of force and the training provided its officers.  (See the Dec. of Duane White,

26 | **Exh. I.**)  Both, pass constitutional muster.

27 | Moreover, it must be emphasized that "[T]he inadequacy of police training may serve as the

28 | basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the

1   rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378,

2   388 (1989); Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367 (1994).

3       As stated in the Declaration of Duane White and demonstrated by the interrogatory

4   responses and training records referred to therein (**Exhs. N and P**) the City spends enormous

5   resources in properly training its police officers in accordance with P.O.S.T. (Commission on

6   Police Officer Standards and Training) guidelines.  Plaintiffs simply cannot prove even a deficient

7   training regimen, much less a deliberately indifferent one.

8       And, lastly, as can be seen by the declarations of each of the officers involved in this

9   incident (**Exhs. A-H**), none of the officers inflicted any constitutional harm on Plaintiff.  The force

10  used was reasonable.  "If a person has suffered no constitutional injury at the hands of the

11  individual police officer" then no municipal liability under § 1983 can result.  City of Los Angeles

12  v. Heller, 475 U.S. 796, 797-799 (1986); Quintinilla v. City of Downey, 84 F.3d 353, 355 (9th Cir.

13  1996).  There is, therefore, no triable issue of material fact and the City's motion for summary

14  adjudication of the First Cause of Action should be granted.

15      **2.    Unlawful Search**

16      Plaintiffs' Second Amended Complaint contains some conclusory allegations about an

17  unlawful search of Plaintiffs' residence.  Defendants served interrogatories on Plaintiffs in order to

18  flesh out this portion of the claim.  Therein Plaintiffs were asked to state each and every fact that

19  supported their contention that "Defendants, and each of them, conducted an unlawful search and

20  seizure of Plaintiffs' residence and personal property."  (See Special Interrogatory No. 13, **Exh. O.**)

21  They responded as follows:

22          "(a)  Immediately after the shooting various officers entered the premises,
            and searched the garage.  After Plaintiff was transported by emergency
23          medical personnel, with his mother, and his sister went to a neighbor's
            house, officers began removing boxes and bags of material from inside
24          and outside the Perez home.  Officers did not make telephonic application
            for warrant until approximately 5:00 a.m. and deliberately deceived the
25          district attorney and judge with regard to the state of the scene and what
            had already been done in an effort to secure the warrant.  With regard to a
26          secondary warrant, the officer unlawfully obtained an overbroad warrant
            permitting wholesale violation of plaintiff Javier Perez's rights of due
27          process and privacy."

28  (See Response to Special Interrogatory Nos. 13 and 14, **Exh. O.**)

1   Defendants dispute the accuracy of those assertions. While that dispute may create an issue

2   of fact as to whether those events occurred, there is no triable issue of fact that Defendants Murphy,

3   La Marca, Sevilla, Nelson, Sanders, Lanigan, Torres, Sudak and White had nothing to do with it if

4   they did. The defendants declarations are clear and unambiguous—they did not engage in any of

5   the "house search" conduct described by Plaintiffs nor did they witness any such conduct. If any

6   such activities occurred, they happened after they left the scene. (Decs. of all officers, **Exhs. A–I.**)

7   Jones v. Williams, supra., 286 F.3d 1159, is dispositive of Plaintiffs' claims versus all of the

8   Defendants on this point. The declarations of each Defendant completely exonerate them from

9   witnessing or participating in any way in the complained of property search. Thus, they

10  participated not at all, much less in the alleged "unlawful conduct" portion of that search. Id. at

11  1163, 1166, 1167. And, as Defendants La Marca, Nelson, Sevilla, Sanders, Lanigan, Torres, Sudak

12  and White, never had any physical contact with any of the Plaintiffs (beyond Sevilla's handcuffing

13  and several others rendering first aid to Plaintiff Javier), they never searched any of their "persons"

14  either. Therefore, there is no triable issue of fact as to the "unlawful  property search" allegations

15  of Plaintiffs' Complaint as to any of the Defendants. And there is no triable issue of material fact

16  as to the illegal search of Plaintiffs' "persons" allegations against Defendants La Marca, Nelson,

17  Sanders, Lanigan, Torres, Sanders and White, because they never searched any of them.

18  As to the allegations against Defendant Murphy that he conducted an illegal search of

19  Javier's person, those charges cannot succeed because an officer in such circumstances is clearly

20  permitted to conduct a "pat down" protective search of the suspect. Michigan v. Long, 463 U.S.

21  1032, 1034-1036 and 1047-1052 (1983); Terry v. Ohio, 392 U.S. 1, 23-27 (1968).

