















AXR   8/13/02   8:44

3:01-CV-00410   PEREZ V. CITY OF ESCONDIDO

*131*

*OPPM.*

1   Carl M. Lewis, SBN 121776
**CARL M. LEWIS**
2   1551 Fourth Ave., Suite 303
San Diego, CA 92101

FILED

3   Telephone: 619-232-0160
Facsimile: 619-232-0420

02 AUG 12 PM 3:44

4

5   Attorneys for Plaintiffs: Javier Perez and Yesenia Perez, a minor          DEPUTY

6   Leon J. Saad, Esq., SBN 129193
**LAW OFFICES OF LEON J. SAAD**
  **& ASSOCIATES**
7   1551 Fourth Ave., Suite 303
San Diego, CA 92101
8   Telephone: 619-230-8529
Facsimile: 619-230-0117

9

10   Attorney for Plaintiff: Estella Perez

11               **IN THE UNITED STATES DISTRICT COURT**

12            **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

13

14   JAVIER PEREZ, a minor; YESENIA          **CASE NO. 01 CV 0410 K (AJB)**
PEREZ, a minor; and ESTELLA PEREZ, an
15   individual,                             **PLAINTIFF'S MEMORANDUM OF**
                                           **POINTS AND AUTHORITIES**
16               Plaintiff,                 **IN OPPOSITION TO MOTION FOR**
                                           **SUMMARY ADJUDICATION AND**
17         v.                               **SUMMARY JUDGMENT OF**
                                           **DEFENDANTS OFFICER J. MURPHY,**
18   CITY OF ESCONDIDO, a governmental       **STEVE LA MARCA, MARCO SEVILLA,**
entity; ESCONDIDO POLICE                **MIKE NELSON, STEVE SANDERS,**
19   DEPARTMENT, a governmental entity;      **SERGEANT LANIGAN, DAMIAN**
DUANE WHITE, an individual; OFFICER      **TORRES, KEITH SUDAK, DUANE**
20   J. MURPHY, an individual; SERGEANT      **WHITE AND CITY OF ESCONDIDO**
LANIGAN, an individual; KEITH SUDAK
21   (DOE 1), an individual; DAMIAN TORRES
(DOE 2), an individual; STEVE LA
22   MARCA (DOE 3), an individual; STEVE     Date:    August 26, 2002
SANDERS (DOE 4), an individual; MIKE    Time:    11:00 a.m.
23   NELSON (DOE 5), an individual; MARCO    Judge:   Hon. Judith N. Keep
SEVILLA (DOE 6), an individual; and
24   DOES 7 through 10,

25               Defendants.

26

27

28

131

01CV0410K (AJB)

**TOPICAL INDEX**

I.    INTRODUCTION .......................................................... 1

II.   STATEMENT OF FACTS ................................................. 1

      A. The Telephone Call and Shooting ...................................... 1

      B. The Physical Evidence ................................................ 7

      C. Post Shooting Conduct ................................................ 8

            1.    Illegal Search of Javier's Person and Exacerbation of Injuries ......... 8

            2.    Estella and Yesenia Perez ..................................... 9

            3.    Conduct of Chief WHITE and the CITY of ESCONDIDO .......... 10

III.  STANDARD OF PROOF .................................................. 11

IV.   DEFENDANTS VIOLATED PLAINTIFF JAVIER'S
      ENUMERATED RIGHTS PURSUANT 42 U.S.C. § 1983 .................... 12

      A.    Under The Circumstances Of This Case, The Use Of
            Deadly Force Was Excessive ...................................... 13

      B.    Qualified Immunity ............................................... 14

      C.    Defendants' SUDAK and TORRES Personally Deployed
            Unreasonable Force Under And Are Subject to 42 U.S.C. § 1983, Liability ... 19

      D.    Individual Liability LANIGAN ..................................... 19

      E.    Liability of All Officers .......................................... 21

            1.    Defendants LANIGAN, MURPHY, SANDERS, LA MARCA,
                  SEVILLA, SUDAK, TORRES And NELSON All Causally
                  Contributed To The Unreasonable Use Of Excessive Force
                  And Resulting Injuries. ..................................... 21

            2.    LANIGAN, MURPHY, SANDERS, LA MARCA, SEVILLA,
                  and NELSON Had A Duty To Protect JAVIER From Harm
                  Arising Based On The Doctrine Of State Endangerment ........... 25

      F.    Liability of Chief White ......................................... 27

      G.    Monell Liability ................................................. 28

      H.    The Handcuffing Of JAVIER Constituted A Fourth Amendment
            Violation Under The Circumstances Of This Case ................... 29

      I.    Search Of The Perez Home Constituted A Fourth Amendment Violation ..... 30

01CV0410K (AJB)

V.   DEFENDANTS HAVE ALSO VIOLATED ENUMERATED
     RIGHTS OF PLAINTIFFS ESTELLA AND YESENIA PEREZ ................. 33

VI.  DEFENDANTS' CONDUCT CONSTITUTED ACTIONABLE
     NEGLIGENCE IN ADDITION TO CONSTITUTIONAL LIABILITY ........... 35

VII. DEFENDANTS BEAR LIABILITY FOR INTENTIONALLY
     INFLICTING SEVERE EMOTIONAL DISTRESS ON PLAINTIFFS ........... 37

VIII. DEFENDANTS ARE LIABLE TO JAVIER
     FOR CIVIL BATTERY ................................................. 39

IX.  CONCLUSION ...................................................... 40

01CV0410K (AJB)

1

# TABLE OF AUTHORITIES

2

**Federal Cases:**

3

*Act Up!/Portland v. Bagley*
988 F.2d 868 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

4

*Alexander v. City of and County of San Francisco*
29 F.3d 1355 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5

6

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 106 S.Ct. 2505, 911 L.Ed.2d 202 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

7

*Bailey v. Newland*
263, F.3d 1022 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

8

9

*Branch v. Tunnell*
14 F.3d 449 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10

*Bivens v. Six Unknown Fed. Narcotics Agents*
403 U.S. 388, 92 S.Ct. 479, 30 L.Ed.2d 2468 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11

12

*Black v. Stephens*
662 F.2d 181 (3rd Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

13

*Bowers v. DeVito*
686 F.2d 616  (7th Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

14

15

*British Airways Board v. Boeing Co.*
585 F.2d 946  (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

16

*Bruner v.  Dunaway*
684 F.2d 422 (6th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

17

18

*Bulthuis v. Rexall Corp.*
789 F.2d 1315 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

19

*Butera v. Dist. Of Columbia*
235 F.3d 637 (D.C.Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 36

20

21

*Byrd v. Clark*
783 F.d 1002 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

22

*Chimel v. California*
395, U.S. 752, 89 S.Ct. 304, 23 L.Ed.2d. 685 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

23

24

*City of Canton v. Harris*
489 U.S. 378, 1098 S.Ct. 1183, 103 L.Ed.2d. 412 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

25

*Commonwealth of Pennsylvania v. Porter*
659 F.2d 306 (3d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

26

27

*Coolidge v. New Hampshire*
403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

28

01CV0410K (AJB)

*Cunningham v. Gates*
229 F.3d 1271 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 23, 24

*Daniel v. Williams*
474 U.S. 327, 106 S.Ct. 677, 81 L.Ed.2d 662 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Deorle v. Rutherford*
272 F.3d 1272 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18

*Eastman Kodak Co. v. Image Technical Services, Inc.*
906 F.2d 432 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Escamilla v. City of Santa Ana*
796 F.2d 266 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Figueroa v. Aponte-Roque*
864 F.2d 947 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Fontenot* v. Uphohn Co.
780 F.2d 1190 (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Forrester v. City of San Diego*
25 F.3d 804  (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Graham v. Connor*
490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1994) . . . . . . . . . . . . . . . . . . . . 13, 17, 18, 26

*Gutierrez-Rodriguez v. Cartagena*
882 F.2d 553 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22, 30, 32

*Harlow v. Fitzgerald*
457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1992) . . . . . . . . . . . . . . . . . . . . 16

*Harris v. Roderick*
126 F.3d 1189 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*Harris v. Chanclor*
537 F.2d 203 (5thCir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Headwaters* Forest Defense et al. v. The County of Humbolt et al.
240 F.3d 1185 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 29

*Hunter v. Bryant*
502 U.S. 224 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ingraham* v. Wright
430 U.S. 651, 673. 97 S. Ct. 1401, 51 L.Ed.2d 711 (1976) . . . . . . . . . . . . . . . . . . . . . . . 30

*Johnson* v. Duffy
588 F.2d 740 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Jones v. City of Chicago*
856 F.2d 985 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

01CV0410K (AJB)

*Jones v. Williams*
0410802 FED9 00-56929 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Larez v. City of Los Angeles*
946 F.2d 630 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 27

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*
507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lehr v. Robertson*
463 U.S. 248, 258, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614  (1983) . . . . . . . . . . . . . . . . . . . . 35

*Liston v. County of Riverside*
120 F.3d 965 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Maclin v. Paulson*
627 F.2d 83 (7th Cit. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Mary Sanders Lee v. County of Los Angeles*
250 F.3d 668 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 35

*McKinney by McKinney v. Dekalb County, Ga.*
997 F.2d 1440 (11th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Melear v. Spears*
862 F.2d 1177 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Mills v. Graves*
930 F.2d 729 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Monell v. New York City Dep't of Soc. Servs.*
436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*
182 F.3d 157 (2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Parratt v. Taylor*
451 U.S. 527 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pembaur v. City of Cincinnati*
475 U.S. 469  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Putman v. Gerloff*
639  F.2d 415 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rascon v. Hardiman*
803 F.2d 269 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

*Reed v. Gardner*
986 F.2d. 1122 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Revere v. Massachussetts Gen. Hosp.*
463 U.S. 239 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

01CV0410K (AJB)

*Reynolds v. County of San Diego*
84 F.3d 1162 (9ᵗʰ Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Rizzo v. Goode*
423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

*Rochin v. California*
342 U.S. 165, 172-173, 72 S.Ct. 205, 96 L.Ed. 183 (1952) . . . . . . . . . . . . . . . . . . . . . 34

*Santos v. Gates*
287 F.3d 846 (9ᵀᴴ Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19, 30

*Santosky v. Kramer*
455 U.S. 745, 752-57, 102 S.Ct. 1388, 1394-96, 71 L.Ed.2d 599 (1982) . . . . . . . . . . . . . . . 35

*Saucier v. Katz*
533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272  (2001) . . . . . . . . . . . . . . . . . . . . . 12, 16, 17

*Schneckloth v. Bustamonte*
412 U.S. 218, 219 (1973), 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 . . . . . . . . . . . . . . . . . . . . 31

*Siegert v. Gilley*
500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Soto v.  City of Sacramento*
567 F.Supp. 662 (E.D.Cal.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Springer v. Seaman*
821 F.2d 871 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 34

*Taylor v. United States*
286 U.S. 1, 52 S.Ct. 466, 467, 76 L.Ed. 951 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Taylor v. Ledbetter*
 818 F.2d 793  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Tennessee* v. Garner
471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 734 (1985) . . . . . . . . . . . . . . . . . . . . . 13, 15, 17, 22

*Triton Energy Corp. v. Square D Co.*
68 F.3d 1216 (9ᵗʰ Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*U.S. v. Capote-Capote*
946 F.2d 1000 (5ᵗʰ Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 36, 40

*United States v. Koon*
34 F.3d 1416 (9ᵗʰ Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 30, 32

*United States v. United States District Court*
407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752  (1972) . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Place*
462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 13

01CV0410K (AJB)

*United States v. Karo*
468 U.S. 705, 714 (1984), 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 . . . . . . . . . . . . . . . . . . . . . 31

*Valerie Streit v. County of Los Angeles*
236 F.3d 552 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Walker v. Rowe*
791 F.2d 507 (7th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Welsh v. Wisconsin*
466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*White v. Rochford*
592 F.2d 381 (7th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 37

*Wilson v. City of Zanesville*
954 F.2d 349 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wood v. Ostrander*
879 F.2d 583  (9th Cir. 1989), cert. denied, 498 U.S. 938 (1990) . . . . . . . . . . . . . . . . . . 25, 34

*Woodrum v. Woodward County, Okl.*
886 F.2d 1121 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 35

*Youngberg v. Romeo*
457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 228 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**California Cases:**

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*
7 Cal.4th 503 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Bird v. Saenz*
86 Cal.App.4th 167 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Burgess v. Superior Court*
2 Cal.4th 1064 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Caldwell v. Montoya*
10 Cal. 4th 972 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*Christianson v. Superior Court*
50 Cal.3d 868 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Dillon v. Legg*
68 Cal.2d 728 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Edson v. City of Anaheim*
63 Cal.App.4th 1266 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 39

*Ess v. Escoton Properties, Inc.*
97 Cal.App.4th 120 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Fife v. Astenious*
232 Cal.App.3d 1090 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

- vii -

01CV0410K (AJB)

*Gates v. Superior Court*
32 Cal.App.481 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Huggins v. Long's Drug Stores California, Inc.*
6 Cal.4th 124 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Krouse v. Graham*
19 Cal.3d 59 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.*
48 Cal.3d 583 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Molien v. Kaiser Foundation Hospitals*
27 Cal.3d 916 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Ochoa v. Superior Court*
39 Cal.3d 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*People v. Hardin*
85 Cal.App.4th 625 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Stone v. Regents of University of California*
77 Cal.App.4th 736 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Thing v. La Chusa*
48 Cal.3d 644 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Wilkes v. Hom*
2 Cal.App.4th 1264 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Zuniga v. Housing Authority*
41 Cal.App.4th 82 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38


**Federal Statutes:**

Federal Rules of Civil Procedure

     Rule 56 subdivision (c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24, 37


**California Statutes:**

California Government Code

     Section 820.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

01CV0410K (AJB)

# I.

## INTRODUCTION

At a moment of personal crisis, 16 year old JAVIER PEREZ resorted to alcohol and drugs on the evening of March 10, 2000, and found himself in a state of utter incoherence.  An errant attempt to page his girl friend, using the familiar 911 code to request an urgent return call, found him in contact with a Escondido Police dispatcher.  Following a twenty-five minute conversation in which he was duped and cajoled, he was led outside thinking a friend was playing a prank.. Defendants knew he was unaware of their presence and without identification or any warning JAVIER he was shot.

