















CAG   1/27/03   14:22

3:01-CV-00410   PEREZ V. CITY OF ESCONDIDO

*159*

*MLIM.*

1 | JEFFREY R. EPP, City Attorney (SBN 123565)
MARK A. WAGGONER, Asst. City Attorney (SBN 111205)
2 | OFFICE OF THE CITY ATTORNEY
201 N. Broadway
3 | Escondido, California 92025
(760) 839-4608 Tel.
4 |
Attorneys for Defendants City of Escondido,
5 | Duane White, Officer J. Murphy, Sergeant Lanigan;
Keith Sudak; Damian Torres; Steve Lamarca;
6 | Steve Sanders; Mike Nelson; Marco Sevilla

*FILED*

03 JAN 27 PH 12: 05

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIF.

BY: _____ DEPUTY

7 |

8 | **IN THE UNITED STATES DISTRICT COURT**

9 | **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10 |

11 | JAVIER PEREZ, a minor [sic]; YESENIA PEREZ, a minor; and ESTELA PEREZ, an
12 | individual,

CASE NO.:  '01-CV-0410-K (AJB)

13 |                          Plaintiffs,

DEFENDANTS' MOTION IN LIMINE TO EXCLUDE TESTIMONY AND REPORT OF PLAINTIFFS' EXPERT LOU REITER

14 | v.

[NO. 4 OF 4]

15 | CITY OF ESCONDIDO, a governmental entity;
ESCONDIDO POLICE DEPARTMENT, a
16 | governmental entity [sic]; DUANE WHITE, an individual; OFFICER J. MURPHY, an
17 | individual; SERGEANT LANIGAN, an individual; KEITH SUDAK; DAMIAN
18 | TORRES; STEVE LAMARCA; STEVE SANDERS; MIKE NELSON; MARCO
19 | SEVILLA and DOES 7 through 10,

*TRIAL DATE:*   *February 19, 2003*
*TIME:*   *9:00 a.m.*
20 |                          Defendants.
*JUDGE:*   *Hon. Judith N. Keep*

21 |

22 | **INTRODUCTION**

23 |        Plaintiffs apparently intend to offer as evidence the testimony of their retained expert, Lou

24 | Reiter, and a copy of his written report[1]. See Joint Order, p. 14:20, Plaintiffs' Exh. 24. Defendants

25 | move exclusion of Mr. Reiter's testimony because Mr. Reiter's opinions are irrelevant and

26 | unreliable. Likewise, Mr. Reiter's report is irrelevant, unreliable and is inadmissible hearsay.

27 |

28 |

---

[1]   Attached as Exhs. A and B to this motion, are copies of Mr. Reiter's written report and deposition transcript.



# I.

## LOU REITER'S OPINIONS SHOULD BE EXCLUDED
## BECAUSE THEY ARE IRRELEVANT AND UNRELIABLE

Mr. Reiter's report and his deposition testimony contain opinions in four categories: conduct of the dispatcher; officer tactics at the scene; search of Plaintiffs' home; and agency supervisory and training issues. Plaintiffs limit the scope of Mr. Reiter's testimony to "issues of reasonableness and appropriateness of police officer conduct related to the use of deadly force, and conduct, policy and procedure related to search and seizure." Joint Order, p. 14:3-11. Despite Plaintiffs' abandonment of some of Mr. Reiter's opinions, Defendants move exclusion of all Mr. Reiter's opinions because they are irrelevant and unreliable.

A.    Expert Testimony Must be Relevant and Reliable

Expert testimony is admissible pursuant to the Federal Rules of Evidence, Rule 702. Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1983), the district court acts as a "gatekeeper," excluding "junk science" that does not meet the standards of reliability required under Rule 702. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997). The trial court makes a preliminary determination to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Daubert, 509 U.S. at 589.

Scientific evidence is deemed reliable if the principles and methodology used by the expert proffering it are grounded in the methods of science. Id. at 592-95. In Daubert, the Supreme Court set forth a list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence. These factors include: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community. Domingo v. T.K., M.D., Queens Medical Center, 276 F.3d 1083, 1088 (9th Cir. 2002) citing Daubert, 509 U.S. at 593-94.

If an expert does not conduct his or her own research, independent of the litigation, on the subject of the testimony, the district court must determine whether there exists any "objective, verifiable evidence that the testimony is based on 'scientifically valid principles.' " Daubert v.

1 | Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317-18 (9th Cir.1995).  The expert may show

2 | the scientific validity of a theory or technique by showing that "the research and analysis supporting

3 | the proffered conclusions have been subjected to normal scientific scrutiny through peer review and

4 | publication."  Id. at 1318.  Experts can also demonstrate the validity of their theory by explaining

5 | "precisely how [the experts] went about reaching their conclusions and point[ing] to some objective

6 | source--a learned treatise, the policy statement of a professional association, a published article in a

7 | reputable scientific journal or the like--to show that they have followed the scientific method, as it

8 | is practiced by (at least) a recognized minority of scientists in their field."  Id. at 1319.

9 |         "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to

10 | admit opinion evidence that is connected to existing data only by "the *ipse dixit* of the expert."

11 | Domingo v. T.K., M.D. and McQueens Medical Center, 276 F.3d 1083, 1089 (9th Cir.2002), citing

12 | Gen. Elec. Co., 522 U.S. at 146.  A trial court may exclude evidence when it finds that "there is

13 | simply too great an analytical gap between the data and the opinion proffered."  Id.

14 |         As discussed more fully below, all of Mr. Reiter's opinions are irrelevant and are unreliable,

15 | connected to existing data only by his own "*ipse dixit*".

16 | B.       Mr. Reiter's Opinion Regarding Dispatcher Conduct is Irrelevant and Unreliable

17 |         As to the appropriateness of the dispatcher's conduct, Mr. Reiter opines:

18 | 
19 |                 The conduct of the Escondido City and Police Department dispatch and
20 |                 communications practices during this contact with Perez was grossly
                    deficient and contrary to any reasonable and generally accepted police
                    practices.  This grossly deficient and shocking police employee conduct
21 |                 was the prime instigator of the subsequent actions which led to the
                    serious shooting injury to Javier Perez.

22 |                 Exh. A, p.5-6.

23 | He elaborates on his opinion by stating "that the conscious role playing by Ms. Daubman (police

24 | dispatcher) reduced the potential that Javier would have known that the police were on the scene,

25 | immediately outside his house, there to assist him."  Exh. A, p. 8.  Finally, he opines that "during

26 | the final exchange with Javier, Ms. Daubman (police dispatcher) consciously elected to not tell him

27 | that the police were outside."  Exh. A, p. 8.

28 | ///

1    None of these opinions are relevant to the issues remaining in this litigation. Defendants

2  Torres and Sudak have no liability whatsoever for the actions of the dispatcher. Further, the Court

3  has ruled that the tactical decisions which were made, including not warning Plaintiff Javier of

4  police presence, were reasonable. See Order Granting In Part and Denying In Part Defendants'

5  Motion for Summary Judgment (hereafter Court's Order), p. 9. The issues remaining for the jury

6  are whether Plaintiff Javier raised the gun and pointed it at the officers and whether the City is

7  liable for the alleged unlawful search of Plaintiffs' home. Mr. Reiter's opinion regarding the police

8  dispatcher's failure to identify herself and warn that the police were outside, have nothing

9  whatsoever to do with these issues. As such, his opinion is irrelevant and should be excluded.

10    In addition, Mr. Reiter's opinions regarding dispatcher misconduct are unreliable. During

11  Mr. Reiter's deposition, he testified that he has never functioned as a dispatch operator, he has

12  never trained dispatch operators, and has never been a participant in a school or training course for

13  dispatch operators. See Deposition of Lou Reiter, attached hereto as Exh. B, p. 12:24-25; 13:1-19.

14  He also testified that he never functioned as a hostage negotiator, never took training to be certified

15  or recognized as a hostage negotiator, never functioned as a trainer of hostage negotiators, has

16  never been published in the field of hostage negotiation tactics or policies, and since his active duty

17  time with the Los Angeles Police Department, he has never taken any training courses on hostage

18  negotiation. See Exh. B, p. 10:9-24. Despite opining on Ms. Daubman's actions as a dispatcher, he

19  never even reviewed her training records and he could not testify as to whether or not her training

20  was typical or atypical. See Exh. B, p. 14:24-25; p. 15:22-25; 16:1-3.

21    As to Mr. Reiter's main criticism of Ms. Daubman (and the police) that they should have

22  told Plaintiff Javier that the police were outside, Mr. Reiter could not point to any specific

23  published policy of any other police department that would describe, in an incident like this, the

24  requirement or the necessity of telling the suspect that the police are outside. See Exh. B, p. 16:19-

25  25; 17:1-25; 18:1-2. Nor could he testify where in any published literature, specific training manual

26  or video, there is a list of criteria that one should consider when deciding whether to tell the suspect

27  that the police are there or not to tell them. See Exh. B, p. 19:8-25; 20:1-2. Given the vagaries of

28  human behavior, who is to say that things would have ended better had the dispatcher used

1   Mr. Reiter's suggested tactics as opposed to what she in fact did.  Mr. Reiter could not point to a

2   single empirical study analyzing the correlation between police tactics employed and results

3   obtained despite numerous invitations to do so in his deposition.  See Exh. B, p.23:4-25; 24:1-25;

4   25:1-15.  Mr. Reiter fails to identify any objective source to show that his opinions are based on

5   scientific or empirical data.  Mr. Reiter has nothing more than his own "*ipse dixit*" to support his

6   opinions about Ms. Daubman's actions.  Mr. Reiter's opinion of Ms. Daubman's conduct should be

7   excluded because "there is simply too great an analytical gap between the data and the opinion

8   proffered."   See Domingo v. T.K., M.D. and McQueens Medical Center, 276 F.3d 1083

9   (9th. Cir.2002).

10  C.     Mr. Reiter's Opinions Regarding Police Officer Conduct are Irrelevant and
           Unreliable and Should be Excluded
11

12         As to the reasonableness and appropriateness of police officer conduct, Mr. Reiter opines:

13             The tactics used by the Escondido Police Department officers, with
               the specific knowledge they had, were totally unreasonable and
14             contrary to generally police practices for this type of subject
               encounter.  Their actions and conscious choices were so egregious
15             that they in essence set up a situation which could be best described
               as an ambush.  Any reasonable officer, in my opinion, would have or
16             should have known that the tactics used would not reasonably ensure
               that Javier would know that they were the police or provide the police
17             with the opportunity to provide that moment of notice.   Their
               conscious choices unnecessarily created the circumstances which
18             culminated in the use of deadly force.

19             Exh. A, p. 9.

20         Mr. Reiter also criticizes the officers for not identifying themselves as police officers and

21  for failing to use time to their advantage.  See Exh. A, p. 13.

22         Both of these opinions are directly contrary to the Court's findings and are no longer

23  relevant.  The Court ruled that the officers' preseizure tactical decisions were not unreasonable as a

24  matter of law under Billington v. Smith, 292 F.3d 1177, 1188-1191 (9th Cir. 2002).  See Court's

25  Order, p. 10-14.  The Court rejected Plaintiffs' theories regarding alternative tactics such as the use

26  of a dog or a negotiator and flatly rejects Mr. Reiter's "ambush" opinion.

27  ///

28  ///

1  The Court states:

2    Therefore, given the information that Javier was armed and
     intoxicated, and that his sister and mother were at home, the Court
3    finds Lanigan's tactical plan of placing a perimeter of armed officers
     around the front of the house, disconnecting the lights, and drawing
4    Javier out of the house, to be reasonable.

5    Court's Order, p.9:26-28,10:1.

6        There can be no question that the Court's ruling alleviates the need for <u>any</u> expert opinion

7  regarding the tactics of the police officers.  Notwithstanding the fact that Mr. Reiter's opinions

8  regarding the police officers' tactics are irrelevant, his opinions are also unreliable.  For example,

9  Mr. Reiter opines that both the police dispatcher and the police should have told Plaintiff Javier that

10 the police were outside[2].  During his deposition, Defendants' counsel tried many times to ascertain

11 the scientific basis for this opinion to no avail.  Mr. Reiter could not point to <u>any</u> specific published

12 policy of any department that would describe, in an incident like this, the requirement or the

13 necessity of telling the suspect that the police are outside.  <u>See</u> Exh. B, p. 16:19-25; 17:1-15; 18:1-2.

14 Nor could he testify where in any published literature, specific training manual or video, there is a

15 list of criteria that one should consider when deciding whether to tell the suspect that the police are

16 there or not to tell them.  <u>See</u> Exh. B, p. 19:8-25; 20:1-2.  Mr. Reiter could not refer to any

17 empirical data of a study that the longer police officers wait (in a situation such as the one involving

18 Plaintiff Javier) the more likely the situation resolves itself better.  <u>See</u> Exh. B, p. 25:8-15.  The

19 only basis for his opinion that the longer the police wait the more likely a situation will resolve

20 itself safely is from his own personal experience, involvement in training, audits, and interaction

21 with police practitioners.  <u>See</u> Exh. B, p. 25:16-25; 26:1-4.  Yet, he admits that in these discussions

22 with others, he has not asked how many times they have been in a situation where they saw a

23 barricaded suspect situation resolved, whether it was done quickly or long, or whether any data was

24 kept on the issue.  <u>See</u> Exh. B, p. 26:5-14.  He also admits that he does not recall being involved in

25 an incident such as the one the officers faced with Plaintiff Javier.  <u>See</u> Exh. B, p. 27:12-21.

26 ///

27

28 [2]  Given that Javier had threatened to "blast those mother fuckers" (i.e. the police) this is dubious advice at best, and
    at worst it could provide Javier just the information he needs to ambush the officers and accomplish his threat.

1   As revealed by Defendants' many attempts to seek the objective, verifiable evidence in

2   support of Mr. Reiter's testimony, there is nothing but Mr. Reiter's *"ipse dixit"* to support his

3   opinions.  Mr. Reiter's opinion of the officers' conduct should be excluded because "there is simply

4   too great an analytical gap between the data and the opinion proffered."  See Domingo v. T.K.,

5   M.D. and McQueens Medical Center, 276 F.3d 1083 (9th Cir.2002)

6   D.   Mr. Reiter's Opinions Regarding The Search are Irrelevant and Unreliable and
         Should be Excluded
7

8   As to the search of Plaintiffs' house, Mr. Reiter opines:

9        The search of the Perez home, in my opinion, was done contrary to
         law and generally accepted police practices.
10
         Exh. A, p. 13.
11

12  He further opines in his deposition that he is not critical of the safety sweep of the house by the

13  officers to make sure there were no more suspects.  See Exh. B, p. 32:4-9.  The main basis for

14  Mr. Reiter's opinion that the search of Plaintiffs' house was unlawful is his assumption that

15  Detective Sweeney made inaccurate statements to the Court in his application for a telephonic

16  search warrant.  See Exh. A, p. 14.