22  In Michigan v. Long, 463 U.S. 1032 (1983), the officers were dealing with an individual

23  who had driven his car into a ditch on the side of the road. Id. at 1035. The driver met the officers

24  at the rear of the car. After the officers asked the driver for his registration, the driver walked to the

25  open driver's side door of the car to get his registration. The officers followed him to the door and

26  then observed a large hunting knife on the floorboard. "The officers then stopped [the driver's]

27  progress and subjected him to a Terry protective pat-down, which revealed no weapons." Id. at

28  1036. The officers then searched the interior of the car "for *other* weapons." (Emphasis added.)

1    Id. at 1036.  Justice O'Connor's well reasoned analysis explained why both the pat down search

2    and the search of the car's interior were constitutional.  Id. at 1047-1052, especially fn. 15.  This

3    conclusion is significant because, throughout, it is obvious that the Court felt it reasonable for the

4    officers to suspect, and search for, the presence of *other* weapons based upon the presence of the

5    weapon that was in plain view.  Id.  ["In this case, the officers did not act unreasonably in taking

6    preventive measures to ensure that there were no *other* weapons within Long's immediate grasp

7    before permitting him to reenter his automobile." (Emphasis added.)  Michigan v. Long, supra.

8    463 U.S. at 1051.]

9         Michigan v. Long is dispositive of Javier's claim that Defendant Murphy illegally searched

10   his person.  Defendant Murphy wanted to conduct first aid but certainly did not have sufficient

11   knowledge of Javier's condition to assess whether he remained capable of wielding a weapon and

12   harming an officer at such close range.  Nor, prior to conducting the pat down search could he

13   know whether Javier possessed any *other* weapons besides the gun.  (Dec. of Justin Murphy, **Exh.**

14   **A.**)  Thus, the pat down search was necessary so Javier's hands could then be freed and appropriate

15   first aid could be rendered.  And, thus, the pat down protective search was constitutionally

16   permissible.  Michigan v. Long, 463 U.S. 1032, 1034-1036 and 1047-1052 (1983); Terry v. Ohio,

17   392 U.S. 1, 23-27 (1968).

18        There is, therefore, no triable issue of material fact as to Plaintiffs' claims that Defendant

19   Murphy illegally searched their persons because Defendant Murphy never searched Plaintiffs

20   Yesenia or Estela and his pat down protective search of Plaintiff Javier was legal.

21        **3.    Summary:  Regarding the First Cause of Action**

22        Despite its length, the only cognizable claims against each of the Defendants contained in

23   the First Cause of Action are allegations that they either employed excessive force against Plaintiff

24   Javier and conducted an unlawful search; or that they participated with others in the employment of

25   excessive force and unlawful search.  As demonstrated above, neither of those two component

26   claims has any merit and there is no triable issue of material fact with respect thereto.  Further, the

27   City has no unconstitutional policy that caused any alleged constitutional violation and hence no

28   § 1983 liability – even if a constitutional violation occurred.  And, because no constitutional

1  violation occurred – the City cannot be liable.  Thus, each Defendant's motion for summary

2  adjudication of the First Cause of Action should be granted.

3      **4.      Qualified Immunity**

4          An additional ground for granting Defendants Murphy's, La Marca's, Sevilla's, Nelson's,

5  Sanders's, Lanigan's, Torres's, Sudak's and White's motion for summary adjudication of the First

6  Cause of Action is the presence of qualified immunity.  The standard in deciding a question of

7  qualified immunity is whether a reasonable officer *could* have believed his conduct was lawful.

8  Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir. 1998).  The purpose of the immunity is to

9  provide officers "an immunity from suit rather than a mere defense to liability."  It is to allow

10  officers to be human and make mistakes without subjecting them to suit and potential liability every

11  time they are human and err.  Gooden v. Howard County, Maryland, 954 F.2d 960, 964-966 (4th

12  Cir. 1992); Act Up!/Portland v. Bagley, supra., 985 F.2d at 872; Roy v. Inhabitants of the City of

13  Lewiston, 42 F.3d 691, 695-696 (1st Cir. 1994).

14          The immunity "protects *all but the plainly incompetent* or those who knowingly violate the

15  law." [Emphasis added.]  Malley v. Briggs, (1986) 475 U.S. 335, 341; Anderson v. Creighton

16  (1987) U.S. 635, 638.  "If officers of reasonable competence could disagree on this issue, immunity

17  should be recognized."  Malley v. Briggs, (1986) 476 U.S. 335, 341.