Defendants would have the Court believe that the application of deadly force was the result of an exigent threat, but as the facts demonstrate the incident developed over the course of twenty-five minutes, and not seconds as defendants now claim.  In short, JAVIER was led into an ambush.

Defendants now seek to avoid liability on theories spanning denial to immunity.  As Plaintiffs demonstrate herein, and based to great degree on Defendants own documentary evidence, liability is either facially clear or is subject to foundational disputes of fact.  In either case, Defendants motion should be denied.

# II.

## STATEMENT OF FACTS[1]

### A. The Telephone Call and Shooting

On the evening of March 10, 2000, at approximately 11:56 p.m., plaintiff Javier Perez ("JAVIER"), then 16 years old, depressed, under the influence methamphetamine, and intoxicated to a state of incoherence, mistakenly dialed 911 while trying page his girl friend and leave her a "911" message - meaning call me right back. (PF 85, 86).  When the dispatcher answered, JAVIER hung up. (PF 86 )  The 911 dispatcher, Wilhelmina Daubman, called him back and a conversation

---

[1]

Unless a specific exhibit is specified, all factual references refer to Plaintiffs' Separate Statement of Disputed Facts ("PF") commencing with PF 85 on page 29 of Plaintiffs' Response to Defendant's Separate Statement of Undisputed Facts and Separate Statement of Additional Facts in Dispute.

01CV0410K (AJB)

ensued spanning a period of twenty-five minutes, during which time JAVIER was not aware he was communicating with law enforcement. (PF 87 ) At various times, he believed he was speaking with a person named Shirley, someone who may have provided him drugs, and ultimately a female neighbor he believed was playing a prank on him. (PF 88) Ms. Daubman played these roles and intentionally misled JAVIER about who was really on the phone. (PF 89) He was still talking to her when he was gunned down by defendants Damian Torres ("TORRES") and Keith Sudak ("SUDAK"). (PF 90) But for his eventual resuscitation by paramedics, JAVIER would have been killed. (PF 91)

At the time of the original call, Sergeant James Lanigan ("LANIGAN"), and defendants Justin Murphy ("MURPHY"), SUDAK and TORRES were at an AM/PM market together. (PF 92) The radio dispatch from Ms. Daubman was coded as a "welfare check," meaning that an officer should be sent to the residence to check on the welfare of the **caller**.[2] (PF 93) Dispatch advised the responding officers the welfare check involved an intoxicated minor possibly with a loaded firearm. (PF 94) Defendants knew JAVIER's younger sister and mother were also at home. (PF 94) The record contains no threats of suicide (PF 96) and no threats against others. (PF 97) Defendants cite to portions of the 911 call which they characterize as threats toward the police, but this information was not known to them at the time. (PF 97) JAVIER did not make these threats seriously or knowingly to law enforcement; immediately following the cited language, he laughed and asked, "who is this?" (PF 97) This "threat" information was **not** communicated via radio. ( ) It appears only as a text note on the CAD print-out[3]. (PF 99) Defendant Steve La Marca ("LA MARCA") who was positioned with MURPHY, confirmed officers were unaware of any threats. (PF 99)

LANIGAN he had ultimate responsibility for the actions of others. (PF 100) LANIGAN instructed MURPHY, LA MARCA and TORRES to remove bulbs from exterior lights on the Perez

---

[2]

Defendants now claim, only after the incident, they were going to check on the welfare of plaintiffs Estella and Yesenia Perez. This claim is contrary to the evidence, including the testimony of Ms Daubman.

[3]

Plaintiffs are unable to determine if the print-out was made contemporaneously with the incident, or whether it was sent or seen by any officer.

01CV0410K (AJB)

1  home and the home of their neighbor across the street. (PF 101). LANIGAN decided to eliminate

2  non-deadly force early and long before JAVIER was ever directed to come outside. (PF 102, 103,

3  104, 105) He instructed others not to deploy non-lethal weapons. (PF 102) When queried by

4  defendant Steve Sanders ("SANDERS"), a canine handler, whether his K-9 should be deployed (as

5  he was ready and able) LANIGAN declined because **"he could not authorize deadly force to**

6  **protect the canine.**" (PF 102) He also decided against use of available protective shields. (PF 102)

7       LANIGAN deployed SUDAK, TORRES, SANDERS, MURPHY, LA MARCA, Marco

8  Sevilla ("SEVILLA") and Mike Nelson ("NELSON") across the front of the residence and off to

9  the side near the garage. (PF 106, 109-113 ). TORRES was set up in sniper fashion across the street

10  with his rifle. (PF 107) All lights were extinguished to enable the officers to take cover in the

11  darkness and conceal their presence and identities from JAVIER, not for protection but to initiate

12  an ambush. (PF 101)[4]

13       The front door of the Perez home opens onto a walkway running alongside the garage wall

14  for its entire length before turning left in front of the garage and onto the driveway. (PF 108) The

15  walk is bordered on the other side by a waste-high hedge. (PF 108)

16       A tow trailer, belonging to neighbor Jose A. Batiste, was parked on the street in front of the

17  Perez home. (PF 109) From that vantage point the front door was visible. (PF 110) SUDAK and

18  SANDERS took up positions behind the trailer. (PF 110)[5] MURPHY and LA MARCA were

19  positioned at the top of the driveway in front of the garage (closed at the time) farthest away from

20  the walkway and  in front of a motor home. (PF 111) MURPHY and LA MARCA had no view of

21  the walkway between the front door and the end of the garage wall. (PF 112) LANIGAN positioned

22  himself, SEVILLA, and NELSON at the street end of the Perez driveway behind the motor home.

23  (PF 113) LANIGAN, SEVILLA and NELSON had no view of the front door or walkway. (PF 113)

24

25  [4]

26  See diagram Exh. 21, p.4.

   [5]

27  It is important to note that the front door of the Perez home, and the length of the walkway from the front door

28  along garage wall was visible only to Sudak, Sanders and Torres and not to Murphy, La Marca, Lanigan, Nelson or
   Sevilla.

01CV0410K (AJB)

1       When all was set, LANIGAN instructed the dispatcher to have Javier come out the front

2   door.  (PF 116) **JAVIER still had no idea** he was talking to law enforcement or that law

3   enforcement was outside.[6] (PF 117) Ms. Daubman told JAVIER his girl friend was outside waiting

4   for him. (PF 117-118) Ms. Daubman asked him to go outside and leave the gun behind.  (PF 118)

5   JAVIER responded there might be "Wetbacks" or "Diablos" outside and he couldn't leave the gun

6   behind. (PF 118) Again, he thought he was talking to his friend. (PF 88) Daubman told him it would

7   be all right.  (PF 118) Daubman advised defendants he was coming out. (PF119) They were not

8   surprised that he exited with the weapon, but they had already decided to use lethal force. JAVIER

9   opened the front door to blackness having no idea police officers were outside. (PF 119-121)

10      Several events occurred: (1) JAVIER was still talking to Ms. Daubman on his cordless

11  telephone (PF 121);  (2) as JAVIER stepped out he was back-lit by the living room lights  (PF 122);

12  (3)  the front door opened onto a step that JAVIER stumbled over causing him to fall against the

13  garage wall (PF 123);  (5) the telephone was in his right hand held to his ear, the BB gun was in his

14  left hand hanging down (PF124);  (6) in trying to steady himself, he attempted to lift his left arm but

15  was unable to; (7) he was shot where he stood, and fell where he was shot (PF 125-126).

16      SUDAK was sure the gun in the right hand, but it was the cordless telephone not the BB gun.

17  (PF 129) SUDAK also observed that JAVIER's actions were defensive not offensive.  (PF 131)

18  JAVIER fell immediately to the ground upon being shot.[7] (PF 126)   The inconsistencies in

19  defendants' versions of events, the testimony of plaintiffs' witnesses, and the **undisputed** physical

20  evidence all substantiate JAVIER was shot almost immediately after exiting his home and could not

21  have reached the location claimed by defendants.

22      Defendants attempt to place JAVIER all the way down the walkway, past the end of the

23  garage a distance of about thirty feet. (Exh. 29, p.9) This is inconsistent with the physical evidence

24

25      6

26  Defendants now variously assert reasons why he knew they were outside, but their belated claims are contrary to the evidence.

27      7

28  In later statements to the Shooting Review Board, some defendants attempt to now create an version of event which has Javier falling back, but that is inconsistent with the physical evidence and most defendants prior statements.

01CV0410K (AJB)

1   and testimony that he crumpled to the ground immediately. (PF 126, 141, 142-146) LANIGAN

2   claims JAVIER raised the gun slowly to shoulder level (2-3 seconds) and aimed at LANIGAN (2-3

3   seconds ). (Exh. 29, p. 12) Yet, Defendants also claim JAVIER pointed at  MURPHY and LA

4   MARCA (PF 136), or across the street (PF 137). The three locations span approximately ninety

5   degrees of angle. (Exh. 21, p. 4) Defendants also claim JAVIER was holding the gun in his left hand

6   (PF 132, 135) or in his right (PF129, 130). **Only** SUDAK, SANDERS and TORRES had views of

7   the Perez front door and walkway.  (Exh. 21, p. 4)

8        LANIGAN designated SEVILLA to be the "shouter" to yell commands to JAVIER when

9   he came out, but did not tell SEVILLA what to say. (PF 128) The **only words** said to JAVIER prior

10   to being shot was "put your hands up, put your hands up," and "drop . . . ." (PF 127)

11        LA MARCA's view of JAVIER was blocked by the garage, though he claimed to have seen

12   the gun. (PF132) LA MARCA admitted, though, that JAVIER never got around the corner and was

13   shot by TORRES and SUDAK because they had better angles. (PF 132) He didn't see JAVIER's

14   right hand. (PF 132) LA MARCA said JAVIER pointed the gun at LANIGAN and SEVILLA. (PF

15   134) LA MARCA, supposedly part of an "arrest team," had his loaded shotgun up to his eye when

16   he claimed to have seen a "left hand" holding a "black gun" and thought "okay, now I'm going to

17   have to shoot this guy."  (Exh. 23, p. 2) Again, Defendants never identified themselves as police.

18   (PF 140).

19        Defendants cite often to statements by JAVIER on the telephone about sending the "fucking

20   pigs," but this information was unknown to officers at the time.  (PF 98)

21        SEVILLA was instructed by LANIGAN to give commands to JAVIER, but he couldn't see

22   JAVIER when he exited the house.  (PF 128) LA MARCA also could not have seen the left hand

23   because SEVILLA had a better angle to the end of the garage. (PF 132) SEVILLA claimed he

24   shouted "let me see your hands," prompting JAVIER to lift the BB gun to shoulder height and point

25   it towards MURPHY and LA MARCA. (PF 136)  LA MARCA, however, admitted JAVIER did not

26   pass the corner of the garage and pointed at LANIGAN, who was next to SEVILLA.  (PF 132)

27        Elsewhere SEVILLA admitted that the gun only came up to a forty-degree angle, and not

28   to shoulder level. (PF 135)  SANDERS and SUDAK claim the gun was in the right hand; they

01CV0410K (AJB)

1  couldn't see JAVIER's left hand. (PF129-130) SANDERS' and SUDAK's views were blocked

2  below JAVIER's waist by a hedge, they did not see the gun, but the telephone.  (PF 108-109)

3      Long prior to LANIGAN telling dispatch to send JAVIER outside he and the other

4  defendants eliminated the use of any level of force but lethal.  (PF 102 - 105.) An on-scene canine

5  was eliminated, "because we can't use lethal force to defend one of the dogs." (PF 102.) SEVILLA

6  requested ENT (Emergency Negotiating Team) prior to the shooting but he was ignored, it "was like

7  pulling teeth." (PF 190)

8      The attempt to fabricate evidence is evident in SEVILLA's response to the Shooting Review

9  Board's questions about the CAD records; presumably to establish officers knew about the alleged

10  threat to police. (PF 99) SEVILLA emphatically denied ever reviewing the CAD records. (PF 99)

11  After the interview was interrupted, however, SEVILLA then recalled having seen the CAD print

12  with regard to the alleged threat. (PF 99)

13      LANIGAN told dispatch to have JAVIER come outside. (PF 116) LANIGAN never

14  mentioned to dispatch that JAVIER should leave the gun behind. (PF 116.) Defendants were not

15  surprised when JAVIER came out with the BB gun. (PF 138) SANDERS also said the gun never

16  came all the way up thus he didn't know where it was pointing.[8] (PF 138) JAVIER dropped straight

17  down after being hit at the location where he was shot. (PF 126, 141)

18      Defendants knew only that the individual in the house was drunk, under the influence of

19  drugs and had a gun. (PF 120) Defendants also knew JAVIER thought someone was playing a joke

20  on him and that he was unaware of any police presence. (PF 120).[9]

21      NELSON claimed the gun was pointed across the street (PF 137), in which case there was,

22  no imminent threat to LANIGAN, SEVILLA, MURPHY or LA MARCA. NELSON was standing

23  with SEVILLA and LANIGAN. (Exh. 21, p. 4)

24

[8]

25  Yet, on another occasion SANDERS claims to have seen the gun pointed at LA MARCA and MURPHY. (3/11/00

26  2.) This is of course impossibly consistent with the actual location Javier was shot.