17   As to the search, the Court dismissed all of the individual officers because each of them

18  proved that they did not search Plaintiffs' home.  The Court, however, allowed the City to remain

19  as a Defendant in case it somehow could be held liable for the alleged search.  See Court's Ruling,

20  p. 13:24-28.  Mr. Reiter's opinion is irrelevant because there is no longer an issue regarding a

21  search or safety sweep conducted by the individual officers.  Even if there was, Mr. Reiter agrees

22  that the safety sweep was appropriate.  Further, the basis of Mr. Reiter's opinion that the search was

23  done contrary to the law is nothing more than speculation based on Mr. Reiter's assumption that the

24  telephonic search warrant was falsely obtained.  This is not a proper subject for expert testimony

25  pursuant to Federal Rules of Evidence, Rule 702.  Ultimate issues of credibility and weight of the

26  evidence rest solely with the jury, not Mr. Reiter.  Even if this fact is proven to be true, it would

27  ///

28  ///

1  have no bearing on the City's liability since the City's policy did not cause any unlawful behavior.

2  See Monnell v. Dept. of Social Services, 436 U.S. 658 (1978).  In light of all of these facts,

3  Mr. Reiter's testimony is irrelevant, unreliable and should be excluded.

4  E.    Mr. Reiter's Opinion Regarding Agency Supervisory and Training Issues are
         Irrelevant and Unreliable
5

6      As to agency issues, Mr. Reiter opines:

7          From the available information to date, there appears to be very
           serious deficiencies in agency supervisory and training issues which
8          would have direct impact on the conduct of police personnel involved
           in this situation.
9
           Exh. A, p. 15.
10

11     He further opines:

12         The Police Department has no documentation that any form of
           warning should be given prior to the use of deadly force upon a
13         subject.

14         Exh. A, p. 15.

15     These opinions are irrelevant because the Court has since dismissed the Escondido Police

16 Department and the City as to the excessive force portion of the first cause of action stating "even if

17 the City had a duty to train on the duty to warn and failed in that duty, Plaintiffs have not come

18 close to raising a material fact as to the deliberate indifference standard."  See Court's Order,

19 p. 11:16-18.  The Court likewise dismissed Police Chief White from any causes of action because

20 Plaintiffs had not established, as a matter of law, that Police Chief White had a duty to promulgate a

21 warn policy or any other policy.  See Court's Order, p. 12:8-16.  The Court's ruling obviously rids

22 of the need for expert opinion on this issue.  As discussed more fully above, the basis for

23 Mr. Reiter's opinion is lacking.  The only basis for his opinion that the City's policy is deficient is

24 reference to a few other policies from different agencies.  See Exh. B, p. 33:8-17.  This is hardly

25 verifiable data supporting his opinion.  As such, Mr. Reiter's opinion regarding the City's policies

26 should be excluded.

27 ///

28 ///

## III.

### LOU REITER'S REPORT SHOULD BE EXCLUDED BECAUSE IT IS IRRELEVANT, UNRELIABLE AND INADMISSIBLE HEARSAY

Plaintiffs seek to offer Mr. Reiter's written report into evidence. See Joint Order, p. 20, Plaintiffs Exh. 24. The report is nothing more than Mr. Reiter's out of court statements being offered for the truth of the opinions contained therein. The report is inadmissible hearsay pursuant to Federal Rules of Evidence, Rule 402 to which no exceptions apply. Further, the report contains opinions that go far beyond those offered by Plaintiffs in its description of Mr. Reiter's testimony contained in the Joint Order. Also, as discussed above, all of the opinions contained in Mr. Reiter's written report are irrelevant and unreliable. Lastly, to allow Mr. Reiter's written report into evidence would be cumulative to any testimony that may be allowed and would unfairly prejudice Defendants.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court grant its motion in limine excluding the testimony and written report of Lou Reiter.

DATED:        January 27, 2003

                                        OFFICE OF THE CITY ATTORNEY

                                        By: _____
                                             MARK A. WAGGONER
                                             Assistant City Attorney/Litigation

Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JAVIER PEREZ, et al.,

    Plaintiffs,

v.                                                        No. '01-CV-0410-K(AJB)

CITY OF ESCONDIDO, et al.,

    Defendants.
_____/

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE


## PRELIMINARY EXPERT REPORT OF LOU REITER

    1.    My name is Lou Reiter. I have been actively involved in police practices and law enforcement since 1961. I was an active police officer for 20 years. Since my retirement in 1981 as an active police officer, I have been involved in police and law enforcement practices as a private police consultant.

    2.    Since 1983 I have been providing law enforcement consultation in police training and management. I provide law enforcement training in the following areas:

- Investigation of critical incidents - officer involved shootings, use of force, and pursuits.
- Managing the Internal Affairs function.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit issues.
- Investigative procedures and supervision.
- Jail intake procedures

1

***EXHIBIT A***

- Personnel practices.
- Supervisory techniques.
- Liability management.
- Policy and procedure development.
- Management effectiveness.

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization.  My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents
- Jail procedures.

3.      Since 1983, I have been retained in over 850 police related cases.  This involvement has been on a mix of approximately 60 percent plaintiff and 40 percent defense.  Assistance provided includes  case analysis and development and expert witness testimony.  I have been qualified in state and Federal courts, including the District of Columbia and Puerto Rico,  to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and emergency vehicle operation including pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.

2

*EXHIBIT A*

- Investigative procedures.
- Jail intake procedures
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.
- Police policy and procedures development.
- Police training.

4.     I am a former Deputy Chief of Police of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty years until I retired in 1981. During that period of time I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer. I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the Police Task Force Report of the National Advisory Commission on Criminal Justice Standards and Goals. In 1993 I published the manual/guide Law Enforcement Administrative Investigations; the Second Edition in 1998; and, in 1996, "Creating Reasonable and Defensible Discipline," CALEA Newsletter.

5.     My experience, training and background is more fully described in the attached resume. A complete list of my testimony during the past four (4) years is attached.

6.     I have reviewed the following materials to date regarding this case:

- Second Amended Complaint
- Defendant's Answer to First Complaint

3

*EXHIBIT A*

- •    Other legal responses by Defendants
- •    Transcripts of audio tapes:
  - •    911 communications between Dispatcher Daubman and Javier Perez
  - •    Police radio communications
  - •    Telephonic search warrant request
- •    Copies of audio tapes
- •    Escondido Police Department Officer Involved Shooting Investigation, 00-04106
- •    Depositions:
  - •    Chief of Police White
  - •    Dispatcher Daubman
  - •    Javier Perez
  - •    Yesenia Perez
  - •    Estela Perez
  - •    Jose Batista
  - •    Leonor Batista
  - •    Alejandro Anguiano
- •    Escondido Police Department documents
  - •    Legal updates
  - •    Qualification Shoot for New Hires
  - •    4.13   Hostage Takers/Barricaded Suspects
  - •    1.46   Use of "Specialty" Munitions
  - •    1.41   Use of Force Review Committee and Core Policy Training
  - •    1.24   Use of Physical Force
  - •    1.13   Handcuffing and Searching Prisoners
  - •    1.5    Use of Firearms

7.     This is a preliminary expert report.  I'm aware that additional discovery depositions are in the process of being completed.  I'm also aware that other relevant police documents are currently the subject of court review for applicability.  I would request that this report be considered preliminary.

8.     From my review of these materials produced to date it is my understanding that the following events occurred which have now culminated in this

4

*EXHIBIT A*

litigation: On March 11, 2000, at approximately 2356 hours, Javier Perez telephoned

Escondido 911. Javier was 16. He had a troubled history including involvement with

narcotics. On this night, he was upset with his relationship with his girlfriend and was

impaired from alcohol and methamphetamine and advised the Dispatcher that he was

in possession of a loaded handgun (actually a BB gun resembling a full sized semi-

automatic handgun). The conversation between Javier and Dispatcher Daubman

consumed approximately 20 minutes. Police personnel from the Escondido Police

Department had been dispatched to the Perez home and had taken up positions

outside the house. The Dispatcher, following the advise of the field commander Sgt.

Lanigan, convinced Javier to come outside. When he came outside with both the

telephone in one hand and the BB gun in the other, he was shot by Officers Torres and

Sudak.

  9.  This preliminary expert will report will cover four (4) major areas of police

practices involved in this incident - (1) dispatch/communications, (2) officer tactics, (3)

search of the Perez home, and (4) agency issues, particularly policy development and

training. These opinions are based upon my specific police practices knowledge,

experience and training and my understanding of specific and generally accepted

police practices from my continued involvement in law enforcement activities.

### Dispatch/communications

  **10.  The conduct of the Escondido City and Police Department dispatch**

**and communications practices during this contact with Javier Perez was grossly**

*EXHIBIT A*

**deficient and contrary to any reasonable and generally accepted police practices. This grossly deficient and shocking police employee conduct was the prime instigator of the subsequent actions which led to the serious shooting injury to Javier Perez.**

11.    The 911 and communications center serving a local police agency is one of the most important elements in providing responsive and reasonable police service to citizens of its community, particularly during incidents involving emotional stress and potential violence.  During a critical call, the information gathered by the 911 operator is crucial to the knowledge of the responding police units.  The 911 operator is the conduit between the police department and the citizen on the other end of the line.  The operator is the one person who can direct and guide the citizen on the telephone as to what they should do to best protect themselves and help the responding police officers. Citizens are normally not aware of what they should or should not do when confronting police officers during critical, explosive situations.  That is the essential reason that 911 callers are requested to remain on the telephone with the operator.

12.    In this encounter with Javier Perez, the police dispatcher, Ms. Daubman, had vital information concerning this incident.  She became the vital conduit between Javier and the responding police officers.  Unfortunately, in my opinion, she served only the interests of the police officers.  Her conscious actions and omissions when dealing with Javier were critical in the tragic outcome of this incident.  They were essential aspects in the subsequent unnecessary shooting incident which caused

6

*EXHIBIT A*

significant injury to Javier.

13.    The 911 tape and transcript are graphic evidence of Ms. Daubman's

failures and departures from generally accepted police practices.

14.    What Ms. Daubman, the police dispatcher, knew and had transmitted to

the responding officers were:

- Javier was intoxicated with a combination of alcohol and meth
- He was a 16 year old juvenile
- He was experiencing a period of significant emotional stress
- Javier was in possession of what he described as a loaded gun
- His mother and younger sister were in the house

15.    What the 911 operator did not ensure was communicated to the

responding police and which she knew were:

- Javier was uttering disjointed, hostile expressions concerning the police and others
    - "No, send the fucking pigs, I'm ready...Fucking ready, blast those motherfuckers, ha ha ha..." pg. 5 of 911 transcript
    - "...No pigs going..., can't take me to fucking jail or whatever..." pg. 6
    - "It's kind of dark and fucking and I'm afraid of fucking wetbacks...Alright, I'm gonna walk outside right now...I'm going to fucking blast em..." pg. 32
- He was fearful that gangs were outside
    - "Fuck it they could be prom fucking Diablos or from fucking anywhere..." pg. 35
- Javier believed he was talking on the telephone with someone other than the police and that she had not told him that the police were outside

16.    The 911 dispatcher consciously mislead Javier into believing he was

talking with someone other the police.  In fact, she assumed the role of someone Javier

stated was the person who had been supplying him with his meth drugs.  During his

7

*EXHIBIT A*

deposition on pages 44 and 61 he stated he thought it was a neighbor playing a joke on

him and "I just remember talking with somebody, not knowing who it was..." and then he

recalls being shot. This conscious roleplaying by Ms. Daubman reduced the potential

that Javier would have known that the police were on the scene, immediately outside

his house, there to assist him. Some of the specific comments by Ms. Daubman are:

- Perez "Who is this again" and Daubman replies "Shirley" twice, pgs 17-18
- On page 18 of the 911 transcript the dispatcher says "No how am I supposed to get in. How am I gonna come over and do drugs with you"
- Javier on page 26 says "I thought you were Shirley" to which the dispatcher responds "I am Shirley, you're pulling my leg all over the place Javier"

17.     The most devastating omission by the dispatcher was the period

immediately before she knew Javier was going to go outside directly into the police

presence. This information was not transmitted to the officers that it appeared Javier

was going out with the gun in his hand thinking he was going to encounter his girlfriend.

During this final exchange with Javier, Ms. Daubman consciously elected to not tell him

that the police were outside. This action served absolutely no reasonable purpose and

ensured that a shooting more than likely than not would occur. There was no reason

not to tell Javier that the police were outside particularly when he was responding that

he was going to exit with his gun.

```
"D     You can't have the gun in your hand though
S      Why not
D      Well because that's not good
S      (unintelligible) Why not
D      What
S      Huh, who not is it good
```

8

*EXHIBIT A*

```
D    Huh
S    Why not
D    Well because that could get you in trouble
S    It can
D    Yeah
S    Well I better be prepared cause I don't know who's out there
D    Okay, well, I can guarantee you safety, how's that
S    M'm
D    I promise you it will be okay..." pgs 34 and 35
```

18.     Ms. Daubman says this was the first such call she had experienced in her 15 years working for the City (pg 15 deposition).  She stated in her deposition that she had no training in this type of incident or how to structure her communication with a person such as Javier (pgs. 10 and 34).

19.     This 911 communication with Javier lasted approximately 20 minutes. There was no reason not to involve someone more familiar with negotiation skills dealing with a juvenile in such an emotional state.