18          "The inquiry is not 'whether another reasonable or more reasonable interpretation of events

19  can be constructed . . . after the fact.'  Hunter, 502 U.S. at 228, 112 S.Ct. at 537.  Rather, the issue

20  is whether a reasonable officer could have believed that his conduct was justified." Reynolds v.

21  County of San Diego, 84 F.3d 1162, 1170 (9th Cir. 1996) (reversed on other grounds—114 F.3d

22  999 (9th Cir. 1997).).  "If a reasonable officer *could* have believed" the actions of the defendant

23  officer were lawful, then the officer is "entitled to qualified immunity."  [Emphasis added.]

24  Act Up!/Portland v. Bagley, supra., 988 F.2d at 872.

25          The question with regard to qualified immunity is thus not whether the Court's view of the

26  conduct, or that of the officer in the field is the correct decision, but is rather, whether a reasonable

27  officer *could* have believed the action taken was justified.  In making that determination, however,

28  the Court should award an "extra degree of deference" to the judgment or conclusion drawn by

1  police officers in the field when they are "responding to a possible crime." Murdock v. Stout,

2  54 F.3d 1437, 1442 (9th Cir. 1995).

3       "Also pertinent is the Court's more general statement in Anderson v. Creighton addressed to

4  qualified immunity for a Fourth Amendment violation.  The Court used as its standard the

5  'reasonable officer' and what 'could reasonably have been thought lawful by such an officer'

6  [citation], *terms suggesting a measure of deference . . . .*  [Q]ualified immunity leaves '*ample room*

7  *for mistaken judgments*.'"  [Emphasis added.]  Roy v. Inhabitants of City of Lewiston, supra.,

8  42 F.3d at 695.

9       "Perhaps a jury could rationally have found that [the officer] could have done a better job;

10  but in our view a jury could not find that his conduct was so deficient that no reasonable officer

11  could have made the same choice . . . .  Put differently, [the officer's] actions, even if mistaken,

12  were not unconstitutional."  Id.

13       "The basic principles of qualified immunity are well known . . . .  A test of the objective

14  reasonableness of official action has been formulated *with the express purpose of according police*

15  *officers latitude* in exercising what are inescapably discretionary functions replete with close

16  judgment calls . . . .  The immunity is to be applied *with due respect for the perspective of police*

17  *officers on the scene and not with the greater leisure and acquired wisdom of judicial hindsight.*"

18  [Emphasis added.]  Gooden v. Howard County, Maryland, 954 F.2d 960, 964-965 (4th Cir. 1992).

19       In fact, the Court in Gooden went so far as to characterize this policy as creating a

20  "customary presumption favoring immunity."  Id. at 965.

21       The qualified immunity defense creates a *substantial margin of error* for police officers in

22  the field.  The shield of qualified immunity is available to the defendant unless no police officer of

23  reasonable competence could have concluded that the action taken was legally justified.  "The

24  purpose of this broad shield is to ensure that police officers are not discouraged from performing

25  their duties even where the relevant facts and circumstances are unclear." Herpel v. Joyce,

26  (Dist.Ct.Conn. 1992) [Civil No. B:89-669 (JAC)] 1992 WL 336765 (D.Conn.), attached as **Exh. R**

27  at p. 3.

28       In light of the foregoing, certainly a reasonable officer could have concluded that the actions

1  of Defendants Murphy, La Marca, Sevilla, Nelson, Sanders, Lanigan, Torres, Sudak, and White,

2  including the shooting, were justified and proper.  Thus, the "broad shield" of qualified immunity

3  should protect Defendants Murphy, La Marca, Sevilla, Nelson, Sanders, Lanigan, Torres, Sudak

4  and White from liability arising out of Plaintiff's First Cause of Action, whether based on

5  allegations of excessive force, unlawful seizure or unlawful search.

6     **a. Handcuffing, The Pat Down Search—Qualified Immunity**

7     The U.S. Supreme Court has recently corrected the Ninth Circuit's mistaken practice of

8  formerly assuming that the reasonableness inquiry on the issue of qualified immunity in an

9  excessive force case is subsumed by the reasonableness inquiry on the merits.  <u>Saucier v. Katz</u>, 533

10  U.S. 194, 121 S.Ct. 2151, 2154, 2158-2159 (2001).  Thus, even if a constitutional violation

11  occurred, the facts must be analyzed with an eye toward awarding the officer the full protection of

12  the broad shield of qualified immunity.  <u>Id</u>. at 2157-2159 and 2164-fn. 6, Justice Ginsburg

13  concurring.  To deny Defendants Sevilla and Murphy qualified immunity for their judgment that

14  under the circumstances it was reasonable and necessary to handcuff Plaintiff Javier and conduct a

15  pat-down search, would be to fail to heed the instruction given to the Ninth Circuit in <u>Saucier</u>; and

16  would mark a return to the erroneous "minimalist view" of the Court's qualified immunity role that

17  previously marred Ninth Circuit jurisprudence in this area.  (<u>See</u>, <u>Jeffers v. Gomez</u>, 267 F.3d 895,

18  909-910 (2001), where the Ninth Circuit recognized it had been "chided" by the Supreme Court

19  "for taking a minimalist view of our role in reviewing a ruling on summary judgment" on a

20  question of the presence of qualified immunity in an excessive force context.)