[9]

27  Only six months later in preparation for the Shooting Review Board, does NELSON, like others, claim to have been

28  apprized of the alleged threat against the officers. NELSON criticizes the CAD printout, however, as incorrect, rendering its reliability, or date of actual creation, questionable.

- 6 -

01CV0410K (AJB)

No one advised JAVIER they were police officers.  (PF 140)

MURPHY's version is that he was told there was a sixteen year old doing drugs and drinking who "just didn't care anymore" (Exh. 24, P. 1)  The only reference to "doesn't care" is radio traffic "[h]e doesn't know is his mother and sister are awake or asleep and he doesn't care" (Exh. 17, p. 4) and a CAD note "RP has no idea . . .he doesn't care" (Exh. 18, p. 1).[10] MURPHY also claimed he received information about a prior  California Penal Code 12020 violation, that involved possession of a small kitchen paring knife and the information was in the possession of City.

MURPHY, who was standing next to LA MARCA, claimed to have seen  a telephone and a gun (PF 133), but then claimed only to have seem a hand and a gun.  (PF 133) MURPHY confirmed JAVIER fell right where he was shot: "I heard the shots go off, I saw him drop the gun and I saw his feet flip out from underneath him and he landed on the ground."  (PF 126)  It cannot be disputed that JAVIER was lying by his front door and no where near the end of the garage wall. MURPHY admitted he and LA MARCA handcuffed JAVIER "right where he fell.  (PF 141)

### B.  The Physical Evidence

LANIGAN claimed JAVIER walked past the end of the garage, stepped out, turned to face in the direction of LANIGAN, SEVILLA, and NELSON.  (Exh. 29, p.9) JAVIER was then allegedly illuminated by LANIGAN's flashlight, told to drop the gun, raised the gun to shoulder height instead, turned it sideways and pointed at LANIGAN for two to three seconds.  (Exh. 29, pp. 10, 12) Murphy said JAVIER walked past the end garage wall and then just stood there for ten seconds. (Exh. 32, p. 9)  MURPHY also said he handcuffed JAVIER "right where he fell." (Exh. 32, p. 5) Defendants' placement of JAVIER beyond the end of the garage for up to ten seconds is simply untrue. JAVIER fell right where he was shot.  (PF 141, 146) But JAVIER was not lying in the driveway or at the end of the garage, but near the front door. (PF 141; Declaration of Estella Perez ¶ 4 )  The telephone was there. (PF 142) The handcuffs were there.  (PF143) The ammu bag was there.  (PF 144) **All** of the blood was there. (PF 145).  Detective Sweeney admitted he was shot

---

10

At one point in this case, defendants attempted to claim this was a case of attempted "suicide by cop," though there was never any evidentiary support.

01CV0410K (AJB)

there, near his front door.  (Exhibit 37, p. 3)  Detective Sweeney was on site shortly after the shooting and was personally walked through the scene by LANIGAN. (Exh. 29, p. 4)  The audio tape confirms he opens the door to see it is dark, he stumbles, the only words heard are "put your hands up" and he is shot.  (Exh. 1; Exh. 2, p. 36)

JAVIER was shot in the center of his chest in a direct line of sight down the length of the walkway by TORRES. (PF 148) It was a straight shot, not one from an angle.[11]  (PF 149-150) The second shot pierced JAVIER's right shoe as he was falling and entered  right heel and lodged in the left groin.[12] (PF 151) There is **no blood** evidence at the end of the walkway, it is **all** by the front where JAVIER was actually shot.  (PF 144)

Again, only SANDERS, SUDAK and TORRES were in positions to see JAVIER. SANDERS said the right arm never came all the way up.  (PF 135) SUDAK was shooting a "weapon" held in JAVIER's right hand; he never saw the left hand. (PF 129).  TORRES took a shot while JAVIER was backlit by the front door.   (PF 139) The evidence belies the claims by MURPHY, La MARCA, SEVILLA, NELSON and LANIGAN that JAVIER posed a threat of harm to any of them.

### C. Post Shooting Conduct

1.   Illegal Search of Javier's Person and Exacerbation of Injuries

The minute the officers reached JAVIER, they knew the "weapon" was a BB gun. (PF 152) When SEVILLA handcuffed JAVIER, he knew it was only a BB gun. (PF 152).  The gunshot wound to JAVIER's chest was immediately visible. (PF155)  NELSON heard the wound "sucking" and JAVIER was coughing up blood. (PF 155 ) Ignoring his mortal injury JAVIER was rolled over and searched while handcuffed.  (PF 156).  As a result, he stopped breathing. (PF 157)  Despite his obvious injury, no one intervened to prevent JAVIER from being rolled, handcuffed and searched.

---

[11]

Lanigan claimed JAVIER turned sideways towards him, which would make a frontal chest shot by Torres contrary to the laws of physics.

[12]

Again, not possible unless JAVIER was shot just past his front door.

01CV0410K (AJB)

After exacerbating JAVIER's injuries by rolling him and  pulling his arms back did defendants contemplate some medical care. (PF 158) All witnesses other than defendants, including CITY's paramedics, observed defendants simply standing around providing no care.  (PF 158) JAVIER is alive only because of paramedics and trauma physicians. (PF 159).

### 2.    Estella and Yesenia Perez

Javier's mother and sister, plaintiffs Estella Perez ("ESTELLA") and Yesenia Perez ("YESENIA"), were witnesses to horrific events. (PF 160) Both heard the shooting. (PF 160) ESTELLA was in the hallway just turning toward the front door. (PF 160)  YESENIA behind her mother. (PF 160) While ESTELLA was forcibly restrained while her son lay dying without medical assistance, YESENIA  was permitted to go to her brother. (PF 161) YESENIA was fourteen years old at the time, yet she was allowed to witness the trauma, bleeding and belabored breathing of her brother who was receiving no medical attention. (PF 162)

ESTELLA was removed by defendants and taken to the hospital while YESENIA went to neighbor Alejandro Aguiano's house. (PF 163) The Perez house was empty.  Officers searched the home removing items of evidence.  (PF 164)  At least LA MARCA, SEVILLA, MURPHY and NELSON entered and search the Perez home without a warrant. (PF 165)  Neighbors, saw officers carrying bags of material out of the house, immediately after the ambulance left (taking out items within the first forty minutes) and continuing until approximately 4:00 a.m.  (PF 168)  All defendants, except TORRES, SUDAK and MURPHY (who drove ESTELLA from the premises) were on scene until approximately 3:00 a.m. (PF 169)

A warrant to search the premises was not applied for until 4:58 .m.  (PF 170).  Detective Sweeney, who applied for the warrant, was personally at the Perez home within thirty to forty minutes of the shooting. (PF 171) Detective Sweeney **swore under oath**, however, the warrant was necessary to secure the premises, look for other suspects and weapons, and search for evidence. (PF 172)  This was a conscious misstatement of facts to the Judge and District Attorney.  The premises had been swept almost five hours previously. (PF 172) The search was already complete by the time the warrant was applied for. (PF 172) The warrant wasn't served at about 6:00 a.m.  (PF 173) The evidence technicians who allegedly performed the search, including Nowak, departed the scene at

01CV0410K (AJB)

1    5:32 a.m.  (PF 173).

2         3.    Conduct of Chief WHITE and the CITY of ESCONDIDO

3         Chief WHITE is the promulgator of police policy for the City of Escondido and the

4    Escondido Police Department.  (PF 175).  He is the sole individual responsible for reviewing

5    officers' conduct and determining whether discipline is appropriate.  (PF 175) He reviewed no

6    statements or other materials in this case to determine whether his officers conducted themselves

7    appropriately other than to  review the Shooting Review Board findings.  (PF 176) Chief WHITE

8    testified the CITY maintained **no policy at all with regard to the necessity of  a warning prior**

9    **to the use of deadly force**.  (PF 177)

10        CITY had no warning policy except in connection with use of a Taser. (PF 177)  After his

11   deposition was concluded, Chief WHITE sought to cover up the CITY's constitutional deficiency

12   by correcting his sworn testimony and claiming  there was a "warn" policy regarding the use of

13   force. (PF 179)  He cited a memorandum written by Lieutenant Houchin which discussed a warning

14   pursuant to *Deorle v. Rutherford*, 272 F.3d 1272 (2001).  (PF 179) That memorandum was drafted

15   on May 1, 2001, over a year after this shooting.  (PF 179)  The written policy of the CITY, covering

16   use of deadly force, was issued by Chief WHITE on November 4, 1999, and omits requirement to

17   warn prior to the use of deadly force.  (PF 180) WHITE again tried to cover up CITY's illegal

18   policy.  His declaration, filed with the Court in support his motion for summary judgement, claims

19   the duty to warn, pursuant  to *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), must have been taught at

20   the general police academy.  (PF 181) WHITE's claim is belied by both his testimony and his

21   written policy. (PF 182)

22        CITY maintains a policy that all suspects, whether subject to arrest or detention, should be

23   handcuffed.  (PF 183) The CITY maintains no policy with regard to instances where the act of

24   handcuffing may exacerbate existing life threatening injuries  (PF 184)

25        CITY fails to train its dispatchers in any area other than how to answer calls, yet bestows

26   them with discretion to classify a call and undertake to negotiate with individuals. (PF 185) The sole

27   training provided to such individuals is operation of the communications devices. (PF 185) CITY

28   does have specialized units and individuals trained for negotiation there is no policy as to when these

01CV0410K (AJB)

1    teams and individuals should be employed. (PF 186) SEVILLA believed he requested negotiators

2    on the night of March 10, 2000, but none were deployed. (PF 190, 191)

3         Plaintiffs obtained documents related to prior police involved shootings from 1994 forward.

4    (PF 187) The records indicate that in each prior shooting involving human victims and lethal

5    ammunition **every** victim was an Hispanic male. (Declaration of Leon J. Saad, Esq., ¶¶ 4-9; Exh.

6    47, 48, 49). SUDAK noted "[w]hen the kid came out he had the flannel on with the one button on

7    the top, the t-shirt with the baggy pants and when he raised the gun-I, I call it gangster style because

8    it's not a normal position, but its turned sideways . . . ." (Exh. 27, 9:19.) The elimination of non-

9    lethal alternatives and a commitment to deadly force was a result of racial stereotyping equating

10   Hispanic males and style of dress with criminal or gang conduct. (PF 187-189)

11   ### III.

12   ### STANDARD OF PROOF

13        The Court cannot grant summary judgment or summary adjudication unless it finds there are

14   no genuine disputes of material fact. Federal Rules of Civil Procedure ("F.R.C.P."), Rule 56

15   subdivision (c); see also *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978).

16   The moving party bears a heavy burden to prove the absence of any dispute of material fact bearing

17   on the moving party's burden of proof at trial. *Nationwide Life Ins. Co. V. Bankers Leasing Ass'n,*

18   *Inc.*, 182 F.3d 157, 160 (2nd Cir. 1999). Unless defendants can establish the absence of any real

19   issue of fact as to one or more elements essential to each claim, they are not entitled to the relief

20   sought. *Wilson v. City of Zanesville*, 954 F.2d 349, 351 (6th Cir. 1992). Likewise, to the extent

21   defendants rely on an affirmative defense as a basis for judgment, they have the burden of

22   establishing each element of the defense and that there are no disputed issues of material fact with

23   regard to any such element. *Fontenot v. Uphohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

24        Plaintiffs must only proffer evidence which, if considered by a fair minded jury, would

25   support a verdict in plaintiffs' favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct.

26   2505, 2512 (1986). This includes the opinion of expert witnesses which may alone be sufficient.

27   *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1222 (9th Cir. 1995). Plaintiffs' burden is to

28   proffer evidence sufficiently probative to permit a reasonable inference in their favor. *Anderson v.*

01CV0410K (AJB)

1     *Liberty Lobby, Inc., supra,* 77 U.S. at , 252, 106 S.Ct. at 2512.  All such reasonable inferences must

2   be drawn in plaintiffs' favor.  *Eastman Kodak Co. v. Image Technical Services, Inc.*, 906 F.2d 432,

3   440 (9th Cir. 1990).

4         In 42 U.S.C. § 1983 cases, the threshold inquiry is whether the facts, when taken in the light

5   most favorable to the plaintiff, show the officers 'conduct violated a constitutional right.  *Siegert v.*

6   *Gilley*, 500 U.S. 226, 232 (1991).  Where "conflicting inferences may be drawn from the facts, then

7   the case must go to the jury. [Cit.]" *Santos v. Gates*, 287 F.3d 846, 851 (9th Cir. 2002). The jury is

8   not limited to direct evidence by may rely on circumstantial evidence.  *Id.* at 852.  Thus, where

9   evaluation of the claim, "depends principally on credibility determinations and the drawing of

10  factual inferences from circumstantial evidence . . . the jury must be allowed to assess whether the

11  force used by the officers was excessive.  *Id.* at 856.  In other words, the reasonableness of police

12  conduct is a jury question.  *Id.* at 855, fn. 12 relying on *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct.

13  2151, 114 L.Ed.2d 277.

14  **IV.**

15  **DEFENDANTS VIOLATED PLAINTIFF JAVIER'S**
**ENUMERATED RIGHTS PURSUANT 42 U.S.C. § 1983**

16

17        JAVIER alleges several bases upon which liability pursuant to 42 U.S.C. § 1983 is premised.

18  He alleges the shooting constituted an unlawful use of force, he was then subjected to a separate

19  unlawful use of force by being rolled and handcuffed after it was conclusively known he posed no

20  threat and had a potentially fatal gunshot wound to the chest, and his residence and personal

21  property were searched without a warrant and in the absence of any exigent circumstance. (Second

22  Amended Complaint ¶¶ 26, 27 and 28.)

23        To establish liability under section 1983, the conduct alleged must have occurred under color

24  of law resulting in a constitutional deprivation. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908,

25  68 L.Ed.2d 420 (1981), overruled on other grounds *Daniel v. Williams,* 474 U.S. 327, 106 S.Ct. 627,

26  88 L.Ed.2d 662 (1986).  Defendants do not dispute that at all relevant times, they were each acting

27  under color of law.  What is in issue is whether defendants uses of force were unreasonable and

28  therefore excessive, and whether the search of the Perez home was constitutionally defective.