## Officer tactics

20.     **The tactics used by the Escondido Police Department officers, with the specific knowledge they had, were totally unreasonable and contrary to generally police practices for this type of subject encounter.  Their actions and conscious choices were so egregious that they in essence set up a situation which could be best described as an ambush.  Any reasonable officer, in my opinion, would have or should have known that the tactics used would not reasonably ensure that Javier would know that they were the police or provide the police with the opportunity to provide that moment of notice. Their conscious**

9

*EXHIBIT A*

**choices unnecessarily created the circumstances which culminated in the use of deadly force.**

21.     I use in training on the subject of dealing with persons who may be emotionally disturbed, intoxicated and/or suicidal an acronym - CCCT.  This is a graphic model which embodies the leading law enforcement materials on this subject. Some of these sources are both books by Gerald Murphy published in 1986 <u>Special Care: Improving the Police Response to the Mentally Disabled</u> and in 1989 <u>Managing Persons with Mental Disabilities</u>, the International Association of Chiefs of Police Training Keys 273 <u>Suicide Intervention</u> and 274 <u>Mentally Ill</u>, and the initial authoritative police manuals by Rowland and Matthews published between 1954 and 1975 <u>Police Manual: How to Recognize and Handle Abnormal People</u>.

> **Coordination.** The concept of devising a plan.  Allocating available resources and ensuring that sufficient units and equipment are brought to the scene.  Determining who will be doing what aspects of the operation. Developing a perimeter to ensure that outside persons don't become involved.  Determining who will be the lead person.  Ensuring that the officers at the scene conduct themselves in manner not to unnecessarily agitate or excite the subject.

> **Containment.** Devising a plan which will contain the subject.  This includes the ability to convince the subject that they do not need to move or continue flight.  This oftentimes requires officers to ensure that they respect the comfort zone of the subject and not agitate or compress this comfort zone.

> **Communication.** One person should be designated as the command voice.  Verbal communication should be non-threatening.  Open ended questions should be used which will facilitate the subject's participation. Various methods of communication should be used particularly if the subject does not respond.  Sharp, authoritative commands should be

10

*EXHIBIT A*

avoided.   Officers must constantly analyze what affect, if any, their efforts are having on the subject.

**Time.**  History has shown that the longer the encounter is allowed to occur, the better the chance of a successful and safe resolution.  This allows the subject to reflect on his or her predicament.  It also allows for the deployment of additional police resources.  It encourages the ability to communicate and create a relationship between the lead officer and the subject.

22.    This model comports with the materials in the California Commission on Peace Officer Standards and Training Basic Police Training Module on handling the Emotionally/Mentally Ill as well as the information embodied in the Escondido Police Department Policy 4.13 Hostage Takers/Barricaded Suspects.

23.    In the encounter with Javier Perez, the officers made conscious choices which were contrary to these reasonable and generally accepted police practices for this type of encounter.  This was not an unusual police incident; only the outcome was unusual.  Police deal with and can be expected to deal with intoxicated persons on almost a daily basis.  Police officers in urban areas regularly confront emotionally disturbed persons.  Juveniles present police officers with particularly unpredictable circumstances.  In this encounter, the officers were aware that all of these highly volatile ingredients were present in this situation.  Their actions were the types which would simply exacerbate these problems and lessen any opportunity to engage in normal diffusing tactics.

24.    Many of the actions of Sgt. Lanigan were reasonable in the area of coordination with one major exception.  He prepared his officers to surprise Javier.

11

*EXHIBIT A*

Everything done by the officers under his direction was done to obscure the presence of the officers and any police presence. In this case, Sgt. Lanigan was informed that Javier was heavily intoxicated and a juvenile. He was informed that Javier had possession of a loaded handgun. It was essential that Javier know that the police were at the location. The communications tape discloses that Sgt. Lanigan made no effort to ensure that Javier knew they were outside. What Sgt. Lanigan failed to do was prepare his units to also be surprised, which occurred.

25.    For the purposes of the circumstances in this incident, containment was obtained. However, the manner in which the officers accomplished it unnecessarily exposed themselves to what should have been anticipated. They made conscious choices to park their marked police vehicles away from the scene to ensure that no one at the house would see them. They unscrewed the garage lights at both the Perez and Batista homes. The officers assigned to the corner of the garage were totally exposed except for the potential concealment of darkness.

26.    The officers failed in the concept of communications. There were no communications between the officers and Javier. Everything done was done in a manner to obscure their presence. While one officer was designated as the command voice, this was violated and there were multiple voices giving some sort of commands at the moment of the shooting. No one was told what to use as commands should Javier exit with the gun in his hand. What the officers have stated is that they shouted the command "raise your hands." In doing so, Javier may well have been responding

12

*EXHIBIT A*

exacting as commanded, but the officers interpreted it as an offensive movement with the gun. There was no one who used any terminology identifying themselves as the police. This is supported by the officers own statements to investigators as well as the audio tapes. On top of that, the officers shined their flashlights on Javier. There would have been no way Javier could have seen who or what he was confronting under these circumstances. The civilians directly across the street, as well as Mrs. Perez who was approaching the front door, heard nothing being said or announced by the police prior to the shots being fired.

27.    The Police Department, dispatcher and officers at the scene failed to use time to their advantage. There was no rush. This was not a split second encounter. The police had the opportunity to plan for the eventual outcome. Javier was on the telephone with Ms. Daubman and there is no indication that he was rushed, looking to leave or engage in any further actions. There was no indication that any violence had occurred. Other than his use of narcotics, there is no indication that any crime had been committed. The plan directed by Sgt. Lanigan was designed to eliminate any use of time in diffusing this situation.

### Search of the Perez home

**28.    The search of the Perez home, in my opinion, was done contrary to law and generally accepted police practices.**

29.    Mr. Jose Batista testified that he observed officers going in and out of the Perez home with "brown bags" between the time of the shooting and 4 or 5 in the

*EXHIBIT A*

morning.  The search warrant was not signed until 0508 hours in the morning.

30.     The investigative report indicated that Sgt. Lanigan stated that following the shooting, "a safety sweep was made of the house to ensure that there were no more suspects."  All of the officers stated that both Javier's mother and sister appeared outside after the shooting.

31.     Detective Sweeney, who appears to have been the lead investigator of the Officer Involved Shooting Investigation, during his taped telephonic search warrant application at 0458 hours with Judge Gale Kaneshiro in the presence of Deputy District Attorney Lisa Flaig stated the purpose of the search warrant and night time service was:

> "I, I believe that inside the residence there's, there is possibly additional methamphetamine or biological evidence that may be destroyed due to time. There possibly could be an additional person inside the house that may destroy evidence, or possibly even an animal could destroy evidence such as the narcotics or stimulants such as amphetamine or marijuana or the alcohol that he stated he had drank on the telephone.  The possible additional person with a handgun as he stated that he did have a handgun that was loaded, could possibly be inside the house also."

Detective Sweeney also stated in this application that the house had not been secured and that he didn't know the location of Javier's sister.

32.     These statements of Detective Sweeney are inaccurate.  He had been on the scene since 0054 hours.  This is documented in the "Crime Scene Entry Control Log."  The house had been secured.  There were no persons in the house.  This was known to the police personnel on the scene.  It is unrealistic to believe that the lead

14

*EXHIBIT A*

investigator would not have known this.

### Agency issues

**33.     From the available information to date, there appears to be very serious deficiencies in agency supervisory and training issues which would have direct impact on the conduct of police personnel involved in this situation.**

34.     This, admittedly, is an area which has not been fully discovered in this case and I understand it is the subject of court review.

35.     There is, however, a serious deficiency in the Escondido Police Department's Use of Deadly Force policy which, in my opinion, is contrary to the Garner v. Tennessee 1985 decision and generally accepted police practices. The Police Department has no documentation that any form of warning should be given prior to the use of deadly force upon a subject. This is an essential element in the above decision when it is practical to give a warning before using deadly force. This requirement is omitted from the Policy 1.5 Use of Firearms. This appears to be a conscious choice by the Escondido Police Department and its policy makers.

36.     Chief of Police White, who acknowledges that he is the ultimate policy maker for the Department, testified on page 29 of his deposition

"Q.     What is the policy of the department with regard to warning individuals prior to the use of deadly force:
A.     I don't believe that there's – warning a person on deadly force?
Q.     On warning a person prior to using deadly force.
A.     I'm not sure I understand what the question is.
Q.     Let me clarify it.  Is there a policy of the department that before using deadly force on an individual whom an officer is confronting, he has a

15

*EXHIBIT A*

duty or obligation to warn that person that he's about to use deadly force?
A.   No, there's no policy."

37.   Following this tragic shooting incident, Chief White has not, as of the date
of his deposition, reviewed anything other than the Use of Force Review Committee
report (which has not been provided to the Plaintiff).  He stated that he found the use of
deadly force and the actions of all of his personnel consistent with his policies.  He has
not discussed this incident with Sgt. Lanigan or the other officers involved.  He has
acquiesced and ratified their actions by his failure to implement any improvements in
tactics or communications response to an incident such as the one involving Javier
Perez.  Conceivably if another such incident occurred, his personnel would respond
exactly the same as they did in the Perez incident.  They would perform as he would
want them to.

38.   Ms. Daubman testified that she had no specific training on how she
should have handled this type of incident.  She would do the same if it were to occur
again.  She had no resources to call upon to assist her during a critical incident such as
this.

39.   Scenario training for dispatchers is common whether done at some formal
training site or during in-service, on-the-job training[1].  Many agencies have a handbook

[1] "1. Training.  As much as possible, most types of messages should be committed to standard
handling procedures.  Any conceivable type of situation should be worked out in hypothetical 'role play'
sessions and communications procedures worked out accordingly.  Once standard operating procedures
are established, they should be made well known to all operating personnel, and these personnel should
be instructed and rehearsed in as many different types of situations as possible.  The training must
coincide with the planning, and both must be constant in the dynamic environment of the law
enforcement milieu." Page 110, *Police Field Operations, Second Edition*, Thomas F. Adams, 1990.

16

*EXHIBIT A*

which provides dispatchers with key points to consider during such a critical incident. Ms. Daubman testified that neither of these occurred nor were made available to her.

40.     It is my understanding that additional materials may be in process of being produced or may be requested later. I would request that this report be considered a preliminary report. Should any subsequent information be produced and materially affect or alter any of these opinions, I will either submit a supplemental response or be prepared to discuss them during any scheduled deposition.

41.     At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

42.     My fees for this professional service is a flat Case Development Fee of $5000 and a fee of $1800 for a deposition in Rhode Island or $2000 per day plus expenses for services away from Rhode Island including depositions and trial appearances.


This report is signed under penalty of perjury on this 28th day of March, 2002, in Greenville, RI.

Lou Reiter

17

*EXHIBIT A*

# LOU REITER...RESUME

**LOU REITER & ASSOCIATES**...58 smith avenue, greenville, rhode island 02828
401.949.6978...401.949.0298(fax)...800.386.8631 (pager)...LREITER583@AOL.COM

## POLICE CONSULTING EXPERIENCE

Lou Reiter has been the principal consultant with Lou Reiter & Associates since its inception in 1983. In that capacity he has been providing professional consulting to law enforcement agencies in three primary areas: (1) training, (2) agency audits and (3) litigation services.

### TRAINING

Lou Reiter typically conducts 15-20 training seminars and programs each year involving approximately 1000 persons. These presentations range in time from 3 hours to five (5) days with the majority being a two (2) day seminar. Normally attended by police supervisors, managers, command personnel and litigation/risk management elements, these seminars involve police practitioners from federal, state, county and municipal law enforcement agencies.

The most common areas of presentation and instruction are:

- Managing the Internal Affairs function, police discipline and the citizen complaint process.
- Investigation of critical incidents - officer involved shootings, use of force, and pursuits/emergency responses.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit/emergency response issues.
- Investigative procedures and supervision.
- Personnel practices.
- Supervisory techniques.
- Liability management.
- Policy and procedure development.
- Jail intake procedures.
- Management effectiveness.

*EXHIBIT A*

These training programs have been presented in the following states for police training academies, private training groups, public agencies, governmental entities and academic facilities:

| | | | |
|---|---|---|---|
| California | Maryland | Colorado | Mississippi |
| Florida | Ohio | Oregon | Tennessee |
| Georgia | Indiana | Washington | Alaska |
| New York | Wisconsin | Hawaii | New Jersey |
| Texas | United Kingdom | Vermont | Connecticut |
| South Carolina | Minnesota | North Carolina | District of Columbia |
| Massachusetts | Missouri | Illinois | New Mexico |
| Rhode Island | Arizona | Oklahoma | Michigan |
| Pennsylvania | Nevada | Louisiana | |
| Virginia | Utah | | |

## LAW ENFORCEMENT AGENCY AUDITS

These types of agency audits take on many different forms.  Some are designed to identify the strengths and weaknesses of the agency, make recommendations and present specific timetables for implementation. Others are specifically designed to evaluate the agency's liability potential, make recommendations and suggest implementation strategies.  Some involve budgetary concerns and consideration of consolidation of police jurisdictions.  Occasionally the purpose is to conduct an administrative investigation using external investigators due to sensitive or political potential conflicts of interest.  Some are accreditation and re-accreditation on-site assessments for the Commission on Accreditation for Law Enforcement Agencies, Inc.

These audits are conducted either as a one-person unit or as a member of a larger team of police professionals, although not more than six (6) total.  Most of these are through contracts with the affected governmental body.  Some are through a litigation or risk management unit.

In 2001, Lou Reiter was appointed as the Federal Court Monitor for the consent decree in *Colin, et al., v. County of Ventura, et al.*, CV 97-8352, 98-3051 and 98-6092 LGB (Cwx), United States District Court, Central District of California.

Lou Reiter since 1983 has audited law enforcement agencies as small as three (3) persons to as large as 39,000 personnel.  They have represented municipal, county and state entities.  Normally, he conducts 3-5 of these audits each year.  During these forms of audits, he rides with line officers and first level supervisors for nearly 100 or more hours for interviews and direct observation of field implementation.

The primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

*EXHIBIT A*

- Training and training documentation
- Use of police resources
- Support functions including communications, records and detention and holding facilities.

These types of agency audits have been conducted in the following states:

| | | | |
|---|---|---|---|
| Florida | Pennsylvania | Illinois | Texas |
| Georgia | North Carolina | Wisconsin | New York |
| Arizona | South Carolina | West Virginia | Rhode Island |
| Colorado | Virginia | Louisiana | Washington |
| Ohio | New Mexico | Tennessee | |
| Delaware | California | | |

## LITIGATION SERVICES

Lou Reiter, since 1983, has been involved in over 800 law enforcement civil litigation cases and a few criminal matters. He has acted both as a consultant and testimonial expert witness. These have been in Federal and local courts. He has worked with plaintiff attorneys approximately 60 percent of the time and the remainder with defense units. He has also been employed in this area by insurance entities, risk management pools, local prosecutorial offices and the United States Department of Justice.