21     Certainly a reasonable officer could have concluded that the actions of Defendants Sevilla

22  and Murphy, including the handcuffing and pat-down search, were justified and proper.  Thus, the

23  "broad shield" of qualified immunity should protect Defendants Sevilla and Murphy from liability

24  arising out of Plaintiff's First Cause of Action, whether based on allegations of excessive force,

25  unlawful seizure or unlawful search.

26     **b. The Sergeant's Tactical Decisions and Qualified Immunity**

27     <u>Cunningham v. Gates</u>, 229 F.3d 1271 (9th Cir. 2000) is dispositive of the issue of Defendant

28  Lanigan's entitlement to qualified immunity for his decision to adapt and utilize the "surround and

1  call" tactics in this instance.  In <u>Cunningham</u>, several of the defendant officers were sued for their

2  use of, and participation in, a police tactic known as "jamming."  In footnote 7 of the decision, the

3  Court described the tactic as follows:

4             "Jamming refers to the practice of boxing in a suspect's vehicle with
           police cars.  This practice is generally use by *plain clothed* special

5             units . . . .  'Jamming' involves the simultaneous and coordinated approach
           of an armed suspect by *unmarked* police vehicles, thus giving the officers

6             the *tactical advantage of surprise* . . . .  [T]his technique prevents suspects

7             from fleeing and potentially endangering the lives of bystanders."

8  <u>Cunningham v. Gates</u>, <u>supra</u>., 229 F.3d at 1279 (fn. 7).

9       After the jamming technique was used in the <u>Cunningham</u> case, there was a gun battle

10  between the suspects and the officers, resulting in suspects being shot.  <u>Id</u>.  In discussing the

11  qualified immunity defense of the non-shooting officers for "formulating or implementing the

12  'jamming' policy" the Court found the evidence of past use of the technique without incident, to be

13  decisive in the officer's favor.  <u>Id</u>. at 1290-1291.  "[T]he uncontroverted evidence indicates the

14  'jamming' technique had been used hundreds of times without incident. . . . [G]iven the

15  circumstances surrounding its use, the jamming technique was a reasonable use of force for the

16  purposes of the Fourth Amendment."  <u>Id</u>.  Sergeant Lanigan's similar successful experiences with

17  the surround and call tactics dictates a similar finding herein.

18       Comparing the "surround and call" tactics formulated and implemented by Defendant

19  Lanigan with the "jamming" tactic described in <u>Cunningham</u>, certainly a reasonable officer *could*

20  conclude that the "surround and call" tactic employed in this instance was legally permissible.

21       Thus, the "broad shield" of qualified immunity should protect Defendant Lanigan from

22  liability arising out of Plaintiff's First Cause of Action, whether based on allegations of excessive

23  force, unlawful seizure or unlawful search.

24            **c.**     **The Shooting and Qualified Immunity**

25       Certainly a reasonable officer *could* have believed that the threat posed by Plaintiff Javier

26  was real, life threatening, and immediate.  In fact, in this situation, every single officer on the scene

27  came to that conclusion.  (See Decs. of all officers, **Exhs. A-H.**)  It was that conclusion that

28  compelled Officers Nelson and Sevilla to retreat backwards in fear as rapidly as possible and

1  Officer Sanders to begin squeezing the trigger on his weapon.  (See Decs. of Marco Sevilla, Mike

2  Nelson, and Steve Sanders, **Exhs. C, D,** and **E.**)  Thus, Defendants Torres and Sudak are entitled to

3  qualified immunity for firing their weapons once each to stop the threat presented by Plaintiff

4  Javier.

5      **5.      Alternative Relief:  Summary Adjudication of An Issue**

6          If the Court is inclined to believe that a triable issue of fact is present as to whether Plaintiff

7  Javier raised the weapon, then Defendants Torres and Sudak ask that the Court make it clear that

8  that is the only issue to be tried (i.e., whether Plaintiff Javier raised the gun).  In other words, the

9  Court should rule now, that if the ultimate fact finder finds that Plaintiff Javier did raise his gun and

10  point it in the direction of an officer, than Defendants Torres and Sudak were justified in firing and