- 12 -

### A.   The Use Of Deadly Force Unreasonable and Excessive

The use of force, and particularly deadly force, by police officers constitutes a seizure subject to the "reasonable" requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In determining the reasonableness of an officer's conduct, an objective standard is applied. *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1994). Analysis of reasonableness necessarily entails a balancing test wherein the nature and quality of the intrusion is weighed against the governmental interests alleged in support of the intrusion. *Tennessee v. Garner, supra*, 471 U.S. at 7; *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2673, 77 L.Ed.2d 110 (1983). In other words, the need for force is balanced against the nature and extent of the force applied. *Liston v. County of Riverside*, 120 F.3d 965, 976 (1997).

JAVIER was shot twice. The 1985 the Supreme Court held, "[t]he intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon." *Tennessee v. Garner, supra*, 471 U.S. at 10. The use of deadly force is presumptively unreasonable. *Id.* at 11. There are very narrow circumstances where officers may be entitled to employ deadly force within the parameters of the Fourth Amendment.

Deadly force may be justified where there is a real and imminent threat of serious or deadly harm to the officers. That is the essence of defendants' argument. The evidence, however, does not support a real or imminent threat. Disparities in defendants' accounts, coupled with incontrovertible physical evidence, demonstrates the absence of a threat and adequate time for defendants to have identified themselves and warned JAVIER that deadly force would be deployed. At the very least, the evidence raises legitimate disputes as to the material facts. Defendants admit they never identified themselves as police officers and never warned JAVIER they would shoot. Even where an actual threat exists, though, the use of deadly force is constitutionally impermissible in the absence of a warning and an opportunity to comply. *Tennessee v. Garner, supra*, 471 U.S. at 11-12. Warnings are required even for less-than-lethal force where, "*the use of force may result in serious injury.*" *Deorle v. Rutherford, supra*, at 1284, emph. added.

Defendants assert they had no time to warn and hence a warning was not feasible. This was not a twelve second encounter but a **twenty-five minute event**. (PF 87) There was adequate time

- 13 -

01CV0410K (AJB)

1   for identification and warnings to be given.  JAVIER only came out of the house when defendants

2   told him to! Lack of time was never an issue in this case. (PF 191)  Defendants **knew** that JAVIER

3   had no knowledge of their presence.  (PF 87, 117, 118, 120) Defendants **knew** JAVIER did not

4   know he was on the telephone with the police and thought, instead, he was the victim of a neighbors.

5   (PF 120 ) Defendants **knew** he was intoxicated to a state of incoherence. He was lured  into a

6   darkened environment by deceit.  There was ample opportunity to advise JAVIER officers were

7   present both prior to and after he exited the house.  Not one of the Defendants on scene shouted

8   "police" or told him they were officers. (PF 140) The shooting was *pre se* unreasonable.

9         JAVIER was shot just outside his front door. (PF 141-146, Declcaration of Estella Perez ¶

10  4)   Defendants have positioned JAVIER at various spots.  LANIGAN placed JAVIER on the

11  driveway beyond the garage thirty feet from his front door.  Other defendants placed him near or

12  at the end of the garage wall.  Depending on which defendant's  account, JAVIER was threatening

13  officers, by pointing a BB gun, in three discrete physical locations with over ninety degrees of

14  separation.  (PF 134, 136, 137, Exh. 21, p. 4) It was never claimed the "gun" was moving, but

15  pointed steady, straight-armed and shoulder-height.

16        Defendants agree JAVIER fell  where he was shot. (PF 141) The physical evidence, the

17  testimony of JAVIER, the testimony of ESTELLA the admission of detective SWEENEY **all** place

18  JAVIER near the front door of PEREZ home. He was shot as he stumbled over the front step and

19  not at the end of the walkway and garage.  (PF 125) **All** of the blood was there along with the

20  telephone, which was still "live,." the handcuffs were there, the ammu bag and, of course  JAVIER.

21  (PF 145, 142, 143, 144)

22        Lou Reiter, plaintiffs' police practices expert, who trains officers nationwide, and whose

23  qualifications are summarized in his sworn report and the resume attached (Exh. 12), reviewed the

24  pleadings and evidence in this case  prior to formulating his opinion.  Mr. Reiter concluded the

25  actions of defendants were so egregious as to be describe as an "**ambush**." (Exh. 12, 9, ¶ 20.) This

26  opinion was not undertaken lightly but accurately assesses the on-scene conduct.

27                   Everything done by the officers . . . was done to obscure the presence of the
                     officers and any police presence. . . They unscrewed the garage lights at both

28                   the  Perez  and  Batista  homes. . .The  officers  failed  in  the  concept  of

communications. . . Everything done was done in a manner to obscure their presence. . . .There was no one who used any terminology identifying themselves as the police. . . There was no rush. This was not a split second encounter. . . Javier was on the telephone with Ms. Daubman and there is no indication that he was rushed, looking to leave or engage in any further actions. There was no indication that any violence had occurred. Other than his use of narcotics, there is no indication that any crime had been committed. The plan directed by Sgt. Lanigan was designed to eliminate any use of time . . .

(Exhibit 12, pp. 12-13, ¶¶ 24-27.)  Mr. Reiter concluded, "[a]ny reasonable officer, in my opinion, would have or should have known that the tactics used would not reasonably ensure that Javier would know that they were the police or provide the police with the opportunity to provide that moment of notice. Their conscious choices unnecessarily created the circumstances which culminated in the use of deadly force." (Exhibit 12, p. 9-10, ¶ 20.)  While plaintiffs rely on a substantial amount of other evidence, expert opinion is admissible and can suffice on its own to defeat summary judgment. *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir. 1985).

The obscuring of their identities as police officers, and the unimpeachable evidence that defendants knew JAVIER was unaware of who they were, constituted an actionable failure to announce and warn. The "knock and announce" rule required for premises searches was intended to protect and citizens from announced invasions. California acknowledges the right to  defend one's property and,  in the absence of identification, any reasonable officer would understand his duty to announce his presence. *People v. Hardin*, 85 Cal.App.4th 625, 633-634 (2000).

Even if defendants had announced their presence, JAVIER never had a chance to brandish or point the BB gun as claimed.[13]  Even if JAVIER had threatened an officer with a real weapon, in the absence of identification and warning, use of deadly force would have been unreasonable and excessive.  Any reasonable officer would or should know that the use of  deadly force without announcing one's presence, without providing an opportunity for the individual to comply with instructions, and without warning that deadly force would be deployed, under circumstances which provided more than sufficient time to warn, is a Fourth Amendment violation. *Tennessee v. Garner*,

---

[13]

As previously established, his physical location rendered the alleged threat nonexistent.

- 15 -

1    *supra*, 471 U.S. at 11-12; *Deorle v. Rutherford*, 272 F.3d at 1284.

2         Notwithstanding JAVIER's age and incapacity, facts which defendants were required to

3    consider[14], the defendants committed to the use deadly force lomg prior to having JAVIER come

4    outside.  Even after the shooting, there was concern that TORRES and others might commence

5    "high-fiving" in the street in front of neighbors. (PF 167) LANIGAN made clear the value he valued

6    JAVIER's life less than that of a dog: "we can't use lethal force to defend one of the dogs." (PF

7    102.)

8         The officers knew immediately after the shooting the "weapon" was a BB gun, there was no

9    danger and JAVIER sustained a mortal chest wound. Nevertheless, he was rolled onto his side, just

10   after the upper and lower lobes of his right lung had been destroyed, and his hands were pulled

11   behind his back.   Only after his breathing became labored, and by some accounts stopped, were the

12   handcuffs removed. (PF 157) Such callous and reckless disregard for JAVIER's life was unjustified

13   and unconscionable.[15]

14                                **B. Qualified Immunity**

15        Police officers are not absolutely immune from suit, but rather are immune only to the extent

16   their conduct doesn't violate clearly established statutory or constitutional rights which a reasonable

17   person would know. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396

18   (1992). It should be noted that the CITY has neither absolute nor qualified immunity. *Branch v.*

19   *Tunnell*, 14 F.3d 449, 450 (9th Cir. 1994), citing *Leatherman v. Tarrant County Narcotics*

20   *Intelligence and Coordination Unit*, 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

21        The Supreme Court recently considered, in the context of a *Bivens*[16] action, the standard to

22   be applied when assessing whether or not qualified immunity applies to an individual set of facts.

23   See *Saucier v. Katz, supra*, at 201-202.  The threshold inquiry is whether the facts, when viewed in

24

25   [14] See *Deorle v. Rutherford*, 272 F.3d at 1285.

26   15

27   Yet JAVIER was charged with brandishing a simulated handgun at Murphy and Lanigan were in different locations.
     There is consistent with a pattern and practice CITY to disregard the law.

28   [16] *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

the light most favorable to Plaintiffs, show the officers' conduct violated a constitutional right. *Saucier v. Katz, supra*, at 201. If a violation can be made out after a favorable review of Plaintiffs' case, the court must next determine whether the right was clearly established. The final step is a determination of whether the officers conduct was reasonable under the particular factual circumstances of each case. *Ibid.* Disputed issues of fact, however, render reasonableness a jury issue. *Saucier v. Katz, supra*, at 205; see also *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) and *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872-973 (9th Cir. 1993).

The use of force constitutes a Fourth Amendment seizure. *Tennessee v. Garner, supra*, 471 U.S. at 7. This is particularly true where deadly force is used. *Id.* Pursuant to *Graham v. Connor, supra*, 490 U.S. at 396, and *Tennessee v. Garner, supra*, 471 U.S. at 8, plaintiff has established that the nature and quality of the intrusion on his Fourth Amendment Rights was presumptively unconstitutional. The government interests at stake are insufficient to shield the officers from liability. The analysis focuses on three factors, "'(1) the severity of the crime at issue, (2) whether the suspect pose(d) an immediate threat to the safety of the officers or others . . . (3) whether he [was] actively resisting arrest or attempting to evade arrest by flight,' and any other 'exigent circumstances [that] existed at the time of the arrest.'"[Cit.]" *Deorle v. Rutherford, supra*, 272 F.3d at 1280.

There are significant foundational facts in dispute in this case. JAVIER's physical location at the time of the shooting is in dispute. Defendants' divergent explanation of events is not consistent with the physical evidence. JAVIER was shot near his front door and not at the end of the garage.

There was no exigency - time was not an issue in this case. JAVIER was in direct contact with dispatch for **twenty-five minutes**. He came outside only upon LANIGAN' command. There was no element of surprise. (PF 138)There is no evidence or allegation that JAVIER exited quickly. In fact, defendants agree JAVIER's staggered or reeled.

JAVIER never knew the police were outside. (PF 87, 88, 117, 140) The officers were hidden. No warning was ever given that police were present and prepared to shoot. JAVIER could not and did not lift his left arm and point the BB gun. (PF 125) He was shot for holding a cordless

1    telephone. (PF 129)

2         No reasonable officer under the circumstances would view the use of deadly force as

3    appropriate.   JAVIER was shot because defendants were committed to doing so.

4         The alleged verbalized "threat" against the police officers may have been irresponsible

5    youthful machismo, but was not taken seriously by dispatch.  After making the alleged threat,

6    JAVIER asked who he was speaking to, he didn't know.  (PF 97) Notwithstanding defendants

7    belated claim they knew of the statement, they did not. (PF 98)

8         The response code was never changed from "welfare check," which means checking on

9    JAVIER's welfare. (PF 93) Defendants now claim their assault response was motivated by concern

10   for ESTELLA and YESENIA.  That is also not true. (Exh. 35, p. 5)

11        Pursuant to *Graham v. Connor, supra,*  and *Tennessee v. Garner, supra,* the application of

12   lethal force was excessive and unreasonable.  Under any objective standard of analysis, no

13   reasonable officer could have believed, based on the facts known at the time, that lying in wait for

14   an intoxicated minor and using deadly force without identifying that police were present and

15   warning prior to use, notwithstanding the opportunity to do so, was constitutionally protected

16   conduct. *Deorle v. Rutherford, supra,* 272 F.3d at 1285.  JAVIER committed no serious offense and

17   was known to be incoherent. Based on the state of the evidence, he never posed a legitimate threat

18   to Defendants.  As noted in *Deorle,*

19              Even when an emotionally disturbed individual is 'acting out' and
                inviting officers to use deadly force to subdue him, the government
20              interest in using such force is diminished by the fact that the officers
                are confronted, not with a person who has committed a serious crime
21              against others, but with a mentally ill individual.

22   *Id.* at 1283.  Whether the force used by a police officer is reasonable "is ordinarily a question of fact

23   for the jury." *Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (9th Cir. 1997), citing *Forrester*

24   *v. City of San Diego,* 25 F.3d 804, 806 (9th Cir. 1994).  As noted recently in this Circuit, "[t]he

25   inherently fact-specific determination whether the force used to effect an arrest was reasonable

26   under the Fourth Amendment should only be taken from the jury in rare cases." (*Headwaters Forest*

27   *Defense et al. v. The County of Humbolt et al.,* 211 F.3d 1121 (9th Cir. 2000), amended by 240 F.3d

28   1185, cert. granted, vacated and remanded, _ U.S. _, 122 S. Ct. 24, 151 L.Ed.2d 1 (2001), 276 F.3d

- 18 -

01CV0410K (AJB)

1    1125 (9th Cir. 2001).  Plaintiffs now address respective liability for each defendants.