While there has been a wide range of specific law enforcement practices and procedures which have been involved in these cases, some of the more common issues addressed in case development and subsequent testimony have been:

- Field procedures including tactics, arrest techniques and pursuits/emergency response driving.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures, including warrant applications, informant control and use, and search warrant processes.
- Jail intake procedures.
- Police management.
- Personnel practices, including hiring, retention, remediation, background investigations, use of professional counseling services and promotion/assignment.
- Investigation of citizen complaints.
- Employee discipline.
- Police policy and procedures development.
- Police training.

These litigation services have been in the following states and jurisdictions:

| | | | |
|---|---|---|---|
| Florida | Texas | Oregon | Wyoming |
| Georgia | Missouri | New Mexico | Colorado |
| Alabama | Illinois | Arizona | Kansas |
| Mississippi | Indiana | Alaska | Oklahoma |
| Louisiana | Michigan | Hawaii | Texas |
| California | Iowa | Montana | Kentucky |

*EXHIBIT A*

| Tennessee | District of Columbia | Connecticut | Wisconsin |
|---|---|---|---|
| Minnesota | Maryland | Maine | Massachusetts |
| Ohio | Pennsylvania | New Hampshire | Idaho |
| South Carolina | New York | Puerto Rico | West Virginia |
| North Carolina | New Jersey | Rhode Island | |
| Virginia | Delaware | Washington | |

## PRIOR ACTIVE POLICE EXPERIENCE

Lou Reiter was a sworn member of the Los Angeles Police Department for 20 years between 1961-1981. He began as a police officer and retired as a Deputy Chief of Police. During that tenure he served in over 20 assignments. Some of those assignments included:

**Promotion schedule.**

- 1980 Deputy Chief of Police
- 1976 Commander
- 1974 Captain
- 1970 Lieutenant
- 1966 Sergeant
- 1961 Police Officer

**Personnel and Training Bureau, Commanding Officer.** As a Deputy Chief directed the operations of three (3) divisions and two (2) major sections, involving over 300 employees.

- Responsible for all training, personnel management, recruitment and selection, employee-management relations and behavioral science services
- Responsible for the successful implementation of the 1980 Consent Decree requiring increased hiring of females and minorities
- Chairman of the Use of Force Review Board which adjudicated all officer-involved firearm discharges, serious injuries resulting from police action and in-custody deaths
- Caused the initiation of a unique peer counseling program for employees and a transfer system for "burned out" employees from high activity areas and assignments.

**Operations West Bureau Commanding Officer.** Directed all police operations (patrol, traffic, investigations and vice/street narcotics) in the Western quadrant of the City with four (4) geographic stations and one (1) traffic division involving over 1400 employees.

**Planning and Fiscal Bureau Commanding Officer.** Directed the operations of five (5) divisions, involving over 400 employees.

- Responsible for the $310 million Police budget preparation and management
- Automated systems
- Planning and research
- Communications
- Guided the development of the Emergency Command Control Communications System, a multi-faceted computer based system financed by a $40 million tax override
- Provided on-going liaison with the City Council and directed efforts to develop local and state legislation

*EXHIBIT A*

**Uniformed Coordinator for Operations Central and Valley Bureaus.** Each Bureau consisted of five (5) geographic stations, a traffic division, gang enforcement unit, and over 1600 employees. In addition to the overall coordination of patrol and uniformed operations, monitored and approved personnel complaint investigations, adjudications and discipline during this four (4) year assignment.

- ▶ Coordinated the successful police efforts in the San Fernando Valley during the 1978 school desegregation
- ▶ Directed the City-wide 500 person police reserve officer program
- ▶ Department liaison to community alcoholism programs
- ▶ Participant in the Physical Altercation and Tactics Committee
- ▶ Regular member of the Fleet Safety Review Board and Shooting Review Panel.

**Central Area Commanding Officer.** For two (2) years commanded over 250 uniformed officers and detectives in the Los Angeles Central City (downtown) area.

**Team policing.** Selected to make preliminary preparations and then command a unique team policing experiment in Foothill Division in July, 1973 (this was similar to the current Community Oriented Policing concept). This consisted of a command of 57 employees including detectives and traffic officers to maintain 24-hour police service for this area. Crime went down in this area while it rose in adjacent areas.

**Traffic assignments.** Served as a uniformed traffic accident investigator throughout the City. Investigated 1200-1500 traffic accidents and arrested nearly 400 drunk drivers. Provided specialized enforcement and accident investigation on the City's freeway systems in specially equipped pursuit vehicles.

**Patrol assignments.** Was a uniformed patrol officer in three (3) geographic stations. Functioned as a plainclothes member of an anti-crime unit. As a sergeant was a field supervisor and later, as a lieutenant, was a uniformed watch commander.

**Employee misconduct administration.** Investigated cases alleging employee misconduct both as a field supervisor and member of Internal Affairs Division. As the Department Advocate, presented the agency case against employees during internal administrative hearings (Boards of Rights). Later, as a Lieutenant, acted as a defense representative for accused employees during these same hearings. Adjudicated investigations of police misconduct and served as a member of Boards of Rights on many occasions.

**Other personnel related activities.** Participant in the Physical Altercation and Tactics Committee, Fleet Safety Review Board and Shooting Review Board. In 1981, chaired the Police Productivity Workshop which presented recommendations for massive changes in operations to respond to budgetary restrictions imposed by the passage of Proposition 13.

**Training commands and assignments.** Commanded (1980-1981) the Personnel and Training Bureau which included the Police Academy and video training production unit. Implemented programs (1980-81) to assist in the achievement of court consent decree hiring of females/minorities and their successful performance during the training aspect of their employment. Was the Assistant Commanding Officer of the Police Academy. Was the Officer-in-charge of the Human Relations Training Unit which covered such topics as community and cultural diversity, officer-partner relations, inter-personal communications, and handling the emotionally disturbed and mentally ill.

**Staff researcher and author for the 1973** *Police Task Force Report* **of the National Advisory Commission on Criminal Justice Standards and Goals.** The report assisted agencies nationwide to update their operations and develop plans for future growth and strategies. The three (3) specific chapters

*EXHIBIT A*

researched authored by Lou Reiter were "Internal Discipline, Training and Management-Employee Relations."

**Managing Unusual Occurrences.** Member of the Department Field Command Post Cadre since its inception following the 1965 Watts Riots. Developed procedures for police operations during such incidents principally as a member of the Operations Section and later incident command functions. Participated in numerous actual unusual occurrence control operations as well as training exercises responding to natural and man-made incidents.

**Volunteer police.** Managed the LAPD 500 person Reserve Officer Corps. Developed revised training programs and an in-service training element. Created a unique expert advisory group within this volunteer corps specializing on the expertise of lawyers, doctors, statisticians, educators and other specialists. Implemented a 54 person Reserve Chaplain program. Lobbied for and supported State laws mandating strengthened training and selection requirements for volunteer elements of police agencies.

**Community Relations and Crime Prevention.** Community Relations lieutenant and Assistant Commanding Officer of Hollywood Division, directing the community mobilization and crime prevention efforts. Was the Officer in Charge of the Public Service and Crime Prevention Section, Public Affairs Division.

**New Careers and Concentrated Employment Program.** In 1967, initiated, implemented and administered this U.S. Department of Labor funded program which employed, trained and assigned disadvantaged, underemployed persons to police community relations and crime prevention programs. Ninety (90) percent were ex-convicts or former narcotics users.

**Planning and Research.** Researched and authored policy and procedure changes for the Department and incorporated them into the Department Manual.

## ADDITIONAL INSTRUCTIONAL EXPERIENCE

During the years since 1971, Lou Reiter has been involved in continuous and varied aspects of training both within and outside the law enforcement field. Some of those not covered in the preceding sections are:

- Faculty member for national level police management and specialized programs for organizations such as the Public Agency Training Council (Indianapolis), Americans for Effective Law Enforcement (Chicago), Institute for Police Technology and Management (Jacksonville, FL.), Police Foundation Executive Institute, Commission on Accreditation for Law Enforcement Agencies, National League of Cities, Law Enforcement Assistance Administration, academic institutions, local police academies, state police organizations and risk management/insurance pool groups.
- Senior Consultant, Institute for Liability Management.
- Faculty member, Criminal Justice Management Program, Florida Center for Public Management, Florida State University.
- Certified Instructor, Law Enforcement Supervision/Management, Florida Department of Law Enforcement.
- Lifetime Vocational Training Certificate, Law Enforcement, California.
- Developed and presented "Frontline Supervision," a police supervision program.

*EXHIBIT A*

Elected to the Santa Clarita Community College Board of Trustees in 1975 and reelected in 1979. Served as Board President and acted on many local and State committees on education.

Past member:

- Police Science Advisory Boards for Junior Colleges of Rio Hondo, El Segundo and Harbor City in the Los Angeles area.
- Faculty member for graduate and undergraduate level courses at various universities and colleges.
- Principal faculty member for the Management Development Program for the City of Los Angeles.
- Trainer for Florida American Cancer Society's Volunteer Leadership Development Program.
- California State University, Northridge, Advisory Committee on Teacher Education.
- Advisory Committee on Clinical Rehabilitative Services Credential, Department of Communicative Disorders.

## LAW ENFORCEMENT PROFESSIONAL ACTIVITIES

Since 1973, Lou Reiter has been involved in law enforcement professional activities and programs. Many of these were during his tenure with the LAPD. Other have been as a concerned public member and police consultant. Some of those include:

- Assessor, Commission on Accreditation for Law Enforcement Agencies, Inc., (1985- ), and has been assigned to both on-site audits for accreditation and re-accreditation. Re-certified as an assessor in 1999 at Montreal Conference.
- American Society for Law Enforcement Trainers, member.
- National Internal Affairs Investigator's Association, member
- National Center for Women and Policing, member.
- Founding Member, Tallahassee Committee of Ninety-Nine and former member of Board of Directors (1982-1988) and Secretary (1984-1987). This organization was formed in 1981 and provided support to local law enforcement agencies for greater professionalization, underwriting local police training programs, purchasing police equipment and ensuring benefits to families of police officers.
- Presenter and participant, 1982 and 1983 Florida Governor's Challenge Conference on Crime.
- Chair, Public Safety Committee, 21st Century Council, City of Tallahassee (1990-1993). This citizen group was organized to create an annual assessment guide to evaluate the effectiveness of our community's public safety performance.
- Past member, California Peace Officers Association
  - Chairman (1979-81) Standards and Ethics Committee.
    - Initiated and moderated the First Joint Symposium on Professional Issues.
    - Developed and received State approval and distribution of the *Code of Professional Conduct and Responsibilities for Peace Officers*.
  - Member, Law and Legislation Committee.
  - Member, Small Agency Committee.
  - Member, Reserve Officers Committee.
  - Recipient of the 1981 'Professionalism Award' from the California Peace Officers Association.

*EXHIBIT A*

- ■ Member or past member:
  - ▸ Florida Sheriffs' Association, Lifetime Member.
  - ▸ Florida Council on Crime and Delinquency.
  - ▸ American Society for Training and Development, local and National.
  - ▸ Public Safety Committee, League of California Cities.
  - ▸ Los Angeles County Peace Officers Association.
  - ▸ Southern California Police Community Relations Officers Association.

## PUBLICATIONS

Lou Reiter has published many law enforcement articles. With the exception of his Internal Affairs manual mentioned below, most of his current publications are integral parts of training he provides and are tailored to the specific subject matter and audience of the presentation. The below represent many of his published works:

- ■ *Law Enforcement Administrative Investigations, a manual/guide.* This comprehensive 120 page manual was first published by Lou Reiter & Associates in 1993. The 2nd edition was published in 1998 and is an expanded version with several guest author chapters and contains over 300 pages in a 'nuts and bolts' method of presentation for practitioners.

- ■ "Creating Reasonable and Defensible Discipline," Commission on Accreditation for Law Enforcement Agencies, Inc., Newsletter, November, 1996.
- ■ "Timesharing With Your Subordinates," Florida Police Chief, April, 1984.
- ■ "Police Agencies Need Shooting Policy," Tallahassee Democrat, September 27, 1982.
- ■ "Truth About Miami Is Down in the Streets," Tallahassee Democrat, December 27, 1982.
- ■ "Police Recruitment in the 80's - Crisis or Opportunity?" Western City, May, 1981.
- ■ "Civil Detoxification in Los Angeles," Police Chief, August, 1981
- ■ "Professional Police," California Peace Officer, 1980.
- ■ "The Elected Public Official Views Police Professionalism," California Peace Officer, 1980.
- ■ "A Footbeat Officer's View of Police Work," Journal of California Law Enforcement, October, 1979.
- ■ "A Day With Sergeant Maynard Jones," Police Chief, April, 1979.
- ■ "Field Sergeants' Administrative Time Utilization," Journal of California Law Enforcement, unknown date.
- ■ "Make Your Meetings Successful," Journal of California Law Enforcement, April, 1979.
- ■ "Ways To Get That Paper Out Now, Faster and Better," Journal of California Law Enforcement, October, 1978.
- ■ "Internal Discipline," "Training," and "Management-Employee Relations," Police Task Force Report, National Advisory Commission on Criminal Justice Standards and Goals, United States Department of Justice, U.S. Printing Office, 1973.

## URBAN ECONOMIC DEVELOPMENT AND COMMUNITY ACTION GROUPS

During his residence in both Southern California and Florida, Lou Reiter has been active in various programs designed to improve and enhance community and economic development. Some of those activities have included:

*EXHIBIT A*

- Tallahassee Area Chamber of Commerce and committees on County and City Governments.
- Local committee for district member voting in Leon County.
- Forward Tallahassee.
- Board of Directors, Skid Row Development Corporation. A non-profit organization formed to stimulate redevelopment of the skid row area in Los Angeles, attract funding sources, funnel monies to redevelopment projects and oversee the general plan for this designated area. During the first year originated over $6 million of projects impacting business stimulation and residential housing.
- Board of Governors, Alcohol Detoxification and Rehabilitation Center. In 1976 conducted an extensive management study of this program. The results were implemented and produced an increased intake of public inebriates and reduction in walkout rates.
- Central Business District Redevelopment Project, Skid Row Task Force.
- Greater Van Nuys Chamber of Commerce and member of the Business Improvement Committee and Vitalize Van Nuys, Inc. ( a specific economic action project).