11  the force thus employed was not excessive; or, at the very least, that they are entitled to qualified

12  immunity for doing so.  "If an officer reasonably, but mistakenly, believed that a suspect was likely

13  to fight back, for instance, *the officer would be justified in using more force than in fact was*

14  *needed."*  (Emphasis added.)  Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2158 (2001).  FRCP

15  Rule 56 allows the Court to grant a motion for summary judgment as to "all or any part" of a claim.

16  Adjudicating the issue now will simplify the trial and prevent the expenditure of the parties' and the

17  Court's time on the litigation of unnecessary issues.

18  **B.      Summary Adjudication of the Second and Third Causes of Action**

19          The Second and Third Causes of Action allege a cacophony of violations of various

20  constitutional rights on behalf of Plaintiff Javier's sister (Plaintiff Yesenia) and mother (Plaintiff

21  Estela).  According to their deposition testimony, neither of them actually witnessed the shooting or

22  had any opportunity to observe or know there were police outside the house until after Plaintiff

23  Javier had been shot and they exited the front door and saw Plaintiff Javier on the ground.  (SSF

24  No. 83; Depo. of Yesenia Perez at p. 29, line 1, through p. 35, line 25; Depo. of Estela Perez at

25  p. 28, lines 13-23, and p. 85, line 4, through p. 100, line 3, **Exhs. L and M**, respectively.)  Both of

26  them were in the house, around the corner from the entry way to the front door, in the hallway to

27  the master bedroom, when they heard the shots.  At that moment, neither could have known who

28  shot who or, for that matter, whether anyone had been shot at all.  (SSF No. 84; Depo. of Yesenia

1  Perez, p. 33, line 22, through p. 35, line 8; Depo. of Estela Perez, p. 92, line 12, through p. 95,

2  line 3. **Exhs. L and M**.)  Nevertheless, neither is deterred from alleging that they "witnessed the

3  incident." (See Plaintiffs' 2nd Am. Complaint at ¶¶ 53 and 78.)

4       Under the facts thus presented, Plaintiffs Yesenia and Estela cannot maintain a § 1983 claim

5  for their alleged injuries arising out of the shooting of Plaintiff Javier.  "[A] § 1983 claim must be

6  based upon the violation of plaintiff's personal rights, and not the rights of someone else."

7  Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir. 1990); Coon v. Ledbetter, 780 F.2d 1158, 1160-

8  1161 (5th Cir. 1986) (Wife who witnessed sheriff deputies shooting into her mobile home and

9  wounding her husband had no constitutional claim for emotional injuries.).

10       The Archuleta Court denied plaintiff recovery because "[h]e was merely a bystander who

11  was asserting indirect and unintended injury as a result of police conduct directed toward another.

12  We use the term 'bystander' to mean someone who witnesses police action but who is not himself

13  or herself an object of that action.  As such, a bystander is unable to assert the kind of deliberate

14  deprivation of his or her rights necessary to state a due process claim under § 1983."  Archuleta v.

15  McShan, 897 F.2d 495, 498 (10th Cir. 1990).

16       Further, based upon all of the arguments and authorities cited above with respect to Plaintiff

17  Javier's § 1983 claims, Plaintiffs Yesenia and Estela certainly cannot make any claim of violation

18  of constitutional rights against Defendants Murphy, La Marca, Sevilla, Nelson, Sanders, Lanigan,

19  Torres, Sudak and White.  They simply engaged in no conduct that violated any constitutional

20  rights possessed by Plaintiffs Yesenia or Estela.  They never employed any force against either,

21  they never searched either of them, and they did not participate in the search of the house

22  complained of.  (Decs. of all officers, **Exhs. A-I**.)  Additionally, for all the reasons stated above

23  with respect to the qualified immunity argument regarding Plaintiff Javier's claims, Defendants

24  Murphy, La Marca, Sevilla, Nelson, Sanders, Lanigan, Torres, Sudak, and White are entitled to

25  qualified immunity for Plaintiffs Yesenia's and Estela's alleged constitutional claims.  And, despite

26  their allegations to the contrary, Plaintiffs have *no evidence* of a municipal policy that caused a

27  constitutional violation or any deliberate indifference to officer training.

28

1   Plaintiffs Yesenia's and Estela's § 1983 claims therefore have no merit and there is no

2   triable issue of material fact with respect thereto.  Thus, each of Defendant's motions for summary

3   adjudication of the Second and Third Causes of Action should be granted.