2        **C.    Defendants' SUDAK and TORRES Personally Deployed Unreasonable Force And Are Subject to 42 U.S.C. § 1983, Liability**

3

4        Defendants TORRES and SUDAK were the "shooters." TORRES was the first to shoot,

5    striking JAVIER in the chest. (PF 148, 151) SUDAK shot immediately after TORRES.  (Exh. 1)

6    The evidence  establishes that JAVIER was shot on the walkway near the front door to the Perez

7    home and not, as claimed, at the end of or beyond the garage wall.  The authorities cited *supra*

8    establish that using deadly force impacts the Fourth Amendment and that any reasonable officer

9    would be aware of that fact.  *Tennessee v. Garner* was decided in 1985.  Plaintiffs believe the use

10   of lethal force under these circumstances was conclusively unreasonable. At a minimum, however,

11   the determination of reasonableness will depend on consideration of disputed foundational facts by

12   a jury. *Santos v. Gates*, *supra*, 287 F.3d at 85.; see also *Act Up!/Portland v. Bagley*, *supra*, 988 F.2d

13   at 872-973.

14       **D.    Individual Liability LANIGAN**

15       LANIGAN's liability arises from his own acts and/or omissions.  See *e.g. Figueroa v.*

16   *Aponte-Roque*, 864 F.2d 947, 953 (1st Cir. 1989).   A supervisor may be held liable where there is

17   an affirmative link established between the misconduct of officers and the action, or inaction, of

18   supervisory officials. See *Rizzo v. Goode*, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46  L.Ed.2d 561

19   (1976).

20       Direct supervisor liability may be imposed in the context of a civil rights action on several

21   bases. *Larez v. City of Los Angeles*, *supra*, 946 F.2d 630, 646 (9th Cir. 1991)

22       It settled that,

23           [s]upervisors may be held liable for: 1) their own culpable action or
24           inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous
25           indifference to the rights of others.

26   *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

27       LANIGAN argues that he has no supervisory liability in any conduct alleged by plaintiffs,

28   but in so doing ignores the law and the policy of his own department, "even more so than the people

- 19 -

01CV0410K (AJB)

1   that actually did the shooting because you [Lanigan] have the overall responsibility."   (   )

2   Defendants rely on several authorities for the proposition that LANIGAN bears no liability because

3   he did not shoot or use any force directly on the person of JAVIER  and did not search the premises.

4   LANIGAN was, however, the principal orchestrating individual, present on the scene, who claimed

5   responsibility for directing the actions of dispatch, each officer on scene, the decision not to consider

6   non-lethal force, and who was directly involved in preparing all officers to use deadly force.  In fact

7   what he did was initiate a response for which the most likely outcome was the shooting of JAVIER.

8   Defendants' own authorities make clear that under these circumstances, a supervisor may be held

9   liable.  See *Rascon v. Hardiman*, 803 F.2d 269, 274 (1986) [a supervisor may satisfy the personal

10   responsibility requirement of section 1983 where the conduct causing the constitutional deprivation

11   occurs at the supervisors direction with knowledge and consent.]

12          The response organized and directed by LANIGAN was nothing short of an ambush.

13   LANIGAN met with officers and gave them orders. (PF 106) He eliminated using any non-lethal

14   alternatives, including the trained canine on scene (PF 102); he failed to employ negotiators

15   (Emergency Negotiating Team "ENT") (PF 190); he set in motion and directed a series of acts by

16   others which he knew or should have known, would result in the shooting of  JAVIER.

17   LANIGAN's  conduct was, causally related to the constitutional violations committed by his

18   subordinates, and a most direct manner.  *McKinney by McKinney v. Dekalb County, Ga.*, 997 F.2d

19   1440 (11th Cir.)  His defense was he never told anyone to shoot JAVIER; "[o]n the air - you know -

20   I never got on the air and said, 'We're going to bring him and prune him out in front of the house."

21   (Exh. 27, p. 7.) LANIGAN knew or should have known his actions and omissions would result in

22   the constitutional violation.  See *Larez v. City of Los Angeles*, *supra*, 946 F.2d at 646; *Cunningham*

23   *v. Gates*, *supra*, 229 F.3d at 1292.

24          Section 1983 imposes liability upon those who "subject[ ] or cause[ ] to be subjected, any

25   citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by

26   the Constitution and laws...." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 560 (1st Cir. 1989).

27   *Gutierrez-Rodriguez v. Catagena* held an officer could be liable for subjecting another to a civil

28   rights deprivation pursuant to section 1983, where, "he does an affirmative act, participates in

- 20 -

another's affirmative acts, or omits to perform an affirmative act which he is legally required to do,

that causes the deprivation of which complaint is made." *Id.* 560-561. Causation is established,

> not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Springer v. Seaman*, 821 F.2d 871, 879 (1st Cir. 1987); quoting *Soto v. City of Sacramento*, 567 F.Supp. 662, 673-74 (E.D.Cal.1983) and *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978).

In *Gutierrez-Rodriguez v. Cartagena*, the Court found,

> . . . no difficulty concluding that there was a firm evidentiary basis for finding that the actions of Soto and Gotay caused plaintiff's injuries. Soto as the man in charge. He directed and participated in the acts that led to the shooting. The jury could also have found that Gotay was a participant in those acts. Gotay exited the car with his gun drawn and moved toward the Gutierrez' vehicle along with the other officers. Under such a factual scenario, the actions of all four of the officers who participated in the intervention could be deemed to be proximate causes of plaintiff's injuries. Cf. *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) (police officer liable under Sec. 1983 where he guarded a door during the commission of an illegal search by other officers)."

*Gutierrez-Rodriguez v. Cartagena, supra*, at 561.

LANIGAN prematurely sanctioned the use of deadly force. See *Gutierrez-Rodriguez v. Cartagena, supra*, at 561. In this situation, knowing JAVIER was impaired and had no idea police were outside, with the neighborhood darkened, officers in hiding and absolutely no warning or notice, a reasonable officer would know shooting JAVIER would constitute a constitutional violation.

**E.    Liability of All Officers**

1.    <u>Defendants LANIGAN, MURPHY, SANDERS, LA MARCA, SEVILLA, SUDAK, TORRES And NELSON All Causally Contributed To The Unreasonable Use Of Excessive Force And Resulting Injuries.</u>

Liability under section 1983 arises where a causal connection can be established between a set of events set in motion which the participants know or should know would result in others inflicting constitutional injury.

> A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative

- 21 -

> act, participates in another's affirmative acts, or omits to perform an
> act which he is legally required to do that causes the deprivation
> which complaint is made. [Cit.] Moreover, personal participation is
> not the only predicate for section 1983 liability. Anyone who
> "causes" any citizen to be subjected to a constitutional deprivation
> is also liable. The requisite causal connection can be established not
> only by some kind of direct personal participation in the deprivation,
> but also by setting in motion a series of acts by others which the
> actor knows or reasonably should know would cause others to inflict
> the constitutional injury. [Cit.]

*Johnson v. Duffy*, 588 F.2d 740, 743-744 (9th Cir. 1978).

In this case defendants LANIGAN, MURPHY, SANDERS, LA MARCA, SEVILLA, SUDAK, TORRES and NELSON all had a duty to identify themselves as police officers and provide a warning that deadly force may be deployed. *Tennessee v. Garner, supra,* 471 U.S. at 11-12; *Deorle v. Rutherford, supra,* 272 F.3d at 1284. While SEVILLA was designated to be the "shouter" he shouted nothing appropriate. (    ) The only command ever shouted prior to shooting JAVIER was, "put your hands up." Each and every officer had a duty to identify their presence to JAVIER and warn him that he would be shot.

> If a police officer, whether supervisory or not, fails or refuses to
> intervene when a constitutional violation . . . takes place in his
> presence, the officer is directly liable under Section 1983.

*Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982), cert. denied, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); see also *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981); *Harris v. Chanclor*, 537 F.2d 203, 206 (5thCir. 1976).

Section 1983 imposes liability upon those who are participants in the complained of act. *Gutierrez-Rodriguez v. Cartagena, supra,* 882 F.2d 560-561; see also *Springer v. Seaman*, 821 F.2d 871, 879 (1st Cir. 1987); quoting *Soto v. City of Sacramento*, 567 F.Supp. 662, 673-74 (E.D.Cal.1983) and *Johnson v. Duffy, supra,* 588 F.2d at 743-44.

In *Gutierrez-Rodriguez v. Cartagena*, the participant officers were found liable.,*Gutierrez-Rodriguez v. Cartagena, supra,* at 561; also *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) [police officer liable under section 1983 where he guarded a door during the commission of an illegal search by other officers.]

Additionally, there is a duty to prevent others from violating the Constitution. Officers have

- 22 -

01CV0410K (AJB)

1   a duty to intercede when their fellow officers violate the constitutional rights of a citizen where there

2   was an opportunity to do so. *United States v. Koon*, 34 F.3d 1416, 1447, n. 25 (9th Cir. 1994), rev'd

3   on other grounds. The duty intervene or take steps to prevent a constitutional deprivation, including

4   the use of excessive force, lies with each Defendant officer.

5          [O]ne who is given the badge of authority of a police officer may not
           ignore the duty imposed by his office and fail to stop other officers
6          who summarily punish a third person in his presence or otherwise
           within his knowledge . . . the same responsibility must exist as to
7          nonsupervisory officers who are present at the scene of such
           summary punishment, for to hold otherwise would be to insulate
8          nonsupervisory officers from liability for reasonably foreseeable
           consequences of the neglect of their duty to enforce the laws and
9          preserve the peace.

10

11  *Byrd v. Clark*, 783 F.d 1002, 1007 (11th Cir. 1986); cited with approval *Rascon v. Hardiman*, *supra*,

12  803 F.2d 269 (7th Cir. 1986). Much like the failure to intervene in the summary punishment by

13  fellow officers in *Byrd v. Clark, supra*, defendants LANIGAN, MURPHY, SANDERS, LA

14  MARCA, SEVILLA, SUDAK, TORRES and NELSON were all at the scene on March 10, 2000,

15  and each had the obligation to act. All said defendants were present, met and agreed to keep their

16  presence secret by removing light bulbs in the neighborhood and taking cover. They acceded to the

17  decision to eliminate any potential for deploying non-lethal force.  Their  decision was to shoot

18  JAVIER.  The plan was a success, TORRES was "marching" in the street causing LANIGAN

19  concern his officers would be for "high fiving" in front of neighbors.  (PF 167) Defendants' tout

20  their experience and qualifications, yet not one made the least attempt to warn JAVIER or announce

21  their presence notwithstanding a constitutional obligation to do so.  The shooting of JAVIER was

22  pre-ordained and,   in every sense of the word, an ambush.   By their individual actions and

23  contributions in creating the ambush, and their individual failures to identify and warn JAVIER,

24  defendants LANIGAN, MURPHY, SANDERS, LA MARCA, SEVILLA, SUDAK, TORRES and

25  NELSON all have participatory liability.

26          Defendants rely on *Cunningham v. Gates, supra*, in support of their motion for summary

27  judgment. But in that case, the Court found only officers not present at the time the plaintiffs were

28  shot, or who were present but had no "realistic opportunity" to intercede could not be held liable.

- 23 -

1   *Cunningham v. Gates, supra*, 229 F.3d at 1290.  In *Cunningham*, one of the shooting incidents

2   involved officers who tailed two suspects where they were permitted to rob it and during the

3   getaway officers returned fire hitting the suspects.  *Id* at 1278-1279.  In a related shooting, a

4   surveillance officers chased a suspect and shot him in the leg.  *Id.* at 1279.

5        The facts in *Cunningham* are considerably different than those at bar.  In this case, officers

6   had twenty-five minutes to determine how to handle a "welfare check," discussed and agreed to

7   eliminate non-lethal force, decided not to use an available canine, lied to JAVIER to bring him

8   outside, unscrewed lights and disguised their presence, never told him they were officers, never

9   warned him they would employ deadly force, never told him to put the gun down but to raise his

10  hands, and then TORRES and SUDAK shot him.  After the shooting, defendants recognized a need

11  for an exigency and decided to place JAVIER at the end of the garage in the driveway to justify.

12  Inconsistencies in defendants stories reflect concerted efforts to massage testimony.  See e.g.

13  *Cunningham v. Gates, supra*, 229 F.3d at 1291

14       Plaintiff also pleaded, and the evidence supports, allegations against defendants in the nature

15  of conspiracy.  Plaintiffs alleged, "defendants LANIGAN, MURPHY, SANDERS, LA MARCA,

16  SEVILLA, and NELSON are the individual employees of the DEPARTMENT who acted in concert

17  with SUDAK and TORRES to abet and implement the use of unlawful deadly force and cause

18  Plaintiff to be shot," (Second Amended Complaint ¶ 26), and " [a]t all times during the events

19  described above, Defendants, and each of them, were acting in a joint venture.  Defendants, and each

20  of them, assisted each other in performing the various actions described and lent their physical

21  presence and support and the authority of their office to each other during the afore described

22  events." (Second Amended Complaint ¶ 37).

23       To establish a conspiracy, plaintiffs need not prove an agreement but a common venture.

24               To be liable as a conspirator you must be a voluntary participant in
                 a common venture, although you need not have agreed on the details
25               of the conspiratorial scheme or even know who the other conspirators
                 are. It is enough if you understand the general objectives of the
26               scheme, accept them, and agree, either explicitly or implicitly, to do
                 your part to further them. [Cit.]
27

28  *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).  The function of "conspiracy" or "joint

- 24 -

01CV0410K (AJB)

venture" allegations in an action pursuant to 42 U.S.C. § 1983, is, "to yoke particular individuals to the specific torts charged in the complaint." *Id*. at 992. The conspiracy allegation is sufficiently supported if the facts establish an agreement or meeting of the minds to violate the constitutional rights of another. See generally, *Woodrum v. Woodward County, Okl.*, 886 F.2d 1121 (9th Cir. 1989).