## COMMUNITY ACTIVITIES

Community activities have been a personal commitment for Lou Reiter. Many of these were in connection with his duties as a police practitioner. Others were from his personal orientation to the communities in which he has lived. Some of those not previously mentioned have included:

- American Cancer Society
    - Board of Directors and Executive Board, Florida Division.
    - State Crusade Committee, Vice Chair.
    - Chairperson, State Direct Mail and Marketing Subcommittee.
    - President (1986-87) and Board of Directors, Leon County Unit.
    - Trainer, State Volunteer Leadership Development Program.
    - Crusade Chairperson (1982-84) Leon County Unit which increased donations 60% to a record high of $111,000 annually.
- President, Consolidation NOW, a citizens' group advocating the consolidation of governments of Leon County and the City of Tallahassee.
- President (1985) and member Board of Directors (1983-88), Tallahassee Junior Museum. During the year as President the museum received accreditation from the American Association of Museums.
- Chairperson, Airshow '86, Tallahassee's first major airshow. Co-chair, Airshow '87.
- Rotary International
    - Tallahassee Capital Rotary (1981- )
    - Paul Harris Fellow (1976)
    - Service Above Self/Member of the Year recipient (1986-7)
    - Presenter at district and zone conferences
    - Past member, Newhall, CA., Rotary
    - Creator of the Newhall Rotary Community Service Fund
- Memberships, current and previous:
    - Forward Tallahassee, Public Safety Committee
    - Florida Economics Club
    - Tallahassee Tiger Bay Club
    - WFSU-TV committees
    - Partners in Excellence, a school/business support program

**LOU REITER RESUME...9**

*EXHIBIT A*

- ▸ 1987 Leon County School District "Citizens For Better Schools" Bond Steering Committee
- ▸ Florida State University Artists Series, benefactor
- ▸ Public Inebriate Task Force, Alcoholism Council of Greater Los Angeles
- ▸ Canyon County, CA., Formation Committee
- ▸ Vice President and Board of Directors, Santa Clarita Valley Boys and Girls Club
- ▸ Board of Directors, Tallahassee Informed Parents
- ▸ Boy Scout Troop 23 Committee
- ▸ Swannee Area Scout Council Fund-raising Committee
- ▸ Board of Directors, LeMoyne Art Foundation
- ▸ Member and Director, United Way of Leon County

## FORMAL EDUCATION

University of Southern California - Graduate of the Managerial Policy Institute (1980) and graduate study in the Master of Public Administration program.

Pepperdine University - Bachelor of Science in Public Management/Criminal Justice Program .

University of California at Los Angeles - undergraduate study in Political Science.

## PERSONAL

Born March 31, 1939, in Minneapolis, Minnesota.

Resident of Rhode Island since 1999 and Tallahassee, Florida, between 1981-1999. Lou Reiter lived in the Los Angeles area for nearly 30 years.

Lou's wife is Marilyn McFadden who is an attorney and was a certified Florida police officer. She currently specializes as a consultant in law enforcement and prosecution issues of Domestic Violence. They have six (6) grown children one of whom is a police officer with the City of Tallahassee.

*EXHIBIT A*

## LOU REITER TESTIMONY

**January, 1998**

Richard Waples, Indianapolis, *Love v. Bolinger*, IP 95-1465-C-B/S, D/T
Andrew Marshall, Athens, GA., *Murray v. Athens-Clarke County*, 3:96-CV-132(DF), D

**February, 1998**

William W. Kurnik, Arlington Heights, IL., *Cefalu v. Village of Elk Grove*, 94 C 1990, T
Richard L. Gullixson, Los Angeles, *Kosma v. City of Hermosa Beach*, CV-96-5494 MRP (Shx), D
Dick Treon/Ray Norris, Phoenix, *Mallet v. City of Phoenix*,          T

**March, 1998**

David Wood/Samuel Paz, Los Angeles, *Frias v. City of Torrance*, CV95-6459-WMB, D

**April, 1998**

William Pickett, Kansas City, MO., *Jones v. Board of Police Commissioners*, 96-0612-CV-W-2, T
Larry Levanthal, Minneapolis, *Holmberg v. Lanasa*,          T

**May, 1998**

James Krasnoo, Andover, MA., *Makris v. Town of Salem, NH.*, C-97-330-SD, D

**June, 1998**

Daniel Clements, Baltimore, *Petitite v. Town of Port Deposit*, S 93-9347 22098-47-695, D
David Switalski, Tallahassee, *Stewart v. City of Sneads*, 4:97CV411-WS, D
Michael Avery, Boston, *Hirshenfang v. City of Boston*, 93-4903-E, T

**July, 1998**

Stuart Gordon, Chicago, *Wilson v. Smrha*, 93 L 12490, D
Michael Zidek, Wheaton, IL., *Johnson v. Landrum*, 94 L 15, D
Jeffrey Tabb, Greenbelt, MD., *Rutledge v. District of Columbia*, 95-2238 (EGS), D

**August, 1998**

Stephen Roach, Boston, *Cox v. City of Boston*, 95-12729-WGY, D

**September, 1998**

Patrick Vastano, Los Angeles, *Oram v. GLOCK, 290597, D*
Jeffrey Scott, Philadelphia, *Vetenshtein v. City of Philadelphia*, No. 3494 APRIL TERM, 1994, D

**November, 1998**

Larry Fuller/John Mallah, Miami Beach, *Mendelson v. City of Miami Beach*, 89-36054 (12), T

1

*EXHIBIT A*

Brad Hall, Albuquerque, *Leghart v. City of El Paso,* EP-98-CA-235-D8, D

**December, 1998**

Allan Guttman, Fort Lauderdale, *John Clements Grand Jury,* T

**January, 1999**

Bruce Jolly, Ft. Lauderdale, *Hennelly v. St. Lucie County,* 97-629-CA-09, D

**February, 1999**

Janet Bickel, Muskogee, OK., *Long v. James,* CIV-98-066-S, D
John Montag, Los Angeles, *Crudup v. City of Ontario, CA.,* SA CV 94-733 AHS (EEx), T

**March, 1999**

Barbara Fromm, Tallahassee, FL., *Vickers v. Madison County Sheriff,* 4:98-CV-241-WS, D
Janet Bickel, Muskogee, OK., *Long v. James,* CIV-98-066-S, T
Arturo Jaruegui, Chicago, *Montano v. City of Chicago,* 97 C 8035, T

**April, 1999**

Jeffrey Tabb, Greenbelt, MD., *Rutledge v. District of Columbia,* 95-2238 (EGS), T
Vonde Smith, Jackson, WY., *Cruz v. City of Laramie,* 98CV066D, D

**May, 1999**

Dan George, Sallisaw, OK., *Eymer v. City of Sallisaw,* CIV 98-536-S, D

**June, 1999**

Tracy Sharp, West Palm Beach, *Lamore v. City of Riviera Beach, FL.,* 97-8527-CIV-RYSKAMP, T

**August, 1999**

Darcy Proctor, Chicago, *Hardaway v. City of Country Club Hills,* 95 L 3302, D
Barbara Fromm, Tallahassee, FL., *Vickers v. Madison County Sheriff,* 4:98-CV-241-WS, T

**September, 1999**

Thomas A. Brill, Santa Ana, CA ., *Chavez v. I.N.S., 98CV0454B(RBB),* D
Joe Fine, Albuquerque, *Abraham v. City of Socorro,* D-0725 CV-9800147, D

**October, 1999**

Thomas Scarritt, Tampa, FL., *Sutherland v. City of Mulberry,* 98-2213-CIV-T-24A, D

**January, 2000**

Steven Thornton/Joe Abodelly, Phoenix, AZ., *Crawford v. City of Scottsdale,* CIV 96-1842 PHX ROS, D
Richard Kastendieck, Pikesville, MD., *Braatz v. Shields,* 4-C-97-1019MT, D

2

*EXHIBIT A*

Michael Raffauf, Decatur, GA., *Cole v. DeKalb County,* 1 97-CV-1144, D

### February, 2000

Joe Palous, District Attorney, Oshkosh, WI., *Pagel Inquest,* T
Peter Ginsberg, Washington, DC., *Lee/Freeman v. City of San Diego, et al.,* 98CV1292 BTM (SLP), D

### March, 2000

Thomas Brill, Sacramento, CA., *Chavez v. I.N.S.,* 98 CV-0454B(RBB), T
Michael Raffauf, Decatur, GA., *Cole v. DeKalb County,* 1 97-CV-1144, T
Shelley Kaufman, Los Angeles, *Benge v. City of Pasadena,* CV97-SVW(JGx), T

### April, 2000

John Connell, Haddonfield, NJ, *Hill v. New Jersey State Police,* T
David Clark/Mary Robberson, San Diego, *Jabro v. San Diego Harbor Police,* D
Billy Mathis, Albany, GA., *Tucker v. Wal-Mart,* 99-SCV-0295, D

### May, 2000

Michael Haddad, Oakland, CA., *Lifton v. Cities of Vacaville and Fairfield, CA.,*     D
Thomas Calcatera, Southfield, MI., *Sims v. City of Detroit,* 99-913202-NO, D

### June, 2000

Paula Cole, Detroit, *Crowley v. City of Detroit,* 98-CV-74882-DT, D

### July, 2000

Barbara Fromm, Tallahassee, *Coisman v. Williams,* 94-11599-CA-O, D
John Martin, Cleveland, *Blair v. City of Cleveland,* 94CV2626, D
Jeff Haas, Chicago, *Tolson v. City of Chicago,* 99C4548 Judge Coar, D
Neil Chonin, Coral Gables, FL., *Vann v. City of Orlando,* 99-385-CIV-ORL-19C, D

### August, 2000

Patty Kinaga, Los Angeles, *Preece v. City of Riverside Arbitration Hearing,* T
Shelley Kaufman, Los Angeles, *Benge v. City of Pasadena,* CV97-SVW(JGx), T
Scott Arceneaux, New Orleans, *Chavin v. Jefferson Parish,* 99-2200 Sect. C(2), D

### October, 2000

Chris Antcliff, El Paso, *Jackson v. County of El Paso,* EP-00-CA-001-H, D
Richard Gullixson, Los Angeles, *Kozma v. City of Hermosa Beach,* CV-96-5494 MRP (Shx), T
Bruce Jolly, Fort Lauderdale, *Enterprise v. Martin County Sheriff's Office,* 98-006647-AE, D

### November, 2000

Jacob Schwartzberg, Detroit, *Leong v. City of Detroit,* D
Thomas Tosdal, San Diego, *Andres v. U.S. Border Patrol,*    D
David Clark/Mary Robberson, San Diego, *Jabro v. San Diego Harbor Police,* T

3

*EXHIBIT A*

**December, 2000**

Darryl Lewis, West Palm Beach, *Jenkins v. Ranger Construction Company,*   D

**January, 2001**

Edward Bell, Sumter, SC, *Dew v. County of Greenville,* C.A. 6:0001386, D
Darryl Lewis, West Palm Beach, *Jenkins v. Ranger Construction Company,*   T

**February, 2001**

Thomas Chamberlin, Phoenix, *Claxton v. State of Arizona,* CV99-10804, D
William Kurnik, Chicago, *Hayes v. City of Des Plaines,*   ,D
Steven Hengen, Concord, NH, *Tostenson v. Town of Lebanon, NH,* Arbitration hearing, T

**March, 2001**

Tim Rastello, Denver, *Williams v. City and County of Denver,* 94-1900, T
Neil Chonin, Coral Gables, *Vann v. City of Orlando, 99-CV-19-C, T*
John Lovey/Russell Barnett, Chicago, *Robinson v. City of Harvey,* 99C3639, T

**April, 2001**

William Liedel, Detroit, *Laroque v. City of Detroit,*            D

**May, 2001**

William Liedel, Detroit, *Laroque v. City of Detroit,*            T

**June, 2001**

Michael Haddad, Oakland, CA., *Lifton v. City of Vacaville,* S-98-1678-DFL DAD, T

**September, 2001**

Ben Silva, Albuquerque, *Corpington v. City of Las Cruses,*       D
Mark Jarmie, Albuquerque, *Vigil v. City of Santa Fe,*        D

**October, 2001**

Thomas Costello, Troy, MI., *Markovitz v. City of Inkster,* 98 836051 NO, D
Kari Mitchell, Detroit, *Robinson v. City of Southfield, MI.,* 00-016020 NO, D

**November, 2001**

James Riley, Boston, *Ulibarri v. Santa Clara Tribal Police,*       D

**December, 2001**

Jeff Grant, Seattle, *Cavanaugh v. City of Mt. Vernon,* C00-1973-L, D
Timothy Lynch, Boston, City of Waltham, MA.,    D
Steven Bennett, Nashau, NH, *Scaccia v. City of Nashua,* Arbitration Hearing, T
Bruce Jolly, Ft. Lauderdale, *Hennelly v. St. Lucie County,* 97-629-CA-09, Special Master Hearing, T

4

EXHIBIT A

**January, 2002**

Jeff Grant, Seattle, *Cavanaugh v. City of Mt. Vernon*, C00-1973-L, T

5

*EXHIBIT A*

RECEIVED

JUN 03 2002

City Attorney's Office

1        IN THE UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

**CERTIFIED COPY**

4    JAVIER PEREZ, a minor;        )
     YESENIA PEREZ, a minor; and   )
5    ESTELA PEREZ, an individual,  )
          Plaintiffs,              )
6                                  )
          VS.                      )    CASE NO. '01-CV-0410-K
7                                  )    (AJB)
     CITY OF ESCONDIDO, a          )
8    governmental entity; ESCONDIDO)
     POLICE DEPARTMENT, a          )
9    governmental entity (sic);    )
     DUANE WHITE, an individual;   )
10   OFFICER J. MURPHY, an         )
     individual; SERGEANT LANIGAN, )
11   an individual; and DOES 1     )
     through 10,                   )
12          Defendants.            )
     _____)

13

14

15                   DEPOSITION OF

16                    LOU REITER

17              WARWICK, RHODE ISLAND

18                   MAY 14, 2002

19

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   330 North Brand Boulevard, Suite 250
     Glendale, California 91203
23   (818) 551-7300

24   REPORTED BY:  HEIDI H. JAMIEL, CSR NO. 10258

25   FILE NO.:  9C02528

1

*EXHIBIT B*

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3                      - - -