4   **C.   Summary Adjudication of the Fourth, Fifth, and Sixth Causes of Action**

5   The Fourth, Fifth, and Sixth Causes of Action allege state law negligence causes of action

6   against all Defendants on behalf of Plaintiffs.  The only allegation of duty in each cause of action is

7   a general allegation that Defendants "owed a duty to Plaintiffs to use ordinary care in the

8   performing of any activity from which harm might be reasonably anticipated."  (See Plaintiffs' 2nd

9   Am. Complaint, ¶¶ 95, 99, and 104.)  But none of the Defendants other than Torres and Sudak ever

10  engaged in "any activity from which harm might be reasonably anticipated."  (Decs. of all officers,

11  **Exhs. A-I.**)  No harm to anyone could be anticipated by their mere presence outside the house, even

12  with their weapons drawn.  They had a legal right to be there and did nothing to expose anyone to

13  any danger.  As for as the shooting, handcuffing, and pat-down search of Plaintiff Javier, none of

14  those actions constituted excessive force and thus there is no liability under state law for their

15  occurrence.

16  Plaintiffs cannot cite to any theory of vicarious liability under these facts that would make

17  any individual Defendant responsible for the alleged torts of other officers.  California Government

18  Code § 820.8.  Nor can Plaintiffs successfully argue that there is anything that any individual

19  Defendant did that was negligent or breached any identifiable standard of care.

20  Pursuant to California law, a police officer is entitled to employ reasonable force.  Edson v.

21  City of Anaheim, 63 Cal.App.4th 1269, 1272-1273; California Penal Code § 835a.  Thus, to

22  succeed against Defendant Sevilla due to the handcuffing of Javier, or Defendants Torres and

23  Sudak for shooting Plaintiff Javier, Plaintiffs cannot rely on a simple allegation of negligence.  In

24  order to establish liability Plaintiffs must prove that the force used was unreasonable.  Susag v. City

25  of Lake Forest, 94 Cal.App.4th 1401, 1415 (2002).

26  Nor can Plaintiffs rely on a simple allegation of negligence in order to succeed against

27  Defendant Lanigan due to the use of the "surround and call" tactics.  To establish liability, Plaintiffs

28  must prove that use of the tactic constituted force and that the force used was unreasonable.  Id.

1   Furthermore, and more to the point, Plaintiffs cannot point to any duty owed by a police

2   officer in Defendant Lanigan's position to employ one tactic over another. Nor can they

3   realistically contend that the choice of using the "surround and call" tactic was "negligent." Given

4   the previous universally successful employment of this tactic in the past, how could Defendant

5   Lanigan be said to have been negligent in choosing to employ it here. Moreover, Defendant

6   Lanigan is entitled to the protection of the "discretionary acts" immunity (Calif. Government Code

7   § 820.2) for his choice of tactics. Reynolds v. County of San Diego, 858 F.Supp. 1064, 1074-1075

8   (U.S. Dist. Ct., S.D. Ca., 1994). This immunity carries over to the City through California

9   Government Code § 815.2.

10   And, lastly, even under *state* law, Defendants are entitled to the same qualified immunity

11   protection explained above when discussing the § 1983 claim. When analyzing the officer's

12   decisions to determine reasonableness, California courts applying state law adopt the "wide zone of

13   protection" awarded the officer in the federal case law. Edson v. City of Anaheim, 63 Cal.App.4th

14   1269, 1273-1273 (1998). "It makes sense to surround the police who make these on-the-spot-

15   choices in dangerous situations with a fairly wide zone of protection in close cases." Id.

16   As to the City's vicarious liability for the conduct of the shooters, the same considerations

17   apply. They are entitled to use reasonable force and their declarations establish that in the face of

18   the threat from Plaintiff Javier, firing their weapons was reasonable. (See **Exhs. G** and **H.**) Of

19   particular importance are the District Court's opinion in Reynolds v. San Diego, 858 F.Supp. 1064

20   (U.S.D.C. S.D. Ca., 1994) holding that "where a suspect is armed and in close proximity to the

21   officer, Courts have found that officers may use deadly force to defend themselves." Id. at 1071; as

22   well as the Court of Appeals decision in that same case, Reynolds v. San Diego, 84 F.3d 1162 (9th

23   Cir. 1996), holding that "[the officer's] use of deadly force was reasonable" as a matter law. Id. at

24   1168. Of special importance is the fact that the Court ruled the officer's use of deadly force was

25   reasonable as a matter of law despite conflicting testimony from plaintiff's experts. Id. at 1168 –

26   1170. Because the California courts apply the same standard as the federal courts in assessing

27   reasonableness, Edson, supra., these cases are dispositive of Plaintiffs' state law negligence claims

28   based on the conduct of the shooting officers. "The Supreme Court has held that an officer's use of

1  deadly force is reasonable if 'the officer has probable cause to believe that the suspect poses a

2  significant threat of death or serious physical injury to the officer or others.'"  Reynolds v. San

3  Diego, supra., 84 F.3d at 1167.  Officers Torres' and Sudak's declarations clearly support that they

4  had probable cause to believe that such a threat existed and acted reasonably to stop it.  Because

5  their action was reasonable no vicarious liability based on those actions can accrue to the City.