Plaintiffs allegations that defendants participated individually but in concert to violate JAVIER's Fourth Amendment rights are supported by substantial evidence and, when the evidence is viewed in the light most favorable to Plaintiffs, establishing liability on the part of LANIGAN, MURPHY, SANDERS, LA MARCA, SEVILLA, and NELSON for the shooting of JAVIER. See generally, *Harris v. Roderick*, 126 F.3d 1189, 1995 (9th Cir. 1997.)

> 2.   LANIGAN, MURPHY, SANDERS, LA MARCA, SEVILLA, and NELSON Had A Duty To Protect JAVIER From Harm Arising Based On The Doctrine Of State Endangerment.

It has been recognized for some time that the State has an affirmative duty to protect individuals in custody; the aptly named doctrine of "state endangerment." See *Revere v. Massachussetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Youngberg v. Romeo*, 457 U.S. 307, 315-316, 102 S.Ct. 2452, 73 :.Ed.2d 228 (1982). This doctrine has been extended to include those situations where officers' conduct places an individual in a position of danger. *Wood v. Ostrander*, 879 F.2d 583, 589-590 (9th Cir. 1989), cert. denied, 498 U.S. 938 (1990). State endangerment is appropriately alleged within the context a claim for violation of civil rights pursuant to 42 U.S.C. § 1983. See generally *Butera v. Dist. Of Columbia*, 235 F.3d 637, 646-647 (D.C.Cir. 2001).

Liability may be imposed where the state creates a dangerous situation or renders citizens more vulnerable to danger. *Butera v. Dist. Of Columbia, supra*, 235 F.3d at 649; *Reed v. Gardner*, 986 F.2d. 1122 (7th Cir. 1983), cert. denied, 510 U.S. 947 (1993). The state's duty arises when its agents create or increase the danger to an individual. *Butera v. Dist. Of Columbia, supra*, 235 F.3d at 652.

An excessive force claim may be based on a showing that defendants, "used excessive force in creating the situation which caused [the decedent] to take the actions he did." *Reynolds v. County*

- 25 -

1   of San Diego, 84 F.3d 1162, 1169 (9ᵗʰ Cir. 1996), citing Alexander v. City of and County of San

2   Francisco, 29 F.3d 1355, 1366 (9ᵗʰ Cir. 1994), cert. denied _U.S._, 115 S.Ct. 7315, 130 L.Ed.2d 638

3   (1995) [the court determined a factual issue existed as to whether officers used excessive when

4   storming the house of a mentally ill and elderly man who had threatened to shoot anyone upon

5   entry]. The *Alexander* court held, that plaintiff's claim (force the police used was unreasonable

6   under the circumstances), stated a classic Fourth Amendment violation under *Graham v. Connor*.[17]

7        In responding to the welfare call, with full knowledge that JAVIER was a minor, was

8   mentally impaired as a result of intoxication, and claimed to have a loaded weapon, defendants

9   LANIGAN, MURPHY, SANDERS, LA MARCA, SEVILLA, SUDAK, TORRES and NELSON,

10  spent twenty five-minutes initiating an ambush. SEVILLA noted time was not an issue and

11  negotiators should have been called in. (PF 191) LANIGAN, MURPHY, SANDERS, LA MARCA,

12  SEVILLA, SUDAK, TORRES and NELSON left any option for non-lethal force by the wayside and

13  each acted individually to create a situation where shooting JAVIER was the only likely outcome.

14       Defendants planned to use deadly force. (PF 102, 103, 104, 105) LANIGAN claimed to have

15  designated MURPHY and LA MARCA as an arrest team but MURPHY and LA MARCA were

16  wielding a shotgun and service revolver.  (Exh. 29, p. 18) It would undoubtedly be difficult and

17  dangerous to arrest or chase somebody down with loaded weapon in hand.  But what crime had

18  JAVIER committed?  At most, being under the influence.  (Cal. Health & Safety Code §, 11550, a

19  misdemeanor.)

20       What defendants did was to elevate a routine welfare check into a "Waco" assault. The

21  claimed "threat" and need to use deadly force would not have arisen but for Defendants' instigation.

22  Defendants each created a dangerous condition which resulted in the shooting of JAVIER.

23       An officer cannot create exigent circumstances to justify use of force.  *U.S. v. Capote-*

24  *Capote*, 946 F.2d 100, 1103 (5ᵗʰ Cir. 1991).  The mere presence of a weapon does also not create an

25  exigent circumstance.  *Id.*  But for the conduct of defendants directing JAVIER into an ambush

26  without notice or warning, he would not have sustained the injuries.

27

28  [17]   *Graham v. Conner*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872-73, 104 L.Ed.2d 443 (1989).

01CV0410K (AJB)

### F.     Liability of Chief White

A police chief may be liable under 42 U.S.C. § 1983 for unconstitutional actions of one of his officers where there is a causal connection between the police chief's actions and the officer's unconstitutional activity. *Commonwealth of Pennsylvania v. Porter*, 659 F.2d 306, 321 (3d Cir. 1981) Relying on *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). The *Porter* court noted the focus of the inquiry is on the degree to which the police chief participated in a pattern of violation by virtue of either knowledge, acquiescence, support or encouragement. *Commonwealth of Pennsylvania v. Porter, supra*, 659 F.2d at 321.

Chief WHITE was contacted twice on the night of the incident by telephone once before the shooting and once after the shooting.  (PF 192) WHITE claims no recollection of the specific discussion.   SEVILLA testified that an ENT (Emergency Negotiating Team) was requested. SEVILLA noted that time was not an issue and a negotiating team would be more skilled in handling this type of call than dispatch. (PF 190-191).  Surely Chief WHITE does not suggest that officers telephone him at home, at midnight, to simply advise they are responding to a "welfare check."

WHITE, though his memory has failed, had direct pre-shooting involvement in the incident. He incurs liability by way of culpable action, inaction and/or failing to supervise and control his subordinates.  See *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).  In the absence of any recollection, a reasonable inference is that White was contacted because this was a situation where deadly force would be deployed and authorization was required or a request to deploy ENT was made. The call to WHITE also belies any claimed exigency.

WHITE may be found liable in his individual capacity if he "set[ ] in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n], would cause others to inflict the constitutional injury . *Larez v. City of Los Angeles, supra*, 946 F.2d at 646.  This includes action or inaction in supervising or controlling his men. *Id.* Likewise, individual liability may be imposed where WHITE 'acquiesces in the constitutional deprivations on which the complaint is based, including a reckless indifference to the rights of others. *Ibid.* WHITE admitted to his personal involvement and an opportune lapse

01CV0410K (AJB)

in memory should not shield him from personal responsibility.

Likewise where plaintiffs can establish that WHITE promulgated an unlawful policy which was followed in the case at issue, and that he had the authority to promulgate the policy, liability may be imposed. *Black v. Stephens*, 662 F.2d 181,189-190 (3rd Cir. 1981); see also *Maclin v. Paulson*, 627 F.2d 83, 86 (7th Cit. 1980) [police behavior which is product of Chief's encouragement or acquiescence]. Chief WHITE testified he was the promulgator of police policy for the CITY and that the CITY had no policy in place in 2000 requiring that officers identify themselves or warn an individual prior to the use of either lethal or non-lethal force, with the exception of a Taser. (PF 177-178) This policy was in direct contravention of *Tennessee v. Garner*, decided in 1985. He also stated there was no policy with regard to handcuffing or searching seriously injured individuals. The aforementioned policies were, and are, *per se* unconstitutional.  Chief WHITE's attempt to reconstruct his testimony was simply unpersuasive. He initially cited to a "policy" memorandum, prepared by Lt. Houchin to established a policy existed.  That memorandum ws not written until May 4, 2001. (PF 179 ) The CITY's use of force policy dated November 4, 1999, made no mention of any duty to warn. (PF 180) Having been caught in this gambit, Chief WHITE filed a sworn declaration with this Court wherein he speculated officers probably received training in accordance with *Tennessee v. Garner* at the basic police academy. (PF 181) It is undisputed, therefore, that CITY maintained unconstitutional policy governing the use of lethal force and Chief WHITE personally issued it.   Defendant officers in this case were acting in conformity with Chief WHITE's directive. No officer identified the police presence to JAVIER, no officer warned JAVIER that deadly force would be deployed, and JAVIER was handcuffed despite his mortal wound. Liability is properly imposed on Chief WHITE under these circumstances. *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir. 1986). Based on the foregoing, plaintiffs submit that Chief WHITE is personally liable for the alleged unconstitutional conduct.

### G.      Monell Liability

As recently noted, "[a ]local governmental entity's failure to train its employees can...create 1983 liability where the failure to train 'amounts to deliberate indifference to the rights of persons.'" *Mary Sanders Lee v. County of Los Angeles,*250 F.3d 668, 681 (9th Cir. 2001), quoting *City of*

01CV0410K (AJB)

1    *Canton v. Harris*, 489 U.S. 378, 388-890, 109 S.Ct. 1183, 103 L.Ed.2d 412 (1989).

2          The promulgation of an unconstitutional policy imposes liability on CITY.

3                  Local governing bodies, therefore, can be sued directly under § 1983
                   for monetary, declaratory, or injunctive relief where . . . the action
4                  that is alleged to be unconstitutional implements or executes a policy
                   statement, ordinance, regulation, or decision officially adopted and
5                  promulgated by that body's officers.   Moreover, although the
                   touchstone of the § 1983 action against a government body is an
6                  allegation that official policy is responsible for a deprivation of rights
                   protected by the Constitution, local governments, like every other §
7                  1983 "person," by the very terms of the statute, may be sued for
                   constitutional deprivations visited pursuant to governmental "custom"
8                  even though such a custom has not received formal approval through
                   the body's official decision making channels

9

10   *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 56 L.Ed.2d 611

11   (1978). The Court of Appeals for the Ninth Circuit recently noted, "The offending 'policy' may be

12   established by 'a first-time decision to adopt a particular course of action [when that action] is

13   directed by a governmentally authorized decision maker,' such as the chief of police. (*Headwaters*

14   *Forest Defense et al. v. The County of Humbolt et al., supra*, at 1185, quoting *Larez* v. *City of Los*

15   *Angeles, supra*, at 646 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481.)  The Court in

16   *Valerie Streit v. County of Los Angeles*, 236 F.3d 552 (9th Cir. 2001) noted, "[a] county is subject

17   to section 1983 liability...if its policies...'caused the particular constitutional violation at issue." (*Id.*

18   at 559. (quoting *Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).*)

19          Plaintiffs have established that CITY, as of March 2000,  maintained no policy requiring

20   identification or  warning prior to the use of lethal force and/or non-lethal force with the exception

21   of Taser use. (PF 177-178) That was both unconstitutional on its face and as applied. Additionally,

22   CITY policy regarding handcuffing every suspect was also unconstitutional as applied.

23          Accordingly, the CITY may be held liable for the excessive force claims of JAVIER.

24   **H.    The Handcuffing Of JAVIER Constituted A Fourth Amendment Violation
             Under The Circumstances Of This Case**

25   SEVILLA, MURPHY and LA MARCA each participated in rolling JAVIER over on his

26   side, pulling his hands behind his back, handcuffing and searching him. (PF 154-157) This action

27   was undertaken when all knew: (1) the "weapon" was merely a BB gun, (2) JAVIER posed no

28

- 29 -



1  threat, and (3) he had a plainly visible "sucking" wound to the chest. (PF 153-156) The obvious

2  severity of his injuries, coupled with the absence of any reasonable basis to presume he was armed

3  or dangerous, rendered the inexpert handling of JAVIER reckless and exhibited conscious disregard

4  for his safety.  The restraint and search violated his Fourth Amendment rights.

5       The right to be free from intrusions on personal security is recognized as a fundamental

6  constitutional entitlement. See *Ingraham v. Wright*, 430 U.S. 651, 673. 97 S. Ct. 1401, 51 L.Ed.2d

7  711 (1976). An individual who is in custody or has been seized is entitled to no less protection.

8  *Escamilla v. City of Santa Ana*, 796 F.2d 266, 268 (9th Cir. 1986) citing *Bowers v. DeVito*, 686 F.2d

9  616, 618 (7th Cir.1982); *Walker v. Rowe*, 791 F.2d 507, 511 (7th Cir.1986). See also *Santos v.*

10  *Gates, supra*, 287 F.3d 846 [plaintiff was taken to the ground, suffered a compression fracture of

11  a vertebra and was then handcuffed.]

12       Defendants knew, immediately after the shooting that the perceived weapon was a BB gun

13  and that JAVIER had sustained a mortal chest wound. The handling of JAVIER by officers

14  SEVILLA, MURPHY and LA MARCA, under the direct supervision of LANIGAN, shocks the

15  conscience. Even the unsophisticated can grasp that rolling an individual onto his side and pulling

16  his arms back poses a life threatening risk where a gunshot wound to the center chest is involved.

17       LANIGAN failed to intercede notwithstanding a duty to do.  Because he directed and

18  initiated the events resulting in the shooting, and because he failed to intercede to protect JAVIER

19  from further injury, LANIGAN is liable for the exacerbation of  JAVIER's injuries resulting in a

20  stroke.  *Gutierrez-Rodriguez v. Cartagena, supra*,  882 F.2d 560-561; *Springer v. Seaman, supra*,

21  821 F.2d at 879.