4
    JAVIER PEREZ, a minor;        )
5   YESENIA PEREZ, a minor; and   )
    ESTELA PEREZ, an individual,  )
6        Plaintiffs,              )
                                  )
7        VS.                      )  CASE NO. '01-CV-0410-K
                                  )  (AJB)
8   CITY OF ESCONDIDO, a          )
    governmental entity; ESCONDIDO)
9   POLICE DEPARTMENT, a          )
    governmental entity (sic);    )
10  DUANE WHITE, an individual;   )
    OFFICER J. MURPHY, an         )
11  individual; SERGEANT LANIGAN, )
    an individual; and DOES 1     )
12  through 10,                   )
             Defendants.          )
13  _____)

14

15

16

17

18           Deposition of Lou Reiter,

19  taken on behalf of Defendants, at Hampton Inn & Suites,

20  2100 Post Road, Warwick, Rhode Island, commencing at

21  9:02 a.m., Tuesday, May 14, 2002, before Heidi H. Jamiel,

22  CSR No. 10258.

23

24

25

2

**EXHIBIT B**

1                          A P P E A R A N C E S

2

3     FOR THE PLAINTIFFS:

4     LAW OFFICE OF CARL M. LEWIS
      BY:  CARL M. LEWIS, ESQUIRE
5     1551 Fourth Avenue
      Suite 303
6     San Diego, California   92101

7

      FOR THE DEFENDANTS:
8
      OFFICE OF THE CITY ATTORNEY
9     CITY OF ESCONDIDO
      BY:  MARK A. WAGGONER, ESQUIRE
10    201 North Broadway
      Escondido, California   92025

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                    3

*EXHIBIT B*

1                           I N D E X

2    WITNESS:  LOU REITER

3    EXAMINATION                                          PAGE

4         BY MR. WAGGONER                                 5

5

6

7    EXHIBITS:

8    NUMBER                DEFENDANTS'                     PAGE
                           DESCRIPTION

9                            (NONE)

10

11

12                          PLAINTIFF'S
                            DESCRIPTION                    PAGE
13   LETTER

                             (NONE)
14

15

16

17   QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:

18                            (NONE)

19

20

21
     INFORMATION TO BE SUPPLIED:
22                        PAGE     LINE
                            (NONE)
23

24

25

4

*EXHIBIT B*

```
 1                      LOU REITER,

 2            having first been duly sworn, was

 3            examined and testified as follows:

 4

 5                      EXAMINATION

 6   BY MR. WAGGONER:

 7            Q.   Good morning, Mr. Reiter.

 8            A.   Good morning.

 9            Q.   As I introduced myself earlier, my name is

10   Mark Waggoner.  I represent the City of Escondido and

11   various police officers in a lawsuit filed by the Perez

12   family against the City of Escondido and those officers.

13   We're here this morning to take your deposition in that

14   action, do you understand that?

15            A.   Yes.

16            Q.   And approximately how many times have you

17   had you deposition taken in the past?

18            A.   Between 100 and 200.

19            Q.   Could you just please state your full name

20   and spell your last name?

21            A.   Yes.  It's Lou Reiter, R-e-i-t-e-r.

22            Q.   And how are you employed, sir?

23            A.   Self-employed.

24            Q.   In what capacity?

25            A.   As a police consultant.
```

5

*EXHIBIT B*

1    Q.   And it's my understanding that you've been

2  retained by the Plaintiffs' attorneys in this case to

3  render expert opinion testimony; is that correct?

4    A.   Yes.

5    Q.   And what are the terms of your retention?

6    A.   It was a case development fee of $5,000

7  which covers any and all work that I do on the case here

8  in the Providence area; $2,000 a day for work outside of

9  Rhode Island; and a deposition fee in Rhode Island of

10  1800.

11   Q.   Okay.   The $5,000 case development fee, is

12  that non-refundable?

13   A.   Yes.

14   Q.   And that's a retainer fee that you had

15  paid upfront to begin work on this case?

16   A.   Yes.

17   Q.   And has that been paid?

18  ·A.   Yes.

19   Q.   Sir, could you briefly summarize your

20  academic and professional background that you believe

21  qualifies you to give the expert testimony that you've

22  been retained to give?

23   A.   I have a bachelor of science in public

24  management with a specialty of criminal justice from

25  Pepperdine University.   I had 20 years with the

6

EXHIBIT B

1    Los Angeles Police Department in a variety of different

2    positions, and retiring at the rank of Deputy Chief.

3    I've maintained activity and professional associations,

4    including the American Society of Law Enforcement

5    Trainers, the Commission on Accreditation for Law

6    Enforcement, I'm one of the assessors for that, and with

7    the National Internal Affairs Association.

8              I do and have done probably 100 to 150

9    agency audits where I specifically looked at patrol

10   operations, operations of specialized units.  I've

11   audited Internal Affairs' files, officer-involved

12   shooting files.  I conduct 15 to 20 training programs a

13   year throughout the country for police practitioners.

14   Those are on Internal Affairs, investigating critical

15   incidents which includes officer-involved shootings,

16   traffic accidents resulting in injuries or death, and in

17   custody deaths or serious injuries.

18             In addition, I've been involved in over

19   850 civil lawsuits, probably half of those involving

20   use-of-force situations on both sides of the table, both

21   defense and plaintiffs.

22        Q.   The half that don't involve use of force,

23   what do they involve?

24        A.   Some are pursuits, some personnel actions,

25   wrongful termination.  Some of them involve domestic

7

EXHIBIT B

1    violence, responses to domestic violence, theft, illegal

2    entries, a myriad of other things spattering here and

3    there.

4         Q.   On the times that you've been retained to

5    function as an expert in litigation, approximately how

6    many times have you been retained by the police

7    department or the police officers versus the plaintiffs,

8    can you give me percentage?

9         A.   About 40 percent of the time I'm working

10   for the defense.  In several cities I work both sides.

11        Q.   And when was the last time that you

12   actually testified in a case where you were retained by

13   the defense?

14        A.   They run together.  Now, you got me

15   thinking.  You know you have my testimony list, don't

16   you?  I could tell from that the best because I don't

17   have one with me.  December of both '01 down in Fort

18   Lauderdale, that was St. Lucy County; December of '01 for

19   the City of Nashua; in September '01 for Santa Fe;

20   September '01 for City of Las Cruces; May for the City of

21   Detroit.

22        Q.   Excuse me, that's May of '01?

23        A.   '01.

24        Q.   So you're going backwards in time?

25        A.   Yes.

8

*EXHIBIT B*

1    Q.   So the most recent would have been the two
2  in December of '01?
3    A.   Yes, I believe that's true.  I haven't
4  done -- I think I've only got one or two this year where
5  I've actually testified.
6    Q.   That's sufficient.  On the most recent
7  ones in December of '01 where you testified on behalf of
8  the defense, were those testimonies in deposition or did
9  you actually have to testify in court?
10   A.   Sorry, I have to go back here.
11   Q.   That's fine.
12   A.   Actually, that was a special master
13 hearing, so it was in person.  The Nashua was an
14 arbitration hearing.  The Santa Fe was deposition.  Las
15 Cruces was deposition.  Detroit was actual trial
16 testimony.
17   Q.   Okay.  What was the name of that case?
18   A.   Laroque, L-a-r-o-q-u-e, versus the City of
19 Detroit.
20   Q.   And who were you retained by in the
21 Laroque litigation?
22   A.   By the attorney representing both the city
23 and the officer.
24   Q.   Was that a city attorney or a private
25 counsel?

9

*EXHIBIT B*

1          A.    Private counsel.

2          Q.    By any chance, do you remember who that

3    was?

4          A.    Bill Liedl, L-i-e-d-l.

5          Q.    Liedl, L-i-e-d-l?

6          A.    Yeah.  Let me check.  L-i-e-d-e-l.  He's

7    in Detroit.

8          Q.    Okay.  Thank you.  Sir, in your time when

9    you were actively employed as a police officer at LAPD,

10   did you ever function as a hostage negotiator?

11         A.    No.

12         Q.    And did you ever take any training to be

13   certified or recognized as a hostage negotiator?

14         A.    No.

15         Q.    Have you ever functioned as a trainer of

16   hostage negotiators?

17         A.    No.

18         Q.    And have you ever published in the field

19   of hostage negotiation tactics or policies?

20         A.    No.

21         Q.    Since your active-duty time with LAPD,

22   have you ever taken any training courses on hostage

23   negotiation?

24         A.    No.

25         Q.    In your employment with LAPD, did you ever

10

*EXHIBIT B*

1   function as someone for the department who would be

2   tasked with the special responsibility in critical

3   incidents, perhaps not hostage incidents, but in critical

4   incidents for negotiating with someone who might be

5   barricaded in a room or a house or otherwise confronting

6   police in a static situation where there's time to

7   negotiate?

8          A.   I was not a negotiator in that capacity.

9   I've been the field commander and the supervisor in

10  charge on many cases, yes.

11         Q.   Okay.  The questions I just asked about

12  hostage negotiations, would they include incidents like

13  the one I just described, would that category hostage

14  negotiation include that type of incident?

15         A.   It could.

16         Q.   Typically in the field if someone is

17  barricaded in a house, for instance, confronting police

18  and there's a need to negotiate with that person, but

19  there's no hostage included, would a department typically

20  use its hostage negotiator to conduct those negotiations?

21         A.   Depending on the situation, yes.  I mean,

22  if you have the ability to do that.  If you have the

23  ability to make communication with the person, if you

24  have the time to do it, and if you have the availability

25  of a hostage negotiation team, yes, you would.

*EXHIBIT B*

1      Q.   And to your knowledge within the police

2   community, there's not some other type of negotiator that

3   gets brought in when it's not a hostage situation, but

4   it's simply a barricaded situation, is there?

5      A.   Well, an average officer can operate as a

6   negotiator too.  We negotiate all the time with persons,

7   that's part of communication.  And when we deal with

8   emotionally disturbed persons, we're acting in a

9   negotiation fashion, but we're not called "hostage

10  negotiator."

11          Hostage negotiator is really more of a

12  formalized process.  It normally would be under a

13  long-term, a long-time standoff.  There are tools that

14  hostage negotiators have that a field officer would not

15  have, and most of those would go through devices,

16  communicative devices, so we do use the same skills.

17     Q.   But in terms of specialized training for

18  conducting negotiations in those types of incidents, if

19  you were an officer looking to get that type of training,

20  you would go to hostage negotiator training courses; is

21  that correct?

22     A.   Sure, if you wanted that specialized

23  training.

24     Q.   And have you ever functioned as a dispatch

25  operator?

12

*EXHIBIT B*

1          A.   No, I haven't.

2          Q.   And have you ever trained dispatch

3     operators?

4          A.   I haven't.

5          Q.   Have you ever attended any schools or

6     training courses for dispatch operators?

7          A.   I have observed them.  I have not been a

8     participant in them.

9          Q.   What do you mean by, you observed them?

10         A.   Well, I was in charge of communication for

11    a little less than a year.  Also on a regular basis, when

12    we'd have to go in and monitor the activities of

13    communications, our communications division on LAPD, I

14    observed the schools that we had for new communications

15    persons when I was the Assistant Commander of a police

16    academy.  I've also observed a training program at

17    Georgia Public Safety Training Center for Dispatchers

18    because they have a much more formalized process for

19    them.

20         Q.   Sir, what have you reviewed to prepare

21    yourself to testify in this matter?

22         A.   I think I --

23         Q.   Actually, let me ask it this way:  You've

24    prepared a report?

25         A.   Yes, and that's what I have reviewed.  The

*EXHIBIT B*

1    only thing that I've been given since that date is

2    Mr. Lewis gave me just yesterday some corrections that

3    the Chief made to his deposition, and I understand

4    there's some additional materials Mr. Lewis said had just

5    been produced to him I believe last week.  And I told him

6    I didn't have time over the weekend to review those, so I

7    have not looked at those, nor have I even been provided

8    that new disclosure material.

9        Q.    Okay.  So your report is dated 28, March;

10   correct?

11       A.    Yes.

12       Q.    And so since 28 March, the only items

13   you've reviewed that are not listed in that report is the

14   correction sheets to Chief White's deposition testimony?

15       A.    Yes.

16       Q.    You have reviewed the deposition testimony

17   of Wilma Daubman?

18       A.    Yes.

19       Q.    That's D-a-u-b-m-a-n.

20            As far as the training of Ms. Daubman, in

21   your opinion did she receive the typical training that

22   911 dispatch operators receive in California law

23   enforcement?

24       A.    I haven't seen her training records.  I

25   don't know.

14

EXHIBIT B

1          Q.    Okay.  Did you review her testimony

2     regarding her training in her deposition?

3          A.    Yes.

4          Q.    And is that not adequate to answer that

5     question for summary of that training in that deposition?

6          A.    I believe she received training in the

7     operation, how to operate the communicative devices, and

8     how to handle the basic data that she would be having to

9     either enter on an MDT or enter into the computer or

10    enter on a hard copy, but she acknowledged she had no

11    training whatsoever in how to deal with this specific

12    situation, dealing with an emotionally disturbed person

13    who said he was armed, and she also had·no training even

14    in suicide prevention.

15              And from my understanding, there was no --

16    when I've done audits in a lot of the communication

17    centers I've looked at, they have like a small book which

18    has like a checklist for things that if you encounter

19    this type of a situation, these are some of the things

20    you would do or attempt to do; and I gather that didn't

21    exist in Escondido either.

22         Q.    But can you compare the training she

23    received to function in her capacity as a 911 dispatch

24    operator with that, that is typically given to 911

25    dispatch operators for law enforcement agencies in

*EXHIBIT B*

1   California, and say whether or not hers was typical or

2   atypical?

3          A.   No.

4          MR. LEWIS:   I'm going to object as vague and

5   ambiguous as to "typical."   I don't know how many

6   municipalities there are in the State of California, and

7   I don't know whether any witness would be qualified to

8   answer what's typical for the entire state, but you can

9   answer.

10         THE WITNESS:   I've seen no documentation of

11  what training she got.   I believe she said she went to 40

12  hours of training.   I have no idea what that training

13  was, so I can't answer the question.

14         Q.   BY MR. WAGGONER:   Sir, at Paragraph Number

15  17 in your March 28th report, you criticize Ms. Daubman

16  for electing to not tell Javier that the police were

17  outside; correct?

18         A.   Yes.

19         Q.   Can you point to any policy, any published

20  policy of any department that you know of, that would

21  describe in an incident like this the requirement or the

22  necessity of telling the suspect that the police are

23  outside?