6          There is, therefore, no merit to these causes of action and no triable issue of material fact

7  with respect thereto.  As a result, each Defendants' motion for summary adjudication of the Fourth,

8  Fifth, and Sixth Causes of Action should be granted.[3]

9  **D.      Summary Adjudication of the Seventh Cause of Action**

10         In the Seventh Cause of Action, Plaintiff Javier seeks to recover for "intentional infliction of

11  emotional distress."  One of the elements of this tort is "*extreme and outrageous* conduct by the

12  Defendant with the intention of causing, or reckless disregard of the probability of causing,

13  emotional distress . . . ."  (Emphasis added.)  Cervantez v. J.C. Penney Co., 24 Cal.3d 579, 593

14  (1979).

15         Suffice it to point out here that Plaintiff cannot point to any of the non-shooting Defendants

16  conduct that even remotely approaches the standard just enunciated.  None of these Defendants'

17  behavior was even close to being extreme and outrageous.  (Decs. of Murphy, La Marca, Sevilla,

18  Nelson, Sanders, Lanigan, and White, **Exhs. A-F** and **I**.)  What is particularly troubling about this

19  cause of action is that it is here that the complaint alleges that each of the Defendants engaged in

20  "racial profiling" and conduct that was malicious and oppressive.  And, herein, Plaintiff Javier

21  seeks punitive damages against each of the Defendants.  Given the complete absence of even a

22  shred of evidence to support these inflammatory accusations against each of the non-shooting

23  Defendants, it is difficult to imagine how these allegations were advanced or maintained in good

24  faith.  Further, Defendants Torres' and Sudak's conduct in shooting Plaintiff Javier was justified

25

26

27  [3]      To the extent the Fifth and Sixth Causes of Action attempt to allege a cause of action on behalf of Plaintiffs
Yesenia and Estela for negligent infliction of emotional distress, they must fail for the additional reason that neither of
28  them saw Plaintiff Javier get shot.  Thus, neither of them knew that Plaintiff Javier was being injured at the moment
they heard the shots.  As a result, they cannot recover for negligent infliction of emotional distress.  Fife v. Astenius,
232 Cal.App.3d, 1090, 1093 (1991).

1   under the circumstances and thus was not extreme or outrageous. They simply did what they had to

2   do under the most tragic of circumstances.

3        Because the non-shooting Defendants did nothing even remotely close to being extreme and

4   outrageous or malicious or oppressive, and because Defendants Torres and Sudak fired only out of

5   dire necessity, there is no merit to this cause of action and no triable issue of material fact with

6   respect thereto.  Thus, each Defendant's motion for summary adjudication of the Seventh Cause of

7   Action should be granted.

8   **E.**   **Summary Adjudication of the Eighth and Ninth Causes of Action**

9        Plaintiffs Yesenia and Estela follow Plaintiff Javier's lead and allege intentional infliction of

10   emotional distress in the Eighth and Ninth Causes of Action.  Their attempt to prove the elements

11   of this tort likewise suffer from the same inability to demonstrate extreme and outrageous conduct

12   by any of the Defendants.  Unfortunately, they also follow suit by groundlessly, and without any

13   imaginable good faith, making the same allegations about "racial profiling" and malicious and

14   oppressive action, and seeking punitive damages. (See Plaintiffs' 2nd Am. Complaint at ¶¶ 115 and

15   119.)

16        But Plaintiff Yesenia's and Estela's attempt to recover on this cause of action is made even

17   more impossible by the additional element that the extreme and outrageous conduct must be

18   directed *at them*.  "The law limits claims of intentional infliction of emotional distress to egregious

19   conduct *toward plaintiff*, proximately caused by defendant." (Emphasis in the original.)

20   Christensen v. Superior Court, 54 Cal.3d 868, 905-906 (1991); Ess v. Eskaton Properties, Inc., 97

21   Cal.App.4th 120 (2002).

22        Each of the Defendants make it clear in their Declarations that although they had

23   information about a sister and mother in the house they had no information that led them to believe

24   that the sister or mother were in danger from the police at any time in the event.[4]  (Decs. of all

25   officers **Exhs. A-I**.)