22       This liability extends to all defendants present at the scene arising from their duty to

23  intercede. *United States v. Koon*, 34 F.3d 1416, 1447, n. 25 (9th Cir. 1994), rev'd on other grounds

24  518 U.S. 81(1996).  Here, defendants knew immediately after the shooting, that the gun was a toy

25  and a mortal chest wound was inflicted.  Any movement would be disastrous.  While SEVILLA,

26  MURPHY and LA MARCA rolled JAVIER around, the others looked on without intervention.

27  **I.     Search Of The Perez Home Constituted A Fourth Amendment Violation**

28       "It is axiomatic that the 'physical entry of the home is the chief evil against which the

- 30 -

01CV0410K (AJB)

ourth Amendment is directed.'" *Welsh v. Wisconsin*, 46 U.S. 740, 748 (1984) wording of *States* v. *United States District Court*, 407 U.S. 297, 313 (1972). The *Welsh* Court (quoting it was, "a 'basic principle of Fourth Amendment law[,]' that searches and seizures further without a warrant are presumptively unreasonable." *Ibid.* quoting *Coolidge v. New ire*, 403 U.S. 443, 474-475 (1971) ["a search or seizure carried out on a suspect's premises ut a warrant is *per se* unreasonable, unless the police can show...the presence of 'exigent cumstances'."]) Police bear a heavy burden to justify a warrantless search. *Welsh v. Wisconsin*, supra, 46 U.S. 740, 748-749, 104 S.Ct. 2091, 80 L.Ed.2d 782 (1984):

The search of the Perez home was not based on any exigency which would underlie a warrantless search. In fact, a search of the home in general may not have been justified under any circumstances. The only offense charged in the crime incident report was "brandishing." That act occurred outside of the home. Officers knew immediately following the shooting that the "weapon" was a BB gun. It was not a crime for JAVIER to possess the BB gun.

Officers had no right to enter the Perez home and conduct a search. There was no articulable basis to suspect dangerous suspects or weapons were located within the residence. JAVIER, mother and daughter were all under police control.

A warrantless search or seizure inside a home is presumptively unreasonable under the Fourth Amendment. *Bailey v. Newland*, 263 F.3d 1022, 1029 (9th Cir. 2001). Private residences are places in which the individual normally expects the highest level of privacy free of governmenta intrusion. *United States v. Karo* (1984) 468 U.S. 705, 714 [104 S.Ct. 3296, 3303, 82 L.Ed.2d 53C A garage that is attached or adjacent to a home also gives rise to a legitimate expectation of privac *Taylor v. United States* (1932) 286 U.S. 1, 5-6 [52 S.Ct. 466, 467, 76 L.Ed. 951]. The Fou Amendment renders a warrantless search of such an area unreasonable *per se*, unless there i recognized exception, for example where consent to the search has been given. *Schnecklot Bustamonte* (1973) 412 U.S. 218, 219 [93 S.Ct. 2041, 2043, 36 L.Ed.2d 854].

Entry in the Perez home by officers following the shooting constituted an illegal se Witnesses testified that boxes and bags were carried out of the residence upon the ambula departure and until 4:00 a.m. (PF 168) Technicians did not relieve the non-shooting defendant

- 31 -

01CV041

3:00 a.m. Even where an individual is arrested in his home pursuant to a lawful arrest warrant, officers are prohibited from searching anywhere other than the individual or the immediate vicinity within the individuals control. *Chimel v. California*, 395, U.S. 752, 763 (1969). Here, JAVIER was arrested for brandishing a BB gun outside the home. Under those circumstances no search was reasonable. *Id.* at 764-765.

LANIGAN was the field supervisor charged with responsibility for the conduct of officers on the scene. (PF 100) Where a constitutional deprivation occurs at the supervisors direction with knowledge and consent, direct liability result. See *Rascon v. Hardiman*, 803 F.2d 269, 274 (1986) Additionally, officers, and in particular supervisors, have a duty to intercede when their fellow officers violate the constitutional rights of a citizen where there was an opportunity to do so. *United States v. Koon*, 34 F.3d 1416, 1447, n. 25 (9th Cir. 1994), rev'd on other grounds 518 U.S. 81, (1996).

LANIGAN was on scene while the house was searched. (PF 169, 171). In fact, he walked Detective Sweeney through it. (PF 171) All defendants on scene knew the house was empty. (PF 163) Because the residents were removed from the scene, leaving exclusive custody and control of the premises with defendants, the issue of which Defendants on scene played a role in the search is a matter for the jury to determine. Recently, the Ninth Circuit Court of Appeal left open the issue of group liability where the police deprive an individual any chance to learn what went on in their home, *i.e.* where the house is in the exclusive control of the officers. See *Jones v. Williams*, 0410802 FED9 00-56929, 10463, 10476 fn. 7 (9th Cir. 2002).

An officer may be liable for subjecting another to a civil rights deprivation pursuant to section 1983, where, "he does an affirmative act, participates in another's affirmative acts, or omits to perform an affirmative act which he is legally required to do, that causes the deprivation of which complaint is made." *Gutierrez-Rodriguez v. Cartagena, supra*, 882 F.2d at 560-56.

LANIGAN's knowledge and intent with regard to permitting the unlawful search is evidenced by his failure to intervene and by a broad *de facto* policy of the CITY to callously disregard the Fourth Amendment rights of others by failing to supervise, investigate or discipline officers who commit overtly illegal acts. Empirical evidence of this policy is found in the transctipt

01CV0410K (AJB)

1  of Detective Sweeney's search warrant application.  Detective Sweeney was on scene between

2  within thirty to forty minutes of the shooting and was walked through by LANIGAN.  Sweeney

3  personally observed the scene. (PF 171) At approximately 4:58 a.m. he applied for a telephonic

4  search warrant.  (PF 170) As a basis for the night warrant, he swore under penalty of perjury that

5  it was "necessary to search for other suspects and weapons." (PF 172) This was untrue.  In fact,

6  Sweeney told the judge JAVIER had a loaded handgun, he never mentioned the weapon was a BB

7  gun. (Exh. 37, p.3;8-16; p. 4:6-8. CITY is clearly unconcerned about whether its officers obey the

8  law.

9      The search of the premises in general, particularly the bedroom of Estella and other parts of

10  the Perez home was not justifiable.  There was no actual gun involved.  The only crime/incident

11  report provided about the incident prior to the shooting investigations charged JAVIER with

12  brandishing a BB gun at officers LANIGAN and MURPHY.

13      The warrant application itself was invalid because Detective Sweeney fabricated a basis for

14  searching the premises and obtained an overbroad warrant based thereon.  Defendants are not

15  entitled to immunity with regard to the search. *Mills v. Graves*, 930 F.2d 729, 731 (9th Cir. 1991).

16  The independent witnesses confirm the search and seizure of property was underway within the first

17  forty minutes after the ambulance left and was continuing until at least 4:00 a.m. The warrant issued

18  at 5:08 a.m. and was served on the premises at 6:00 a.m. The officer logs reveal that the individuals

19  who allegedly logged and collected the evidence were gone by the time the warrant was served.

## V.

### DEFENDANTS HAVE ALSO VIOLATED ENUMERATED RIGHTS OF PLAINTIFFS ESTELLA AND YESENIA PEREZ

23      The claims of ESTELLA and YESENIA allege that defendants acted to endanger their lives

24  and that with reckless and callous disregard for their safety.  They were placed at risk of being killed

25  or seriously injured by the officer's conduct denying them due process of law This indifference was

26  due, in part, to unequal treatment in that the response was a result of racial profiling.  They were

27  then subjected to an unlawful search of their home and seizure of property. (Second Amended

28  Complaint ¶¶ 50-56, 76-80.)

- 33 -

01CV0410K (AJB)

The Due Process Clause protects individuals from activities which are fundamentally offensive to a sense of justice or which shock the conscience. *Rochin v. California*, 342 U.S. 165, 172-173, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Deliberate indifference to the well being of plaintiffs ESTELLA and YESENIA constitutes an invasion of their interests in personal security and thus a Fourteenth Amendment violation. See *Taylor v. Ledbetter, supra* 818 F.2d at 793, 795-797; *see also Wood v. Ostrander*, 879 F.2d 583, 588 (9th Cir. 1989). Officers are liable for acting with deliberate indifference or callous disregard for the personal security or well-being of others. *Wood v. Ostrander, supra*, 879 F.2d at 588-589. Emotional or psychological injury arising from arbitrary intrusions on personal security is cognizable as damages by way of a claim pursuant 42 U.S.C. § 1983. *White v. Rochford*, 592 F.2d 381, 385 (7th Cir. 1979).

LANIGAN and the other defendants knew early on that ESTELLA and the minor YESENIA were in the house at the time the operation was commenced.  (PF 94) Notwithstanding this information, LANIGAN orchestrated a response where non-lethal force was eliminated and all officers prepared to take JAVIER down. (PF 102 ). LANIGAN positioned officers around the front of the residence only, all with guns drawn. TORRES was positioned in the driveway across the street directly in line with the front door of the residence. (PF 107) SUDAK and SANDERS were placed to the front yard side of the home within sight of the from door and windows.  (PF 100) ESTELLA was walking down the hallway when she heard the gunfire and YESENIA was behind her. (PF 160)

ESTELLA and YESENIA were each placed in a position of imminent peril from the reckless shooting.  They were endangered by a real potential for stray bullets. "So, if I missed, that round is going to go into a house that I am pretty much 99% sure that it is occupied with Mom and daughter . . . ." (Exh. 28, p. 13:8)

Because he directed and initiated the events resulting in the shooting, and because he failed to intercede to avoid the reckless endangerment of ESTELLA and YESENIA, LANIGAN is liable for the damages claimed. *Gutierrez-Rodriguez v. Cartagena, supra*,  882 F.2d 560-561; *Springer v. Seaman, supra*, 821 F.2d at 879. SUDAK and TORRES bear responsibility for the shooting itself. SANDERS, MURPHY, LA MARCA, SEVILLA and NELSON bear participant liability.

01CV0410K (AJB)

Equally cognizable under the Due Process Clause are the rights of ESTELLA and YESENIA to familial companionship. A parent maintains an interest in the care and well-being of his or her children. *Santosky v. Kramer*, 455 U.S. 745, 752-57, 102 S.Ct. 1388, 1394-96, 71 L.Ed.2d 599 (1982). The relationship of love between family members in a family unit is a liberty interest entitled to constitutional protection. *Lehr v. Robertson*, 463 U.S. 248, 258, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614 (1983). "'[E]xisting Supreme Court and Ninth Circuit precedent establish that a parent has a constitutionally protected liberty interest in the companionship and society of his or her child. The state's interference with that liberty interest without due process of law is remediable under section 1983.' [Cit.]" *Woodrum v. Woodward County, Okl.*, 886 F.2d 1121, 1124-1125 (9th Cir. 1989). While the cited cases dealt with custodial issues, a fundamental due process right is cognizable under section 1983. See also *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001)

**VI.**

**DEFENDANTS' CONDUCT CONSTITUTED ACTIONABLE NEGLIGENCE IN ADDITION TO CONSTITUTIONAL LIABILITY**

Defendants assert immunity as a defense to all causes of action for negligence. Defendants misconstrue the application of state governmental immunity in this instance.

The California Supreme Court has held,

> a "workable definition" of immune discretionary acts draws the line between "planning" and "operational" functions of government. [Cit.] Immunity is reserved for those "basic policy decisions [which have] ... been [expressly] committed to coordinate branches of government," and as to which judicial interference would thus be "unseemly." [Cit.]

*Caldwell v. Montoya*, 10 Cal.4th 972, 981 (1995). Immunity applies only to deliberate policy making decisions and not to general discretionary activity by government employee, *i.e.* "Immunity is not available to people who follow a policy directive that has not been converted to a regulation. *Jansen v. California Department of Corrections*, 920 F.Supp. 1480, 1501-1502 (1996). While immunity is available where actions are performed in accordance with a valid regulation, it is **not** available for conduct reliant on an uncodified policy. *Id.* at 1502. California public employees are provided both a defense and indemnity for their personal conduct pursuant to the Tort Claims Act,

- 35 -

01CV0410K (AJB)

hence personal conduct attributable to government employees does not give rise to a policy basis for immunity.  *Caldwell v. Montoya, supra*, 10 Cal.4th at 981.  Hence, defendants MURPHY, SANDERS, LA MARCA, SEVILLA, SUDAK, TORRES and NELSON are not afforded immunity pursuant to California Government Code § 820.2 in this case.  Similarly, neither are WHITE or LANIGAN entitled to immunity pursuant to California Government Code § 820.8. *Jansen v. California Department of Corrections*, 920 F.Supp. at 1502.  This is consistent with stated public policy that, "in governmental tort cases 'the rule is liability, immunity is the exception' .... societal goal of compensating injured parties for damages caused by willful or negligent acts must prevail." *Gates v. Superior Court*, 32 Cal.App.481, 493 (1995).

In this case, defendants LANIGAN, MURPHY, SANDERS, LA MARCA, SEVILLA, SUDAK, TORRES and NELSON agreed and participated in transforming a welfare check to an assault. Officers cannot create exigent circumstances to justify use of force. *U.S. v. Capote-Capote*, 946 F.2d 100, 1103 (5th Cir. 1991).

Defendants had a duty to use only reasonable force in the performance of their duties.  By unreasonably creating a situation in which harm to plaintiffs was virtually assured,  Defendants' abandoned any attempt to exercise due care. See *Edson v. City of Anaheim*, 63 Cal.App.4th 1266, 1273 (1998). A California peace officer may be held accountable for excessive or unreasonable force. *Edson v. City of Anaheim, supra* 63 Cal.App.4th at 1273.