24         A.   I think you would have to go to -- I'm not

25  going into individual departments, but you'd go to some

EXHIBIT B

1   nationally published documents like Handling the Mentally

2   Ill by Gerald Murphy.  The ones that I cited.  Also look

3   at the IACP, the Training Keys on Suicide Prevention, all

4   of those require that you try to defuse the situation.

5   You notify that the police are there.  This was the kind

6   of situation that you want the person to recognize that

7   the police are there and that the police are there to

8   help him.

9           And in this case, everything I looked at,

10  everything done by the dispatch as well as the officers,

11  they did everything they could to mask the identity that

12  the police were there and gave no forewarning, no

13  indication that the police were there to help him and · ·

14  that they would be outside.  So I think you'd look at

15  those documents, whether it's the Gerald Murphy studies,

16  whether it's even the old...

17          Many years ago when we were putting

18  together documents for LAPD training on handling suicidal

19  persons and emotionally disturbed, we looked at the data

20  from the '50s, the Rowland & Matthews, and then you look

21  at the IACP model policies, you look at the IACP model

22  policies on barricaded suspects; and I believe that dated

23  '95, '94, '95.  All of those are indicative that you want

24  to ensure the person knows the police are there, so at

25  least notification; and then what the person does

*EXHIBIT B*

1    following notification, you can use in making, in making

2    tactical decisions.

3            Q.   Are there some criteria for these types of

4    incidents that would distinguish between when you would

5    want to tell the person that the police are there and

6    when it might be a good idea to not tell the person that

7    the police are there or is it you're opinion that you

8    should always in any situation like this tell the person

9    the police are there?

10           A.   No, there are situations when you would

11   not want them to know you're there.  In the first place,

12   you may want to get in a position where you set your

13   persons up.  So you don't want to alert the person that

14   you're in the area setting up, whether it's your

15   observation post or your sniper post, so that they can

16   safely get into those positions of advantage.

17               I'm sure there are some other cases where

18   you might want to use a surprise tactic.  If you're

19   dealing with a heavily barricaded situation and you have

20   knowledge of that, an example might be a fortified

21   narcotic operation or a fortified terrorist location,

22   sure, those you wouldn't want to give.  You want to keep

23   the element of surprise.  We're not dealing with that

24   here.

25               Here we're dealing with a person who's

18

EXHIBIT B

1    high on meth, emotionally disturbed, not fully in control

2    of his own capabilities, and that you can hear on the

3    tape.

4         Q.   So can you tell me where in any of the

5    published literature there is a list of criteria that one

6    should consider when deciding whether to tell the suspect

7    that the police are there or to not tell them?

8         A.   There you'd really have to go to some of

9    the texts and some of the training modules, that's not

10   going to be in a -- I don't think that's going to be

11   directly involved in the policy procedure.  There you

12   would go into a text dealing with SWAT operations,

13   high-risk entry operations, whether you're looking at

14   texts or whether you're looking at some of the videos

15   that are available.  You'd go into some of the schools,

16   the tactical schools, but I don't think you'd find that

17   in a policy.

18             That's a decision that has to be made by

19   the field commander after an analysis of what's

20   occurring, an evaluation of the options available to

21   them and specific knowledge of what's occurring.

22        Q.   And can you point to any specific training

23   manual or video or particular course where that criteria

24   would be discussed?

25        A.   Not as I sit here right now.  I review

*EXHIBIT B*

1   many, many texts, videos, and training programs.  I just

2   can't as I sit here now, no.

3           Q.   And can you just from your memory tell me

4   what the criteria would be for the field commander to

5   consider when he's deciding whether or not to notify the

6   person, the suspect, that there are police in the

7   vicinity?

8           A.   I think I've already covered that several

9   times.

10          Q.   What would those be?

11          A.   Well, the idea if surprise is going to be

12  a factor, if you're dealing with a heavily fortified area

13  where there's that danger that you don't want to alert

14  the person that you're going to be entering, if you're

15  making a high-risk entry.  If you get a nighttime search

16  warrant where no knock, that's when you got specific

17  information and you want to catch them with their guard

18  down.  If you had a large terrorist organization that you

19  were trying to invade a compound, but I don't think

20  you're going to find that when you're dealing with an

21  emotionally disturbed, intoxicated, suicidal person.

22               I think any texts you can come up with

23  you're going to identify that you want to develop

24  communications.  You want them to know that you're

25  present.  You want them to be able to know that they're

*EXHIBIT B*

1   dealing with the police.  Particularly in this case where

2   he acknowledges in his communication with the dispatcher

3   that he thinks there may be gangbangers out there or

4   maybe he had some sort of a problem with undocumented --

5   I mean, everything he's talking about is there were

6   boogeymen out there.  Well, he also said about the

7   police, that if the police were there, he was going to

8   react violently.

9           So at that point, you want to ensure that

10  I think any texts you bring up, whether it deals with

11  emotionally disturbed, suicidal persons is going to say

12  that you need to alert the person that you're there to

13  help them, try to defuse the situation.  Make sure that

14  they know you're the police.  Try to do everything

15  possible to alert them to the fact that you are the

16  police.  They have a duty and responsibility to cooperate

17  with you.

18          Everything done here was done contrary to

19  that, to mask that.  Like I mentioned, everything they

20  did almost set up, the term I used was an "ambush" in

21  this situation.

22      Q.   Is there any consideration in the

23  literature that you're talking about that encourages,

24  according to you, that encourages the police to let the

25  suspect know they're there?  Is there any consideration

21

EXHIBIT B

1    in that literature to -- whether you convey that

2    information to a suspect dependent upon whether or not he

3    has made any threats against the police?

4            A.   I don't understand your question.

5            Q.   Is one of the factors you would consider

6    in whether or not you let the suspect know that there are

7    police present, the fact that the suspect has made

8    threats against the police?

9            A.   I don't --

10           MR. LEWIS:   Asked and answered.

11           THE WITNESS:   Yeah, I don't believe so.   I

12   think what that does is it makes it, it would make it

13   very certain on your part that you maintain positions of

14   cover and you ensure your own safety.

15           Q.   BY MR. WAGGONER:   But in deciding whether

16   or not to tell the suspect that there are police present,

17   you wouldn't consider as one of the factors in making

18   that decision the fact that the suspect has made threats

19   against the police?

20           MR. LEWIS:   Asked and answered.

21           THE WITNESS:   No.

22           Q.   BY MR. WAGGONER:   And in terms of

23   training, would you expect that a training course for

24   hostage negotiators would cover the topic of

25   communications with the suspect and what sort of things

22

*EXHIBIT B*

1    the police ought to be telling the suspect in those

2    communications?.

3         A.   Typically they do.

4         Q.   And to your knowledge, is there any

5    emperical data that documents whether situations of this

6    nature resolve themselves without violence, or better,

7    dependent upon which tactics the officers involved

8    employed?

9         MR. LEWIS:  Vague and ambiguous.

10        THE WITNESS:  I know there have been studies

11   on that.  There have been studies on suicide by cops; a

12   lot of those have been done in Southern California,

13   primarily by the LA County Sheriff.  I don't know if

14   there are enough studies to show specific tactics.

15        You know, even the policy of Escondido on

16   barricaded suspects talked about the longer you elongate

17   the time and the contact and communication with the

18   subject, the more likely to resolve itself safely for

19   everyone; and that's been the typical, generally accepted

20   practice in law enforcement.  When you say "emperical

21   studies," I've read studies, but really they're more

22   anecdotal than emperical.

23        Q.   BY MR. WAGGONER:  See, that's what I'm

24   getting at.  If, for instance, that very assumption that

25   the law enforcement has in their policies, if you

23

*EXHIBIT B*

1    elongate the situation that that's a goal you're to

2    strive for to make it better; where is there any data in

3    terms of emperical data of the number of incidents

4    studied where in some cases they didn't follow that

5    policy and in some cases they did, and then a comparison

6    of the results of the ends of those incidents that would

7    back up that assumption as being true, do you know of

8    anything like that?

9           MR. LEWIS:  I think the question is vague and

10   ambiguous, and I think he's answered the question

11   already.

12          THE WITNESS:  I don't believe there is that

13   kind of study.  But as long as I've been in law

14   enforcement, that's been the generally accepted standard

15   of care in law enforcement; and it's still the generally

16   accepted standard of care by those persons who, in fact,

17   do train in hostage negotiation practices, whether you go

18   way back to one of the fathers of hostage negotiation,

19   Frank Boles, B-o-l-e-s, out of New York.  And now his

20   counterpart, a fellow that I've trained next to, not

21   with, but I forgot that fellow's name, but he's also out

22   of NYPD.  And Frank Boles was probably one of the

23   original hostage negotiators, and that's been a generally

24   accepted practice taught by both those persons.

25              There are a few mavericks out there that

*EXHIBIT B*

1    say, well, the law doesn't require us to wait.  Well, the

2    law may not require us, but we know by practice and by

3    historical, this body of unwritten knowledge, that the

4    longer you wait, the more likely it is to resolve itself

5    safely for everyone.  Now, there is no emperical study

6    that I'm aware of.  Maybe there is one, I'm not aware of

7    it.

8         Q.   BY MR. WAGGONER:  Okay.  That's my

9    question, you say the longer you wait, the more likely it

10   is that the situation resolves itself better.  I'm just

11   curious, you said there's -- now, I think we've cleared

12   up that there's no emperical data of a study that's

13   generated that data.

14        A.   I don't know that there isn't.  I'm saying

15   I'm unaware of one.

16        Q.   My question is then, how do you know that

17   that assumption is true as you sit here today?

18        A.   I know from personal experience, being the

19   field commander on many of them, and I don't even

20   remember what number.  I know from involvement in

21   training, involvement in audits where I've talked to the

22   SWAT and hostage negotiations persons.  I know from my

23   regular interaction with police practitioners in the

24   training I do; all of those acknowledge, yes, that in

25   their experience, it's equal to mine, that the longer you

*EXHIBIT B*

1    wait, the more likely it is that it resolves itself

2    safely.  So those are all personal experiences by persons

3    throughout the United States who have been involved in

4    barricaded suspect kind of situations.

5              Q.   Okay.  In those discussions, have you

6    asked those people that you've discussed, approximately

7    how many times they've been in a situation where they saw

8    a barricaded suspect situation resolved, whether it was

9    done quickly or long and kept any data or anything more

10   hard and fast other than just their general sense

11   throughout their career?

12             MR. LEWIS:  The question is compound.  It's

13   .vague and ambiguous.

14             THE WITNESS:  No.

15             Q.  BY MR. WAGGONER:  And can you give me an

16   estimate of the number of incidents that you were

17   personally involved in, as a law enforcement officer for

18   the LAPD, where there was a barricaded suspect or a

19   hostage negotiation situation?

20             A.   Like I said, I really can't recall the

21   specific number.  I know there were many.  More than 20,

22   probably less than 50, somewhere in that range.

23             Q.   And of that general estimate between 20

24   and 50, are those incidents where you were actually in

25   the field during the incident or are you including in

*EXHIBIT B*

1   there incidents that you simply reviewed as a supervisor

2   afterward?

3         A.   No, those were when I was in the field

4   either as a supervisor or as the field commander.

5         Q.   And can you give me an estimate of the

6   percentage of those incidents that resolved without

7   having to use force against the suspect?

8         A.   Well, when we say "force," I mean, we all

9   end up using force because we handcuff them.  We take

10  them down to the ground.  In none of those situations did

11  we have to use deadly force.

12        Q.   And approximately how many incidents can

13  you recall being involved in, as a law enforcement

14  officer in the field, where you had a teenager as the

15  suspect who reportedly was armed with a loaded handgun

16  and was intoxicated and on the phone with a law

17  enforcement officer or dispatch operator and would not

18  give the phone to other people in the residence, but had

19  acknowledged there were people in the residence?

20        A.   I don't know if I have encountered one

21  specifically like that.

22        Q.   Do you recall one even close to that?

23        A.   I'm sure I've encountered, I know I've

24  encountered intoxicated persons, whether they were a

25  teenager or not, I don't recall, who have been armed, who

*EXHIBIT B*

1   would not communicate or who would communicate.  I really

2   can't give you a number.

3        Q.   On the issue of cover, generally the word

4   "cover," is it your understanding that that refers to the

5   concept that a police officer in a situation might want

6   to stand behind something that would protect him if

7   someone shot at him; is that what "cover" is?

8        A.   Yes.

9        Q.   And from a police officer's perspective in

10  the field, if a suspect points what he believes to be a

11  lethal weapon, a gun, at the officer, does it make any

12  difference in the officer's reaction at that moment to

13  that loaded gun being pointed at him by the suspect,

14  whether or not the officer is behind cover?

15       MR. LEWIS:  I'm going to object as an improper

16  hypothetical.  It misstates facts.  It assumes facts not

17  in evidence.

18       THE WITNESS:  It depends on the officer.  It

19  depends what kind of cover.  I think it's too general

20  what you're saying.  It depends on how far away he is.

21  He knows the specifics of what's occurring.  There are a

22  lot of factors that are involved, so I really can't

23  answer that question.

24       Q.   BY MR. WAGGONER:  For an officer in the

25  field confronting an intoxicated suspect who has made

*EXHIBIT B*

1  threats against the police and said he possesses a loaded

2  handgun, would it make any difference to that officer

3  when he confronts that suspect within a range of 50 feet

4  and that suspect points that weapon at the officer, would

5  it make any difference whether that officer was standing

6  behind his squad car looking over the car or was standing

7  completely exposed in the street?

8       MR. LEWIS:  I'm going to object to that

9  question.  It assumes facts not in evidence.  It

10  misstates facts in the case.  It's an improper

11  hypothetical.

12       THE WITNESS:  I think it makes a difference if

13  he's out in the wide open with no cover.  It would be

14  foolish for him to either not seek cover or engage the

15  suspect if he's behind cover, then it depends on that

16  particular officer.  I think most officers would not

17  shoot, unless they felt their life was imminently in

18  jeopardy.  But cover provides you that opportunity for

19  more time to ensure that the actions of the subject

20  you're confronting are truly offensive on their part or

21  not just some misunderstanding of what your command might

22  be or their slowness to acknowledge what you're saying or

23  their slowness to acknowledge what they should do.