26

27

28

---

[4]      Although Defendants were concerned during the event that Plaintiffs Yesenia and Estela were in danger from Plaintiff Javier.

1   There is, therefore, no merit to these causes of action and no triable issue of material fact

2   with respect thereto.  Thus, each Defendant's motion for summary adjudication of the Eighth and

3   Ninth Causes of Action should be granted.

4   **F.   Summary Adjudication of the Tenth Cause of Action**

5   Plaintiff Javier alleges a state law claim of battery in the Tenth Cause of Action.  For all the

6   reasons stated above regarding the excessive force claim, Defendants Murphy, La Marca, Sevilla

7   Nelson, Sanders, Lanigan, Chief White and the City are entitled to summary adjudication of the

8   battery claim.  Having only touched Plaintiff Javier to assist in the rendering of first aid, it is

9   inconceivable how Defendant La Marca and Nelson (in good faith) could be said to have battered

10  him.  It is even more difficult to imagine how Defendants Sanders, Lanigan and Chief White

11  battered Plaintiff Javier, given that they never even touched him.  Further, because the pat down

12  protective search was permissible; and that search plus rendering first aid were the only physical

13  contact between Defendant Murphy and Plaintiff Javier, it cannot be said that Defendant Murphy

14  battered Plaintiff Javier.  Likewise, having only touched Plaintiff Javier to handcuff him under

15  circumstances clearly justifying such action, Defendant Sevilla did not commit a battery.  (Decs. of

16  all officers, **Exhs. A-I.**)

17  The holding in Susag v. City of Lake Forest, 94 Cal.App.4th 1401 (2002), is dispositive of

18  Plaintiff Javier's claims here.  There, after discussing the fact that the moving officer's lack of

19  physical contact with the plaintiff precluded § 1983 liability for excessive force, the Court

20  addressed plaintiff's state law battery claim as follows:  "We also conclude this lack of evidence [of

21  physical contact] defeats Richard's state law claims as a matter of law:  (1) a prima facie element of

22  a battery claim against a police officer is the use of unreasonable force."  Id. at 1415.  Therefore,

23  there certainly is no merit to the battery cause of action against the officers who never touched

24  Plaintiff Javier or did so only to render first aid (i.e., La Marca, Nelson, Sanders, Lanigan, and

25  White).  Nor is there any merit to the battery cause of action against officers Sevilla, Murphy,

26  Torres or Sudak because the force used in handcuffing, searching, and shooting Plaintiff Javier was

27  reasonable.

28

1    There is, therefore, no merit to this cause of action and no triable issue of any material fact

2  with respect thereto.  Thus, each Defendant's motion for summary adjudication of the Tenth Cause

3  of Action should be granted.

4  **G.    Summary Adjudication of the Eleventh Cause of Action**

5    Plaintiffs Yesenia and Estela join in the Eleventh Cause of Action which is entitled

6  "Reckless Endangerment."  Defendants' counsel has been unable to locate any California case law

7  recognizing "reckless endangerment" as a separate tort.  When that phrase does appear in the cases,

8  it is apparently just an allegation of a means by which emotional distress was inflicted and as such

9  is subsumed in the tort of intentional infliction of emotional distress.  Thus, this cause of action

10  should be dismissed as redundant with the Eighth and Ninth Causes of Action.

11    And, suffice it to say, none of the Defendants did anything that in any way recklessly

12  endangered Plaintiffs Yesenia or Estela.  (Decs. of all officers, **Exhs. A-I.**)  There is, therefore, no

13  merit to this cause of action and no triable issue of material fact with respect thereto.  Thus, each

14  Defendant's motion for summary adjudication of the Eleventh Cause of Action should be granted.

15  **H.    Summary Judgment of the Complaint**

16    Defendants Murphy's, La Marca's, Sevilla's, Nelson's, Sanders', Lanigan's, Torres',

17  Sudak's, White's and the City's motion for summary judgment of the Second Amended Complaint

18  should be granted because, as demonstrated above, there is no merit to any of its component causes

19  of action as against these moving Defendants.

20                                         **V.**

21                                  **CONCLUSION**

22    For all the reasons set forth above, Defendants Murphy's, La Marca's, Sevilla's, Nelson's,

23  Sanders', Lanigan's, Torres', Sudak's, White's and the City's motion for summary adjudication of

24  each cause of action as well as their motion for summary judgment of the Second Amended

25  Complaint should be granted.

26                                    Respectfully submitted,

27  DATED:      July // , 2002        OFFICE OF THE CITY ATTORNEY
                                      By:

28                                        MARK A. WAGGONER
                                          Assistant City Attorney/Litigation