While defendants SUDAK and TORRES, SEVILLA, NELSON and MURPHY all equally failed in their duty to use reasonable force, to intervene to prevent the use of excessive force, as did LANIGAN and WHITE.

Additionally SEVILLA, NELSON and MURPHY, once JAVIER was subject to police control, had a duty not to undertake any action which would increase the risk of injury or exacerbate his physical condition. *Butera v. Dist. Of Columbia, supra*, 235 F.3d 637 at 648.  Notwithstanding this duty, JAVIER was rolled with a mortal injury.

Negligent infliction of emotional distress is not an independent tort, but the tort of negligence *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.*, 48 Cal.3d 583, 588 (1989).  Defendants owed a duty of due care to all plaintiffs with regard to the shooting and post shooting treatment of

- 36 -

JAVIER, as wells as the treatment of ESTELA and YESENIA. Emotional or psychological injury arising from arbitrary intrusions on personal security is cognizable as damages by way of a claim pursuant 42 U.S.C. § 1983. *White v. Rochford*, 592 F.2d 381, 385 (7th Cir. 1979). If the same emotional injuries arise out of a breach of duty by officers to exercise due care, it constitutes negligence. Defendants are thus liabile for negligent infliction of emotional distress as to all plaintiffs.

## VII.

### DEFENDANTS BEAR LIABILITY FOR INTENTIONALLY INFLICTING SEVERE EMOTIONAL DISTRESS ON PLAINTIFFS

Plaintiffs also pursue emotional distress claims predicated on intentional conduct. Plaintiffs rely on both "direct victim" and "bystander liability". Indeed where the facts of the case, as here, implicate both "direct victim" and "bystander" theories, plaintiffs need not elect a single theory, but may plead both. *Huggins v. Long's Drug Stores California, Inc.*, 6 Cal.4th 124, 126 (1993); *Burgess v. Superior Court*, 2 Cal.4th 1064, 1071 (1992). A person (the "bystander") who suffers serious emotional distress from observing the negligently caused injury of a close relative may recover damages for distress if the "bystander": 1) was present at the scene of the incident, and 2) was aware at the time, by direct sensory observation, that the event was causing the relative's injury. *Thing v. La Chusa*, 48 Cal.3d 644, 666-668 (1989); see also *Dillon v. Legg*, 68 Cal.2d 728, 740 (1968).

Here, the evidence is clear that both ESTELLA and YESENIA heard the shots and saw the result. Moreover, the incidents they sensorily observed resulted in severe emotional distress not only arising from the shooting and denial of care, but from ESTELLA being restrained while fourteen year old YESENIA was allowed to go to JAVIER's side and witness his suffering first hand ( ). There can be no question that ESTELLA and YESENIA's emotional injuries derive from direct sensory and contemporaneous observation of an ongoing series of events, within the requirements of *Thing v. La Chusa* and *Dillon v. Legg, supra*. Both YESENIA and ESTELLA are members of the immediate family of the victim, see *Thing v. La Chusa*, 48 Cal.3d 644, 668 (1989). Visual witnessing is not required—other sensory perception suffices *Krouse v. Graham*, 19 Cal.3d 59, 76 (1977) In *Wilkes v. Hom*, 2 Cal.App.4th 1264, 1273 (1992) is more probative. There, a mother who

01CV0410K (AJB)

did not visually witness injury suffered by her daughter met the "direct sensory observance" test because she was present in another room, personally felt the explosion that caused the injury, and heard her daughter scream after the explosion. (*Id.*)

In fn.3 to their Memorandum of Points and Authorities, Defendants argue that Plaintiffs' claims for emotional distress must fail because they failed to actually see Javier get shot, saying, mistakenly and speculatively, that "neither of them knew that Plaintiff Javier was being injured at the moment they heard the shots" referring to *Fife v. Astenious*, 232 Cal.App.3d 1090, 1093 (1991). Defendants offer evidence only that both ESTELLA and YESENIA never saw the shots (it is undisputed they heard them). The Court of Appeal decision in *Fife*, splitting seconds as it does, is "a lone voice in the wilderness" and is not consistent with Supreme Court authority such as *Thing v. La Chusa, supra*. In this case, the events and injuries unfolded as an ongoing sequence. Estella and Yesenia heard the shots. They were there seconds later to witness Javier lying shot on the ground. They witnessed the failure to timely provide proper medical treatment. They witnessed him cease to breathe resulting in loss of oxygen to the brain and permanent injury. The rolling over and cuffing caused further injury. Their awareness was contemporaneous. (Decl. E.Perez, ¶; Decl. Y.Perez, ¶) In *Bird v. Saenz*, 86 Cal.App.4th 167 (2001), *Fife* was distinguished and not followed where, as here, there was ongoing injury witnessed by relatives. See also, *Zuniga v. Housing Authority*, 41 Cal.App.4th 82 (1995) [plaintiff need not be present for all aspects of the injury-producing event where the injury was still occurring.] The observed event causing the emotional impact does not have to be a single occurrence. *Ochoa v. Superior Court*, 39 Cal.3d 159, 167-170 (1985),

Under the "direct victim" theory, plaintiffs can recover if defendants breached a duty owed to them directly. *Christianson v. Superior Court*, 50 Cal.3d 868, 890 (1991); see also *Molien v. Kaiser Foundation Hospitals*, 27 Cal.3d 916, 923 (1980).

In *Christianson v. Superior Court*, 54 Cal.3d 868, 891 (1991), *supra*, it was held that mortuaries owe a duty of care to the "close relatives" of the decedents for whose benefit they provide funeral services; the existence of this duty creates a "direct victim" claim on the part of relatives and differentiates them from mere "bystanders". Moreover, *Christianson's* requirements

- 38 -

of "violent attack" and reckless disregard for ESTELLA and YESENIA, known to be present , are met. *Ess v. Escoton Properties, Inc.*, 97 Cal.App.4th 120 (2002), relied upon by Defendants, is inapt in that a "direct victim" claim was denied against a nuring home the sister was not a patient, and she witnesses nohing.

Plaintiffs can recover for intentional infliction of emotional distress if they suffer severe emotional injury caused by defendants' outrageous conduct which intentionally or with reckless disregard caused emotional distress.  Plaintiffs suffered severe emotional distress (the screams are clearly audible on the 911 tape). As establiedn throughout these pleadings, defendants' conduct was indeed extreme and outrageous.  For all these reasons, it is clear that Defendants, and each of them, who acted in concert, as well as separately, are liable to Plaintiffs for both intentional and negligent infliction of emotional distress.

## VIII.

### DEFENDANTS ARE LIABLE TO JAVIER FOR CIVIL BATTERY

As discussed *supra*, Defendants are not entitled in this case to claim of immunity. Defendants' reliance, therefore, on California Penal Code section 835a is also misplaced.  That section provides that "[a] peace officer who uses unreasonable force . . . commits a battery . . ." See BAJI 7.54.  A California peace officer is not immune where he or she employs excessive or unreasonable force.  *Edson v. City of Anaheim, supra* 63 Cal.App.4th at 1273.

Plaintiff JAVIER alleges a battery was committed by defendants SUDAK and TORRES.. The basis for claims is that each defendant intentionally but unreasonably shot him.

Plaintiff also alleges that defendants SEVILLA, LA MARCA and MURPHY each committed a battery by forcibly rolling him over and handcuffing him where he posed not threat and was mortally wounded.

Further, Defendants LANIGAN, MURPHY, SANDERS, LA MARCA, SEVILLA, SUDAK, TORRES,  NELSON and WHITE, by authorization and ratification, agreed and participated in the transformation from welfare check to urban assault.  Officers cannot create exigent circumstances to justify use of force.  *U.S. v. Capote-Capote*, 946 F.2d 100, 1103 (5th Cir.

- 39 -

01CV0410K (AJB)

1   1991). Neither does the mere presence of a weapon does also not create an exigent circumstance.

2   *Id.* But for the conduct of Defendants, and their action in eliminating non-lethal force and directing

3   JAVIER into an ambush without notice or warning, he would not have sustained the injuries.

4          Multiple tortfeasors may be liable for a single act where there is an agreement, a wrongful

5   act by any of the conspirators pursuant to the agreement, and damages. *Stone v. Regents of*

6   *University of California*,  77 Cal.App.4th 736, 748 fn. 9, citation omitted (1999), see also

7   *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 511, citations and internal

8   punctuation omitted (1994). For these reasons all defendants are responsible for the battery.

9                                              **IX.**

10                                      **CONCLUSION**

11         For all of the reasons set forth herein, plaintiffs respectfully request that defendants Motion

12   for Summary Adjudication and Summary Judgment be denied in its entirety.

13

14                                      Respectfully Submitted,

15

16   Dated:    8/12/02

17

18                                      CARL M. LEWIS
                                        Attorney for Plaintiffs
19                                      Javier Perez and Yesenia Perez

20

21   Dated:   8/12/02

22                                      LEON J. SAAD
                                        Attorney for Plaintiff
23                                      Estella Perez

24

25

26

27

28

01CV0410K (AJB)

ATTORNEY OR PARTY WITHOUT ATTORNEY (NAME AND ADDRESS):
Leon J. Saad (SBN 129193)
Carl M. Lewis (SBN 121776)
1551 Fourth Ave., Suite 303
San Diego, California 92101

TELEPHONE NO.:
(619) 230-8529

COURT USE ONLY

ATTORNEY FOR (NAME): Estella Perez

**United States District Court for the Southern District of California**
**940 Front Street**
**San Diego, California 92101**

PLAINTIFF(S)/PETITIONER(S): Javier Perez, Yesenia Perez, Estella Perez

Judge: Hon. Judith N. Keep

Dept.:

DEFENDANT(S)/RESPONDENT(S): City of Escondido

| **PROOF OF PERSONAL SERVICE**<br>(Code Civ. Proc. §1011 & Local Rules, Div. II, Rule 2.2C) | CASE NUMBER: O1 CV 0410 K<br>(AJB) |
|---|---|

**FOR PROOF OF SERVICE OF SUMMONS, USE SDSC CIV-9B(CIVIL) OR SUPCT D-4A(FAMILY LAW). FOR PROOF OF SERVICE OF SUBPOENA, USE SDSC CIV-216, 216A, 216B, 216C, 216D, CR-1(CRIMINAL OR JUV-56(JUVENILE).**

1.   At the time of service I was at least 18 years of age and not a party to this case, and I served copies of the following documents:

    1.   SEE ATTACHMENT TO PROOF OF PERSONAL SERVICE

2.   a.   Upon (name of party) **Mark Waggoner, Assistant District Attorney, Office of the City Attorney, 201 N. Broadway, Escondido, CA 92025,** (For civil cases, specify the nature and status of the party's involvement in the case, i.e. plaintiff, defendant, cross-complainant, etc.; and the name, address and phone number of the party's counsel of record, if any)

    b.   Person served:   individual in item 2a   attorney for party named in item 2a   other (specify name and title or relationship to the party named in item 2a): SYLVIA MCNAUGHTON, AUTH TO ACCPT

    c.   Address: 201 N. BROADWAY, ESCONDIDO, CA

    d.   Date and time of delivery: 8/12/2002 @ 1:19 AM

3.   I served the individual named in item 2
    a.   by personally delivering the copies.
    b.   by leaving the copies at the attorney's office, in an envelope or package clearly labeled to identify the attorney being served,
        with a receptionist or, with a person having charge thereof.
        in a conspicuous place in the office between the hours of nine in the morning and five in the afternoon.
    c.   by leaving the copies at the individual's residence with some person of not less than 18 years of age. (If service was to a party and not an attorney, delivery was made between the hours of 8:00 a.m. and 6:00 p.m.).

4.   Person serving (name, address, and telephone no.):
JERROD T. GREGG, SD 877
**XL PROFESSIONAL SERVICES, INC.**
2560 First Avenue, Suite 103
San Diego, CA 92103
(619) 233-7874

    a.   Fee for Service: $ 60.00
    b.   Not a registered California Process Server.
    c.   Exempt from registration
    d.   Registered California Process Server.
        (1)   Employee or independent contract
        (2)   Registration No.: 877
        (3)   County: SAN DIEGO

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. I am a California sheriff, marshal, or constable and I certify that the foregoing is true and correct

Dated: 8/12/2002

**PROOF OF PERSONAL SERVICE**

SD-9

ATTACHMENT TO
**PROOF OF PERSONAL SERVICE**
(Code Civ. Proc. §1011 & Local Rules, Div. II, Rule 2.2C)

*Perez v. City of Escondido*, et al.
**United States District Court for the Southern District of California**
**Civil Case No.** 01 CV 0410 K (AJB)

1. PLAINTIFF'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION AND SUMMARY JUDGMENT OF DEFENDANTS OFFICER J. MURPHY, STEVE LA MARCA, MARCO SEVILLA, MIKE NELSON, STEVE SANDERS, SERGEANT LANIGAN, DAMIAN TORRES, KEITH SUDAK, DUANE WHITE AND CITY OF ESCONDIDO

2. PLAINTIFFS' RESPONSE TO DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED FACTS AND SEPARATE STATEMENT OF ADDITIONAL FACTS IN DISPUTE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION AND SUMMARY JUDGMENT

3. DECLARATION OF CARL M. LEWIS IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION AND SUMMARY JUDGMENT

4. DECLARATION OF LEON J. SAAD IN SUPPORT OF PLAINTIFFS' JOINT OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

5. DECLARATION OF ESTELLA PEREZ IN SUPPORT OF PLAINTIFFS' JOINT OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

6. NOTICE OF LODGMENT OF PHYSICAL EVIDENCE [AUDIO TAPE] IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

7. NOTICE OF LODGMENT IN SUPPORT OF PLAINTIFFS' JOINT OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION AND/OR SUMMARY JUDGMENT