24       You have to deal -- when you're dealing

25  with an intoxicated person, their perceptions and their

EXHIBIT B

1    reactions are slower, and more importantly they're more

2    erratic, that's what happens with intoxicated persons.

3    To say one officer might shoot, one officer might not;

4    but what it does is give you that different margin of

5    time.  But if you constantly put yourself in a position

6    where you're totally exposed, then what you're doing is

7    creating a situation having to shoot your way to get out

8    of.

9         Q.   BY MR. WAGGONER:  But the difference

10   between whether or not the officer shoots in that

11   situation would be dependent -- you said some would

12   shoot, some wouldn't, would you suspect that which one

13   would and which one wouldn't would be dependent upon the

14   threat that they're receiving when the person points the

15   weapon; is that correct?

16        A.   Sure, and then you have to analyze.  It

17   was their perception, that's what a reasonable officer

18   would have perceived at that moment under those same

19   circumstances, correct.

20        Q.   And even an officer behind a vehicle

21   confronting that suspect in that situation could

22   legitimately perceive that despite the cover, his life is

23   still being threatened by the weapon being pointed at him

24   and...

25        MR. LEWIS:  I'm going to object.  It misstates

30

*EXHIBIT B*

1    facts.  It's vague and ambiguous.

2                THE WITNESS:  He might.

3                Q.    BY MR. WAGGONER:  And that could be a

4    reasonable conclusion based upon the situation that that

5    officer is in, depending upon those circumstances?

6                MR. LEWIS:  Same objection.

7                THE WITNESS:  Might.

8                Q.    BY MR. WAGGONER:  Have you been to the

9    scene of this incident?

10               A.    No.

11               Q.    And to your knowledge, as best you can

12   glean from the materials you have reviewed, what cover

13   was available in front of the Perez home that night?

14               A.    Well, there was a trailer.  There was a

15   truck.  There was a truck across the way that would have

16   been the cover, true cover.  There was also availability

17   of all the police cars that they had at their disposal

18   and elected not to use.

19               Q.    Now, by "trailer" do you mean the trailer

20   that was on the street right in front of the Perez home?

21               A.    Yes.

22               Q.    At Paragraph 30 of your report, you

23   discuss a safety sweep made of the house to make sure

24   there were no more suspects.

25               A.    Yes.

31

*EXHIBIT B*

1          Q.   You just state that it happened.  I can't

2     glean from this whether you're critical of that

3     happening.

4          A.   No, I'm not.

5          Q.   Okay.  And so you don't have any problems

6     after an event like this, the officers for their safety

7     should do a safety sweep of the house just to make sure

8     there are no threats; is that correct?

9          A.   Correct.

10         Q.   You've made some criticisms of the

11    use-of-force policy for the police department.  In

12    particular you state that there is no document that any

13    form of warning should be given prior to the use of

14    deadly force upon a suspect.  That was written obviously

15    before you had the materials from Chief White's

16    deposition.  Is your opinion now different from the

17    review of Chief White's deposition?

18         A.   No.  The policy of use of firearms didn't

19    have that.  There's a memo as indicated in 2001 where

20    they then adopted the language of the -- I believe it's

21    Doerle, D-o-e-r-l-e, versus Rutherford case, but they

22    still in their policy, I mean, they didn't even meet that

23    element of Garner versus Tennessee which was in '85,

24    which surprised me.

25         Q.   Can you point to a written policy of a

32

EXHIBIT B

1    particular department that does contain the language that

2    you criticize Escondido policy for omitting?

3           MR. LEWIS:  Objection.  I think the question is

4    overbroad.  I think it's not calculated to lead to

5    discoverable evidence.  The document of any department

6    has no bearing on the issues of this case.  You can

7    answer.

8           THE WITNESS:  The model policy of the

9    International Association of Chiefs of Police on the use

10   of force and deadly force, I think the last edition was

11   1994, has that language.  The last time I observed the

12   FBI policy on use of deadly force, it had that language.

13   The policy of -- now it's called Miami Dade Police

14   Department, has that language.  Tallahassee Police

15   Department, where I used to live, has that language.

16   There's just a few examples and, of course, Memphis has

17   adopted that language too.

18          Q.   BY MR. WAGGONER:  At Paragraph 39 of your

19   report, you said that scenario training for dispatchers

20   is common.

21          A.   Yes.

22          Q.   What's your basis for that opinion?

23          A.   I think that's why I footnoted it.  That's

24   from 1990 Field Operations Textbook, that's an example of

25   it.  I know though when I reviewed the dispatch training

33

*EXHIBIT B*

1   at the Georgia Public Safety Training Center, they in

2   fact used actors on the other side of lines to actually

3   simulate calls to the person.

4          Q.   Okay.  So you've seen training like this,

5   what you would call "scenario training" in this Georgia

6   facility?

7          A.   I have.

8          Q.   And you've read a textbook which says

9   apparently, that's at least your interpretation of this

10  portion of the textbook, is that that training should

11  occur?

12         A.   Yes.

13         Q.   Where else have you seen that training

14  actually occurring such that you can say that such

15  training for dispatchers is common?

16         A.   Other than that and my knowledge of what

17  training -- what occurs with other agencies, larger

18  agencies like NYPD and Chicago, that's the basis of my

19  knowledge.

20         Q.   And how do you know what occurs even with

21  these larger agencies such as NYPD and Chicago?

22         A.   Because I visited both those departments.

23  I'm aware of what they've done.  I haven't actually seen

24  the training though.  I know that it was -- so that's the

25  basis of my knowledge.

34

1    Q.   Okay.  How are you aware of what training

2    the dispatchers at Chicago or NYPD have undergone just by

3    visiting the department?

4    A.   Because I've gone through, into the 911,

5    their centers, specifically looking at the operations of

6    those centers, and those persons there have told me

7    that's the kind of training they provide their 911

8    operators.

9    Q.   At Paragraph 27 you indicate that there

10   was no rush and that there was no reason to or there was

11   no reason not to use time to their advantage; in arriving

12   at that conclusion, did you consider or what weight did

13   you give to any consideration of the police personnel's

14   concern for the fact that the suspect had said he had a

15   loaded handgun and that there were other people in the

16   house, but he wouldn't allow the dispatcher to speak to

17   anyone else in the house, he would not take the phone to

18   anyone else in the house?

19   MR. LEWIS:  The question is compound.  It's

20   vague and ambiguous.  It's an improper hypothetical.

21   THE WITNESS:  Yeah.  I'm not sure I understand

22   your question.

23   Q.   BY MR. WAGGONER:  Okay.  What I'm getting

24   at is, wouldn't it be a reasonable conclusion to draw

25   from the communication from the suspect that he's

*EXHIBIT B*

1    intoxicated, he's got a loaded handgun, there are other

2    people in the house, but he won't let the dispatcher

3    speak to those other people in the house, wouldn't take

4    the phone to them; couldn't you draw from that a

5    reasonable concern for the safety of those individuals in

6    the house that the suspect might already have been

7    violent against them, might have already done something

8    to them or they might be in danger such that you would

9    want to at least consider the fact that you might need to

10   resolve this fairly quickly in order to see what's

11   happened with those people?

12        MR. LEWIS:  The question is compound.  It's

13   vague and ambiguous.  It assumes facts not in evidence,

14   and improper hypothetical.

15        THE WITNESS:  Yeah, you've thrown so much in

16   there.  I mean, it's a factor that you use, the fact

17   there are other persons, but you put too many things in

18   there.  I mean, the whole issue is that when you listen

19   to the tape and you read the transcript even, there was

20   no attempt.  This person, Javier, thought he was dealing

21   with first his girlfriend, then he thought he was dealing

22   with a neighbor, then he thought he was dealing with his

23   drug dealer; there was no indication that he ever

24   recognized the fact he was even dealing with a

25   dispatcher, police dispatcher; so it's a concern that the

*EXHIBIT B*

1    field commander has, and it's a certain that rushing it

2    or getting involved in a shooting could also jeopardize

3    them as well.

4                    So there's just so much that you've thrown

5    in there.  It's a concern that any field commander would

6    have; but it's the kind of concern that you would then

7    methodically direct the dispatcher to attempt and have a

8    different kind of communication.  If that's not working,

9    direct someone to assume that role who has a more

10   extensive police background, take it over from the

11   dispatcher.  To my knowledge, nobody ever went in there

12   who had police training other than Daubman, who had

13   dispatcher training, no one went in there and took it

14   over to try to offer or even gave her or stood next to

15   her or even gave her some pointers.

16                   Pointers like where are there -- you know,

17   to ask questions, specific questions that then could

18   broach that subject with Javier.  Nobody asked, was in a

19   position to tell her, find out what kind of gun he's got.

20   Find out, you know, have her divert his attention.

21   What's the name of the gun?  What kind of bullets did you

22   load it with?  No one did any of that.

23                   So what you asked me was a very segmented

24   question.  Yes, should it have been a concern?  Yes.

25   Would rushing it safeguard those people?  No.

37

1          Q.   BY MR. WAGGONER:   Okay.  Now in the answer

2     to that question and in your report, you suggest

3     alternative tactics, things that are alternative measures

4     that you think could have helped the situation; for

5     instance, having someone stand next to the dispatcher.

6               My question is, without any emperical data

7     to assess the actual results of engaging in one set of

8     tactics versus another, from where can you gain assurance

9     that your conclusions are valid, that there's any support

10    that anything would have been better had they used one

11    set of tactics versus the other?

12              MR. LEWIS:   The question is compound, vague,

13    and ambiguous.

14              THE WITNESS:   I can't answer it any more than

15    I've already answered it.  I know generally accepted

16    practice is, my own personal experiences, my interaction

17    with other officers, we know that those tactics more

18    often than not result in safe resolution of the matter

19    with safety to both the subject that we're dealing with,

20    other persons in the area, as well as the officers.

21    Emperical data, we've already talked about that.

22              Q.   BY MR. WAGGONER:   You say we know that it

23    more often than not results in a better outcome, my

24    question to you is, what's the basis of that knowledge?

25              MR. LEWIS:   Asked and answered.

*EXHIBIT B*

1            THE WITNESS:  I've already answered that at

2    least two times, if not three times.

3            Q.    BY MR. WAGGONER:  Can you answer it again?

4            A.    It's in the record.  I was very specific

5    the first time and enumerated all those reasons.  It's in

6    the record already.

7            Q.    So you don't have anything other than what

8    you've already testified to or what's in your report?

9            A.    Correct.

10           MR. WAGGONER:  I want to take a break for five

11   minutes.

12           MR. LEWIS:  Sure.

13           (Break taken.)

14           MR. WAGGONER:  Back on the record.  Actually,

15   I'm done with questions.  I assume you don't have any.

16           MR. LEWIS:  I have none.

17           MR. WAGGONER:  Okay.  Why don't we stipulate

18   that the original of the deposition transcript will be

19   forwarded to Mr. Lewis's office.  Mr. Lewis will forward

20   it to the witness for his review and signature.

21   Actually, while I think about it, would it be quicker to

22   just send it to Mr. Reiter?  Off the record.

23           (Discussion held off the record.)

24           MR. WAGGONER:  Go back on the record.  Why

25   don't we stipulate that the original transcript will be

*EXHIBIT B*

1   sent to Mr. Lewis's office.  Mr. Lewis will provide it to

2   Mr. Reiter.  Mr. Reiter, will 30 days be sufficient time

3   for you to review it and make any changes to it that you

4   need to?

5           THE WITNESS:  Yes.

6           MR. WAGGONER:  Mr. Reiter will then have 30

7   days to make any changes to the deposition transcript and

8   return it to Mr. Lewis.  Mr. Lewis, within two weeks of

9   his receipt of the changes and the signed copy of the

10  deposition transcript, will notify all counsel that it

11  has been signed and of any changes thereto.  Mr. Lewis

12  can retain the original and will make it available upon

13  any reasonable request.  And if the original's ever

14  unavailable or unsigned, a certified copy can be used as

15  the original.

16          MR. LEWIS:  So stipulated.

17          (Ending time:  10:10 a.m.)

18

19

20

21

22

23

24

25

40

*EXHIBIT B*

```
 1    STATE OF RHODE ISLAND        )
                                   ) SS.
 2    COUNTY OF PROVIDENCE         )

 3

 4

 5            I, the undersigned, declare under penalty of

 6    perjury that I have read the foregoing transcript, and

 7    I have made any corrections, additions or deletions

 8    that I was desirous of making; that the foregoing is a

 9    true and correct transcript of my testimony contained

10    therein.

11            EXECUTED this _____ day of _____,

12    20____, at _____, _____.

13                    (City)                (State)

14

15

16

17

18

19

20

21          _____

22                  LOU REITER

23

24

25
```

41

*EXHIBIT B*

1                    C E R T I F I C A T E

2

3        I, Heidi H. Jamiel, hereby certify that I am expressly
     approved as a person qualified and authorized to take
     depositions pursuant to Rules of Civil Procedure of the
4    Superior Court, especially but without restriction thereto,
     under Rule 30(e) of said Rules; that the witness was first
5    sworn by me; that this deposition was stenographically
     reported by me and later reduced to print through
6    Computer-Aided Transcription, and the foregoing is a full and
     true record of the proceedings.

7

8        Pursuant to Rule 30(f) of the Rules of Civil Procedure,
     original transcript shall not be filed in court; therefore,
     the original is delivered and retained by the attorney for the
9    Plaintiff.

10       IN WITNESS WHEREOF, I have hereunto set my hand this
     ___24th___ day of _____May_____, 2002.

11

12

13

14

15

16
                      HEIDI H. JAMIEL
17                    CERTIFIED COURT REPORTER/NOTARY PUBLIC

18
     MY COMMISSION EXPIRES:  June 6, 2005
19

20

21

22

23

24

25

42

*EXHIBIT B*

1          REPORTER'S CERTIFICATION OF CERTIFIED COPY

2

3

4          I, HEIDI H. JAMIEL, CSR No. 10258, a Certified
   Shorthand Reporter in the State of Rhode Island, certify
5  that the foregoing pages 1 through 42, constitue a true
   and correct copy of the original deposition of
6  LOU REITER, taken on May 14, 2002.
          I declare under penalty of perjury under the
7  laws of the State of Rhode Island that the foregoing is
   true and correct.

8
          Dated this 24th day of May, 2002.
9

10

11         HEIDI H. JAMIEL, CSR NO. 10258

12

13

14

15

16

17

18

19

20

21

22

23

24

25

43

*EXHIBIT B*